**NO. 12-5363**

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals

### For The District of Columbia Circuit

# ELECTRONIC FRONTIER FOUNDATION,

*Plaintiff – Appellant*,

# v.

# UNITED STATES DEPARTMENT OF JUSTICE,

*Defendant – Appellee*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

_____

## PAGE PROOF BRIEF OF APPELLANT

_____

David L. Sobel
ELECTRONIC FRONTIER FOUNDATION
1818 N Street, N.W., Suite 410
Washington, DC  20036
(202) 797-9009

*Counsel for Appellant*

Mark Rumold
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, California  94110
(415) 436-9333

*Counsel for Appellant*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Appellant Electronic Frontier Foundation hereby certifies as follows:

**A.      Parties and Amici**.  Electronic Frontier Foundation was Plaintiff in the district court and is Appellant in this Court.

Department of Justice was Defendant in the district court and is Appellee in this Court.

There were no amici in the district court.  Citizens for Responsibility and Ethics in Washington ("CREW") is an amicus in this Court.

**B.      Ruling Under Review**.  The ruling under review is the district court's September 21, 2012 order, ECF Dkt. No. 23 (and incorporated memorandum opinion, ECF Dkt. No. 22), in *Electronic Frontier Foundation v. Department of Justice*, No. 1:11-cv-00939-RJL (Hon. Richard J. Leon).  The district court's order and opinion are reprinted at Joint Appendix ("J.A.") ___.

**C.      Related Cases**.  This matter has not previously been before this Court.  Counsel are aware of no related cases currently pending in this Court or in any other court within the meaning of D.C. Circuit Rule 28(a)(1)(C).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to D.C. Circuit Rule 26.1 and Federal Rule of Appellate Procedure 26.1, Appellant Electronic Frontier Foundation submits the following corporate disclosure statement:

Appellant Electronic Frontier Foundation is a donor-funded, non-profit civil liberties organization.  The Electronic Frontier Foundation has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page(s)**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ....................................... ii

TABLE OF AUTHORITIES .................................................................vi

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES .................................................................2

STATUTES AND REGULATIONS .......................................................3

STATEMENT OF FACTS ...................................................................4

    The Office of Legal Counsel and the OLC Opinion At Issue in This Case....................................................................................................4

    The Investigation of the FBI's Surveillance Practices ...................................6

    EFF's FOIA Request and the District Court Proceedings............................10

SUMMARY OF THE ARGUMENT ....................................................13

STANDARD OF REVIEW ................................................................15

ARGUMENT ..................................................................................16

    I.    THE OLC OPINION IS IMPROPERLY WITHHELD UNDER EXEMPTION 5 OF THE FOIA.......................................................17

        A.    The OLC Opinion Constitutes the Executive Branch's "Working Law" and, Therefore, Is Improperly Withheld Under the Deliberative Process Privilege .................................19

1.    The OLC Opinion is the Agency's Working Law
Because It Constitutes the Final, Controlling
Interpretation of the Executive's Authority Under
Federal Law ...................................................................20

2.    The OLC Opinion's Status as "Working Law" is
Supported by Forty Years of This Circuit's
Precedent.........................................................................24

3.    The OLC Opinion's Status as "Working Law" is
Supported by the Fact That the Opinion Is Neither
"Predecisional" Nor "Deliberative" ...............................29

B.    Even if the Opinion Does Not Constitute the Agency's
"Working Law," It Has Lost its Protection Because the
Agency Adopted and Relied Upon It........................................34

C.    The OLC Opinion May Not Be Withheld Because the
Attorney-Client Privilege Does Not Apply to an
Agency's Working Law and, Under Any Circumstances,
the Privilege Here Has Been Waived .......................................37

1.    Because the OLC Opinion Constitutes the
Agency's Working Law, the Attorney-Client
Privilege Does Not Shield It from Disclosure...............38

2.    The Attorney-Client Privilege Has Been Waived
Through the OLC Opinion's Disclosure and
Distribution to Non-Client Third Parties ......................40

II.    THE DISTRICT COURT'S EXEMPTION 1 RULING WAS
CONTRARY TO THIS CIRCUIT'S LONGSTANDING
PRECEDENT ON THE SPECIFICITY AN AGENCY MUST
PROVIDE TO WARRANT SUMMARY JUDGMENT...................44

III.    THE DISTRICT COURT ERRED BY FAILING TO
ADDRESS THE SECREGABILITY OF UNCLASSIFIED
FACTUAL INFORMATION WITHIN THE OLC OPINION
AND BY IMPERMISSIBLY SHIFTING THE BURDEN TO
EFF ..................................................................................49

iv

CONCLUSION ..........................................................................................................52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Access Reports v. Dep't. of Justice,*
    926 F.2d 1192 (D.C. Cir. 1991)....................................................30

*Afshar v. Dep't of State,*
    702 F.2d 1125 (D.C. Cir. 1983)...............................................20, 21

*Allen v CIA,*
    636 F.2d 1287 (D.C. Cir. 1980).....................................................47

*Army Times Publ'g Co. v. Dep't of Air Force,*
    998 F.2d 1067 (D.C. Cir. 1993)..........................................49, 50, 52

*Arthur Andersen & Co. v. IRS,*
    679 F.2d 254 (D.C. Cir. 1982).............................................30, 34

*Billington v. U.S. Dep't of Justice,*
    233 F.3d 581 (D.C. Cir. 2000)......................................................50

*Brennan Ctr. for Justice v. Dep't of Justice,*
    697 F.3d 184 (2d Cir. 2012) ............................................34, 36, 39

*Brinton v. Dep't of State,*
    636 F.2d 600 (D.C. Cir. 1980)....................................................24

*Campbell v. Dep't of Justice,*
    164 F.3d 20 (D.C. Cir. 1998)......................................................45

*\*Coastal States Gas Corp. v. Dep't of Energy,*
    617 F.2d 854 (D.C. Cir. 1980).................... 18, 19, 20, 23, 24, 27, 28, 29, 31, 32, 33, 34, 36, 40, 43

*\*Chief Authorities are Designated with an Asterisk*

vi

*Cuneo v. Schlesinger*,
    484 F.2d 1086 (D.C. Cir. 1973)............................................................. 39-40

*Dep't of Air Force v. Rose*,
    425 U.S. 352 (1976)...................................................................................16

*Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
    489 U.S. 749 (1989)...............................................................................16, 52

*Dep't of Justice v. Tax Analysts*,
    492 U.S. 136 (1989)...................................................................................16

*Dep't of the Interior v. Klamath Water Users Protective Ass'n*,
    532 U.S. 1 (2001)......................................................................................17

*Edwards v. Carter*,
    580 F.2d 1055 (D.C. Cir. 1978).................................................................5, 30

*Elec. Privacy Info. Ctr. v. Dep't of Justice*,
    584 F. Supp. 2d 65 (D.D.C. 2008).................................................................42

*EPA v. Mink*,
    410 U.S. 73 (1973).....................................................................................50

*In re Sealed Case*,
    676 F.2d 793 (D.C. Cir. 1982).......................................................... 37-38, 40

*In re Sealed Case*,
    877 F.2d 976 (D.C. Cir. 1989)............................................. 40, 41, 42, 43-44

*John Doe, Inc. v. Mukasey*,
    549 F.3d 861 (2nd Cir. 2008) .......................................................................7

*Jones v. FBI*,
    41 F.3d 238 (6th Cir. 1994) ....................................................................48, 49

*Jordan v. Dep't of Justice*,
    591 F.2d 753 (D.C. Cir. 1978)......................................................................29

*Judicial Watch, Inc. v. FDA*,
  449 F.3d 141 (D.C. Cir. 2006)......................................................................29

*Kimberlin v. Dep't of Justice*,
  139 F.3d 944 (D.C. Cir. 1998)......................................................................46

*King v. Dep't of Justice*,
  830 F.2d 210 (D.C. Cir. 1987)..................................................................45, 46

*Loving v. Dep't of Defense*,
  550 F.3d 32 (D.C. Cir. 2008)..................................................................15, 50

*\*Mead Data Cent., Inc. v. Dep't of the Air Force*,
  566 F.2d 242 (D.C. Cir. 1977)........................................ 19, 41, 44, 45, 46, 47

*Morley v. CIA*,
  508 F.3d 1108 (D.C. Cir. 2007)..............................................................32, 50

*Nat'l Council of La Raza v. Dep't of Justice*,
  411 F.3d 350 (2d Cir. 2005) ..................................................25, 36, 37, 38, 39

*Nat'l Day Laborer Organizing Net. v. ICE*,
  827 F. Supp. 2d 242 (S.D.N.Y. 2011) ..........................................................42

*NLRB v. Robbins Tire & Rubber Co.*,
  437 U.S. 214 (1978)....................................................................................16

*\*NLRB v. Sears, Roebuck & Co.*,
  421 U.S. 132 (1975)...................................... 17, 18, 19, 20, 21, 34, 37, 38, 39

*Oglesby v. Dep't of the Army*,
  79 F.3d 1172 (D.C. Cir. 1996)......................................................................45

*Petroleum Info. Corp. v. Dep't of Interior*,
  976 F.2d 1429 (D.C. Cir. 1992)............................................................... 29-30

*Public Citizen v. Burke*,
  843 F.2d 1473 (D.C. Cir. 1988)..............................................................22, 31

viii

*Public Citizen v. OMB*,
    598 F.3d 865 (D.C. Cir. 2009)........................................................29, 32, 34

*Ray v. Turner*,
    587 F.2d 1187 (D.C. Cir. 1978)..............................................................45

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*,
    421 U.S. 168 (1975)..............................................................................30

*Richmond v. Scibana*,
    387 F.3d 602 (7th Cir. 2004) ...................................................................4

*Schlefer v. United States*,
    702 F.2d 233 (D.C. Cir. 1983)....................................................22, 24, 27, 28

*Smith v. Jackson*,
    246 U.S. 388 (1918)..............................................................................31

*Sterling Drug, Inc. v. FTC*,
    450 F.2d 698 (D.C. Cir. 1971).......................................................20, 24, 33

*Tax Analysts v. IRS*,
    117 F.3d 607 (D.C. Cir. 1997)........................... 18, 21, 25, 26, 27, 37, 38, 39

*Tax Analysts v. IRS*,
    294 F.3d 71 (D.C. Cir. 2002).......................................................25, 26, 27

*Taxation with Representation Fund v. IRS*,
    646 F.2d 666 (D.C. Cir. 1981)....................................................20, 30, 32, 36

*Texaco Puerto Rico, Inc v. Dep't of Consumer Affairs*,
    60 F.3d 867 (1st Cir. 1995).....................................................................41

*Trans-Pacific Policing Agreement v. U.S. Customs Serv.*,
    177 F.3d 1022 (D.C. Cir. 1999).................................................................51

*United States v. Nixon,*
      418 U.S. 683 (1974)................................................................37

*Vaughn v. Rosen*,
      484 F.2d 820 (D.C. Cir. 1973)......................................45, 46

**STATUTES**

5 U.S.C. § 552 ..............................................................................1

5 U.S.C. § 552(a)(4)(B) ..............................................................52

5 U.S.C. § 552(b) ........................................................................49

5 U.S.C. § 552(b)(1) - (9) ...........................................................16

5 U.S.C. § 552(b)(5)....................................................................17

8 U.S.C. § 510 .........................................................................4, 31

18 U.S.C. § 2707 .........................................................................22

18 U.S.C. § 2709 ...........................................................................6

28 U.S.C. §§ 511-513 ..............................................................4, 31

28 U.S.C. § 1291 ...........................................................................1

28 U.S.C. § 1331 ...........................................................................1

**RULE**

Fed. R. App. P. 4(a)(1)(B) ............................................................1

**REGULATION**

28 C.F.R. § 0.25(a)...................................................................4, 31

**OTHER AUTHORITIES**

David Barron, Department of Justice, *Memorandum for Attorneys of the Office, Re: Best Practices for OLC Legal Advice and Written Opinions* (July 16, 2010) ............................................................................4, 5, 23. 26, 28 , 31, 32, 33

Dep't of Justice, Office of Inspector General, *A Review of the Federal Bureau of Investigation's Use of National Security Letters*, Special Report (March 2007)...........................................................................................6, 7

Dep't of Justice, Office of Inspector General, *A Review of the Federal Bureau of Investigation's Use of Exigent Letters and Other Informal Requests for Telephone Records* (January 2010)........................... 7-8, 9, 10, 21, 22, 27, 31, 33, 34, 35, 41, 48

Judiciary, Intelligence, Appropriations, and Governmental Affairs/Government Reform. *See Office of Congressional Affairs*, FBI, https://www.fbijobs.gov/ 311173.asp (last visited Mar. 10, 2013) ........................41

Note, *The Immunity-Conferring Power of the Office of Legal Counsel*, 121 Harv. L. Rev. 2086 (2008) .......................................................................22

*Report by the Office of Inspector General on the FBI's Use of Exigent Letters and Other Informal Requests for Telephone Records: Hearing Before the Subcomm. On the Constitution of the H. Comm. On the Judiciary*, 111th Cong. (2010) ............................................................................10

Steven G. Bradbury, Principal Deputy Assistant Attorney General, Department of Justice, *Memorandum for the Files, Re: Status of Certain OLC Opinions Issued in the Aftermath of the Terrorist Attacks of September 11, 2001* (Jan. 15, 2009)..........................................................................23

## JURISDICTIONAL STATEMENT

This case is a challenge to the withholding of agency records requested under the Freedom of Information Act, 5 U.S.C. § 552.  The district court had jurisdiction under 28 U.S.C. § 1331.  It entered judgment on September 21, 2012. Plaintiff-appellant filed a notice of appeal on November 15, 2012, within the 60 days allowed by Federal Rule of Appellate Procedure 4(a)(1)(B).  This Court has appellate jurisdiction under 28 U.S.C. § 1291.

**STATEMENT OF ISSUES**

1.    Whether the Department of Justice ("DOJ") properly invoked Exemption 5 of the Freedom of Information Act ("FOIA") to withhold from disclosure an Office of Legal Counsel ("OLC") Opinion, where the Opinion constitutes a binding interpretation of the Executive Branch's surveillance authority under federal law; and

2.    Whether DOJ properly invoked Exemption 5 of the FOIA to withhold from disclosure the OLC Opinion, where the Opinion was relied upon and adopted by the agency; and

3.    Whether DOJ properly invoked Exemption 5 of the FOIA to withhold from disclosure the OLC Opinion, where the Opinion was widely distributed within two branches of government, and possibly outside of the government; and

4.    Whether DOJ properly invoked Exemption 1 of the FOIA to withhold from disclosure the OLC Opinion, where the Opinion consists primarily of legal analysis, and DOJ failed to specifically identify those portions of the Opinion which it claimed to be classified; and

5.    Whether the district court erred by failing to assess the segregability of unclassified, factual information within the OLC Opinion and by placing the burden upon Plaintiff-Appellant to demonstrate that segregable factual information exists.

## STATUTES AND REGULATIONS

All relevant statutes and regulations are reproduced in the Addendum.

## STATEMENT OF FACTS

### The Office of Legal Counsel and the
### OLC Opinion At Issue in This Case

By delegation of the Attorney General,[1] the Office of Legal Counsel ("OLC")—a component within the Department of Justice ("DOJ")—has the authority to issue formal legal opinions that are binding on the DOJ, its components, and other agencies within the Executive Branch. *See*, *e.g.*, *Richmond v. Scibana*, 387 F.3d 602, 603 (7th Cir. 2004) ("Because the Bureau [of Prisons] is a unit within the Department of Justice, the OLC's opinion governs the Bureau's conduct.").

Indeed, "OLC's central function is to provide, pursuant to the Attorney General's delegation, controlling legal advice to Executive Branch officials[.]" David Barron, Department of Justice, *Memorandum for Attorneys of the Office, Re: Best Practices for OLC Legal Advice and Written Opinions* (July 16, 2010)

---

[1] The Attorney General is authorized by statute to advise the President, heads of executive departments, and the heads of the military on questions of law. 28 U.S.C. § 511-513. The Attorney General has delegated this authority to the Office of Legal Counsel. 8 U.S.C. § 510 (providing that Attorney General may delegate duties); 28 C.F.R. § 0.25(a) (delegating Attorney General's authority to OLC).

("OLC Best Practices") at 1 (ECF Dkt. No. 14-2);[2] *Edwards v. Carter*, 580 F.2d 1055, 1103 n.42 (D.C. Cir. 1978) (noting "there is considerable authority that [an opinion of the Attorney General] is binding on an executive official who requests the opinion on a matter of law"). Although OLC "frequently conveys its controlling legal advice" in informal ways, "including through oral presentation and by e-mail," OLC's "formal written opinions" are a "particularly important form of controlling legal advice." OLC Best Practices at 2.

These formal OLC opinions generally address "issues of first impression that are unlikely to be resolved by the courts" and, as such, often represent "the final word on the controlling law." OLC Best Practices at 1. The formal opinions of OLC seek "to provide an accurate and honest appraisal of applicable law"—"not simply an advocate's defense of the contemplated action." *Id*. Opinions are "the product of a careful and deliberate process," which includes initial evaluation of the request by multiple attorneys; soliciting the views of interested agencies; researching, outlining, and drafting; and "rigorous review within OLC of draft opinions." *Id*. at 3-4. Once finalized, OLC opinions are printed on bond paper and signed. *Id.* at 4. The opinions are then indexed and referred to as precedent, and

---

[2] The Memorandum addresses the "best practices OLC attorneys should follow" in issuing "formal written opinions." OLC Best Practices at 1.  Attesting to the authoritative nature of the Memorandum, DOJ's declarant, Mr. Colborn, relied upon it in his description of OLC's practices and procedures. *See* Declaration of Paul P. Colborn ("Colborn Decl.") ¶ 9, n.2 (ECF Dkt. No. 11-4).

prior opinions are "ordinarily give[n] great weight." *Id*. at 2. "[B]ut, as with any system of precedent, past decisions may be subject to reconsideration and withdrawal in appropriate cases." *Id*. at 2.

The OLC opinion (the "Opinion") sought in this case establishes the scope of the Executive Branch's authority under federal law to obtain private communications records without legal process or a qualifying emergency, in spite of apparent statutory prohibitions to the contrary. The Opinion was generated after a lengthy inquiry by the Office of Inspector General ("OIG") into the use and misuse of various surveillance authorities by the Federal Bureau of Investigation ("FBI") during national security investigations.

## The Investigation of the FBI's Surveillance Practices

In 2005, Congress authorized the DOJ OIG to investigate and review the FBI's use of National Security Letters ("NSLs"), a type of secret administrative subpoena providing the FBI with the power to compel certain telephone records in connection with authorized national security investigations. *See* 18 U.S.C. § 2709; Dep't of Justice, Office of Inspector General, *A Review of the Federal Bureau of Investigation's Use of National Security Letters*, Special Report (March 2007) ("*NSL Report*").[3] The OIG's investigation uncovered widespread misuse of the NSL authority, concluding that "the FBI used NSLs in violation of applicable NSL

---

[3] *Available at* http://www.justice.gov/oig/special/s0703b/final.pdf.

statutes, Attorney General Guidelines, and internal FBI policies." *NSL Report* at

124, 120-127; *see also John Doe, Inc. v. Mukasey*, 549 F.3d 861, 880 (2nd Cir.

2008) (citing the *NSL Report*'s conclusions).

   During the course of its investigation of the FBI's use (and abuse) of its NSL

authority, the OIG discovered one particularly questionable practice: the Bureau

had acquired call record information from telephone company employees without

any legal process whatsoever[4]—a practice known within the Bureau as issuing

"exigent letters." *See NSL Report* at 86-97. As a consequence of the FBI's use of

these so-called "exigent letters," the OIG concluded the FBI had:

> circumvented the [Electronic Communications Privacy Act] NSL
> statute and violated the [National Security Investigation] Guidelines
> and internal FBI policies. These matters were compounded by the fact
> that [the FBI] used exigent letters in non-emergency circumstances,
> failed to ensure that there were duly authorized investigations to
> which the request could be tied, and failed to ensure that NSLs were
> issued promptly after the fact pursuant to existing or new
> counterterrorism investigations.

*Id*. at 93.

   After its initial NSL report, the OIG began a subsequent investigation

focusing entirely on the FBI's use of exigent letters and other process-less requests

for customer telephone records. *See* Dep't of Justice, Office of Inspector General,

---

[4] Pursuant to contracts with the FBI, employees of three telephone companies were
co-located within FBI units in order to provide "near real-time servicing" of
requests for telephone records. *NSL Report* at 88.

7

*A Review of the Federal Bureau of Investigation's Use of Exigent Letters and Other Informal Requests for Telephone Records* (January 2010) ("*Exigent Letter Report*").[5] The report concluded that FBI practices were more brazen than initially believed: in some circumstances, Bureau personnel replaced the already-legally insufficient exigent letters with requests submitted by email, by telephone, and by placing "Post-it" notes on the FBI-workstations of telephone company employees. *Id*. at 45-47. The OIG concluded that these practices resulted in hundreds, if not thousands, of statutory and regulatory violations. *Id*. at 65-71.

In July 2009, prior to publication of the *Exigent Letter Report*, the FBI was permitted to review and respond to a draft of the OIG's findings. *Id*. at 263-64. After reviewing the draft, the Bureau asserted that, "as a matter of law," it was not obligated to use legal process to obtain call record information in certain national security investigations. *Id*. at 263. In November 2009, the FBI asked the OLC for an opinion on the Bureau's interpretation of its authority and the legality of the practices described in the OIG report—specifically, the Bureau's practice of obtaining communications records without valid legal process or a qualifying emergency. *See* Declaration of David M. Hardy ("Hardy Decl.") ¶ 4 (ECF Dkt. No. 11-3); Colborn Decl. ¶ 9 (ECF Dkt. No. 11-4); *Exigent Letter Report* at 263.

---

[5] An excerpt of this report describing the OLC Opinion at issue in this case is filed at ECF No. 14-1. The full report is available at http://www.justice.gov/oig/special/s1001r.pdf.

8

On January 8, 2010, the OLC issued its opinion, establishing the Executive Branch's authoritative statement on the legality of service providers voluntarily disclosing call records under federal law. *See* Colborn Decl. ¶ 9; *Exigent Letter Report* at 263. The OLC Opinion agreed with and supported the FBI's position that, "as a matter of law," the FBI could obtain call records "without any legal process or qualifying emergency through voluntary production by the communications service providers." *Exigent Letter Report* at 264-65. The OLC Opinion was then "used by decision-makers at the FBI and by other Executive Branch agencies and Department components in the context of their efforts to ensure that any information-gathering procedures compl[ied] fully with the law." Colborn Decl. ¶ 13.

The OIG determined that the legal authority provided by the OLC Opinion warranted careful scrutiny. *Exigent Letter Report* at 268. The OLC Opinion, according to the OIG, "create[d] a significant gap in FBI accountability and oversight," warranting close examination "by the FBI, the Department, and Congress." *Id*.  "[G]iven the abuses described" in the *Exigent Letter Report* and the OLC Opinion supporting those practices, the OIG urged that the "Department and Congress" consider "appropriate controls" on the FBI's authority. *Id*. The OIG further recommended "the Department notify Congress of this issue and of the OLC opinion interpreting the scope of the FBI's authority under" federal law. *Id*.

9

Indeed, following issuance of the *Exigent Letter Report*, the House

Committee on the Judiciary held a hearing on the FBI's surveillance practices.

*Report by the Office of Inspector General on the FBI's Use of Exigent Letters and*

*Other Informal Requests for Telephone Records: Hearing Before the Subcomm. On*

*the Constitution of the H. Comm. On the Judiciary*, 111th Cong. (2010). The OLC

Opinion was provided to the Department's oversight committees and discussed at

the hearing. *Id.* (statement of Valerie Capronri, General Counsel, FBI) at 10

("Caproni Testimony") (ECF Dkt. No. 20-2).

### EFF's FOIA Request and the District Court Proceedings

In February 2011, Plaintiff-Appellant Electronic Frontier Foundation

("EFF") requested under FOIA the disclosure of the OLC Opinion. After DOJ

claimed the Opinion was exempt from disclosure and failed to respond to EFF's

administrative appeal, EFF filed suit in the U.S. District Court for the District of

Columbia. At summary judgment, the agency asserted FOIA Exemptions 1 and 5

as the bases for its withholding.

In support of its claims under Exemption 1, DOJ provided wholly generic

and superficial information about the classified material contained within the

Opinion. In particular, the agency's declaration failed to identify with any

specificity the distribution of classified information within the Opinion. Although

DOJ apparently claimed that only "portions" of the Opinion contained classified

information, the agency never specified which portions of the record were classified: the agency's declaration simply asserted, in a footnote, that "Exemption b(1) has been asserted in the aggregate on the following pages of the OLC Memo: 1-2, 4-11." Hardy Decl. ¶ 6, n.3. Thus, the agency asserted a blanket claim under Exemption 1 for ten of the Opinion's eleven pages of legal analysis. No more information was provided about the quantity, proportion, or potential segregability of classified information within the Opinion. Over EFF's objections, the district court sustained the agency's withholdings under Exemption 1.

In support of its claims under Exemption 5, DOJ asserted both the deliberative process privilege and the attorney-client privilege. Despite its status as a binding statement of the Executive's legal authority under federal surveillance and privacy statutes, DOJ argued the Opinion was protected by the deliberative process privilege. While the district court did not address DOJ's attorney-client claim, it sustained the agency's withholding of the Opinion, in its entirety, under the deliberative process privilege.

The district court also determined DOJ had satisfied its segregability burden. Despite the agency's failure to even mention segregability in its declarations, the court determined that, because EFF had failed to present "contrary evidence or specific cites to potentially unsegregated portions," Mem. Op. at 16 (ECF Dkt. No. 22), DOJ had satisfied its burden.

11

The district court thus granted summary judgment for DOJ and against EFF, approving the agency's withholding of the OLC Opinion in its entirety. EFF timely appealed to this Court.

## SUMMARY OF THE ARGUMENT

The district court erred when it found that DOJ properly withheld the OLC Opinion under Exemption 5.  The Opinion is a binding statement of DOJ's binding interpretation of federal surveillance law, used within the agency and other components of the Executive Branch "to ensure that any information-gathering procedures comply fully with the law." Colborn Decl. ¶ 13  As such, it constitutes the agency's "working law" and cannot be withheld under the deliberative process or the attorney-client privileges of Exemption 5. The Opinion's withholding constitutes the propagation of "secret law," against which this Circuit's precedent has long guarded.

Even if the OLC Opinion, at the time it was created, did not constitute DOJ's "working law," the agency's subsequent reliance upon, and adoption of, the Opinion is sufficient to overcome the agency's deliberative process and attorney-client privilege claims.  Additionally, any protections the attorney-client privilege may have otherwise provided have been waived by virtue of the Opinion's wide distribution throughout the government and, possibly, the private sector.

The district court further erred by upholding the agency's vague and imprecise claims under Exemption 1. DOJ's description of the Opinion did little more than state that, "in the aggregate," Hardy Decl. 6, n.3, ten pages of an eleven-page legal analysis contained classified information and were, therefore, exempt

13

from disclosure. The agency made no attempt to identify with particularity those portions of the record that were classified (or that contained some classified information) and those portions that were not. The district court's reliance upon the agency's vague representations ran afoul of this Court's longstanding requirement that agencies must provide specific and detailed descriptions of disputed information to justify its withholding. Particularly where, as in this case, the records at issue concern potentially improper or illegal agency action (as detailed here in an Inspector General report), a far more searching *de novo* review of the agency's withholding decisions is warranted.

Finally, the district erred when it failed to consider the possible segregation and release of unclassified, factual information contained within the OLC Opinion (indeed, the agency's declarations failed to even address the segregability issue). The district court's error was compounded when it improperly shifted the burden to Plaintiff-Appellant to demonstrate that segregable portions of the Opinion exist. Such an approach is flatly inconsistent with FOIA's mandate that the agency bears the burden of demonstrating compliance with the Act's requirements.

## STANDARD OF REVIEW

In FOIA cases, this Court reviews a "district court's summary judgment ruling *de novo*, remaining mindful that the burden is on the agency to show that requested material falls within a FOIA exemption."  *Loving v. Dep't of Defense*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quotation marks omitted).

## ARGUMENT

The Freedom of Information Act ("FOIA") safeguards the American public's right to know "what their Government is up to." *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989). The central purpose of the statute is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). As the Supreme Court has long emphasized, "disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).

The FOIA requires disclosure of agency records when requested by the public unless the records fall within one of nine exemptions. *See* 5 U.S.C. § 552(b)(1) - (9). If requested information does not fit squarely into one of these enumerated categories, the law requires federal agencies to release the information. *See Robbins Tire*, 437 U.S. at 221. The exemptions "have been consistently given a narrow compass," and requested agency records that "do not fall within one of the exemptions are improperly withheld[.]" *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989) (internal quotation marks omitted).

Here, if FOIA's central purpose is to have meaningful effect, the agency cannot be permitted to shield itself from public scrutiny by withholding the OLC Opinion in its entirety.

## I.     THE OLC OPINION IS IMPROPERLY WITHHELD UNDER EXEMPTION 5 OF THE FOIA[6]

FOIA Exemption 5 permits an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5). The Supreme Court has explained that this provision "exempt[s] those documents, and only those documents, normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). Exemption 5 thus "incorporat[es] civil discovery privileges," shaped by "judicial standards that would govern litigation against the agency that holds [the privilege]."  *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).

One such privilege is the "deliberative process privilege," which is designed to protect "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and

---

[6]  The district court determined that the OLC Opinion was exempt in its entirety under the deliberative process privilege of Exemption 5. The agency also claimed that the Opinion was exempt in its entirety under the attorney-client privilege of Exemption 5. Thus, any inquiry into the application of FOIA's exemptions to the Opinion logically begins by analyzing the claims that allegedly justify withholding the Opinion in its entirety.

policies are formulated." *Id.* (quotation marks omitted). A second privilege incorporated within Exemption 5 is the attorney-client privilege, which "protects confidential communications from clients to their attorneys made for the purpose of securing legal advice," as well as "communications from attorneys to their clients if the communications rest on confidential information obtained from the client." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997) ("*Tax Analysts I*") (quotation marks omitted).

However, like all privileges, the deliberative process and attorney-client privileges are "narrowly construed and [are] limited to those situations in which [their] purposes will be served." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980). Neither privilege's purpose is served here. As we demonstrate below, the deliberative process privilege is inapplicable because: 1) the Opinion constitutes the "working law" of the agency; or, alternatively, 2) the agency has adopted and relied upon the Opinion. Likewise, the attorney-client privilege may not be invoked because 1) the privilege does not protect agency "working law" or records adopted by the agency; and 2) any privilege that might have applied has been waived.

18

### A.   The OLC Opinion Constitutes the Executive Branch's "Working Law" and, Therefore, Is Improperly Withheld Under the Deliberative Process Privilege

The district court gave short shrift to the applicability of the deliberative process privilege to the OLC Opinion, notwithstanding the fact that DOJ seeks to withhold the document *in its entirety* under the privilege.  Indeed, the court's brief, two-paragraph discussion of the Opinion's eligibility for such protection wholly ignored EFF's principal argument in support of disclosure—that the Opinion constitutes "working law" and thus may not be withheld.[7]

EFF argued below, and reiterates here, that the OLC Opinion's status as the agency's "working law" precludes its withholding under the deliberative process privilege. The privilege is designed to protect agencies from "operating in a fishbowl," *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 256 (D.C. Cir. 1977), and thus only protects "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal

---

[7]   The district court's cursory consideration of DOJ's deliberative process claim stands in stark contrast to this Court's longstanding admonition that "[i]n order to determine whether the agency's claim that the documents were properly withheld is valid, an understanding of the function the documents serve within the agency is crucial." *Coastal States*, 617 F.2d at 858 (citing *Sears*, 421 U.S. 132 (1975). The district court characterized the OLC Opinion as "legal advice," having been "generated as part of a continuous process of agency decision-making[.]" Mem. Op. at 14. This superficial assessment, however, ignores the larger, and more fundamental, nature of the "function [OLC Opinions] serve within the agency." *Coastal States*, 617 F.2d at 858.

opinions of the writer rather than the policy of the agency." *Coastal States*, 617 F.2d at 866.

"[P]roperly construed," however, the deliberative process privilege protects only an agency's "group thinking," and "calls for disclosure of all 'opinions and interpretations' which embody the agency's effective law and policy." *Sears*, 421 U.S. at 153 (citation omitted). The privilege therefore does not apply to "final opinions that have the force of law" within the agency. *Taxation with Representation Fund v. IRS*, 646 F.2d 666, 678 (D.C. Cir. 1981). The agency thus carries the burden of establishing that records withheld under the privilege contain "the ideas and theories which go into the making of the law" and not the agency's "law itself." *Sterling Drug, Inc. v. FTC*, 450 F.2d 698, 708 (D.C. Cir. 1971). Here, DOJ's attempt to shield the OLC Opinion behind the deliberative process privilege results in precisely the type of secret agency working law this Court has long prohibited.

1.     **The OLC Opinion is the Agency's Working Law Because It Constitutes the Final, Controlling Interpretation of the Executive's Authority Under Federal Law**

The "working law" of an agency, as defined by this Court, consists of "those policies or rules, and *the interpretations thereof*, that 'either create or determine the extent of the substantive rights and liabilities of a person.'" *Afshar v. Dep't of State*, 702 F.2d 1125, 1141 (D.C. Cir. 1983) (emphasis added; citation omitted).

20

This includes an agency's opinion about "what the law is" and "what is not the law and why it is not the law." *Tax Analysts I*, 117 F.3d at 617. The OLC Opinion is an authoritative and controlling opinion on "what the law is": specifically, the scope of the Executive Branch's authority under federal surveillance law. It thus represents the "'working law" of the agency. *Sears*, 421 U.S. at 153 (requiring disclosure of "'*opinions and interpretations*' which embody the agency's effective law") (emphasis added).

    The factors this Court has long considered when assessing a record's status as "agency law" support a finding that the OLC Opinion is precisely such "law." Foremost, the Court looks to whether the disputed record "create[s] or determine[s] the extent of the substantive rights and liabilities of a person.'" *Afshar*, 702 F.2d at 1141. Here, the OLC Opinion formally establishes the Executive Branch's operative authority under federal law—an interpretation that "determine[s] the extent of [] substantive rights" under the Stored Communications Act and the Electronic Communications Privacy Act. *Id*. The OLC Opinion shapes the substantive privacy rights of current and future telephone company customers whose records may be obtained pursuant to the Opinion's authority. *See Exigent Letter Report* at 264-65; Hardy Decl. ¶ 16 (techniques described in OLC Opinion are "still in use today"). The OLC Opinion affects the FBI's "rights": it establishes the scope of the Bureau's authority to obtain communications records in certain

21

circumstances. *See Exigent Letter Report* at 264-65. The Opinion also impacts the potential liability of telephone companies, whose original participation in the FBI's exigent letter program rested on a tenuous and unsettled legal foundation. *Compare Exigent Letter Report* at 65 (practice unsupported by ECPA, Attorney General's guidelines, or FBI policy), *with* 18 U.S.C. § 2707 (providing civil cause of action for unlawful disclosure of communication records). And, finally, the OLC Opinion provides a powerful shield of legal immunity for government officials relying in good faith on the Opinion's determinations. *See*, *e.g.*, Note, *The Immunity-Conferring Power of the Office of Legal Counsel*, 121 Harv. L. Rev. 2086 (2008) (quoting former Attorney General Mukasey stating, "the Justice Department . . . could not investigate or prosecute somebody for acting in reliance" on an OLC Opinion); *see also Public Citizen v. Burke ("Public Citizen I")*, 843 F.2d 1473, 1477 (D.C. Cir. 1988) (noting the Archivist of the United States considered OLC opinions binding because, among other reasons, the DOJ represents the Archivist in all litigation). Thus, the OLC Opinion shapes and affects the "rights and liabilities" of a wide and disparate swath of individuals and entities.

Beyond a document's operative legal effect, this Court has looked to other indicia to determine whether a requested record effectively serves as agency law: for example, whether a document is referred to as precedent, *see Schlefer v. United States*, 702 F.2d 233, 237 (D.C. Cir. 1983) (withholding improper where records

"serve as 'law'-like precedent in subsequent cases"), or whether the type of record

is ever "rescinded" or "amended." *Coastal States*, 617 F.2d at 860. Opinions

generated by the OLC possess both characteristics: OLC indexes its opinions for

reference in future opinions. OLC Best Practices at 2 ("OLC opinions should

consider and ordinarily give great weight to any relevant past opinions of [OLC]"

and "should not lightly depart from such past decisions[.]") And, as demonstrated

by the recent withdrawal of nine OLC Opinions concerning controversial

interrogation techniques, domestic surveillance, and the Executive's war powers,

OLC opinions may be "rescinded." *See* Steven G. Bradbury, Principal Deputy

Assistant Attorney General, Department of Justice, *Memorandum for the Files, Re:*

*Status of Certain OLC Opinions Issued in the Aftermath of the Terrorist Attacks of*

*September 11, 2001* (Jan. 15, 2009);[8] OLC Best Practices at 2 ("[P]ast decisions

---

[8] *Available at* http://www.justice.gov/opa/documents/ memostatusolcopinions
01152009.pdf.

The Memorandum states, in pertinent part:

> [T]he propositions highlighted in the nine opinions identified above
> do not reflect the current views of the Office of Legal Counsel and
> should not be treated as authoritative for any purpose. A number of
> opinions that contained these propositions have been withdrawn or
> superseded and do not constitute precedents of this Office; caution
> should be exercised before relying in other respects on the remaining
> opinions.

*Id*. at 11.

may be subject to reconsideration and withdrawal in appropriate cases and through

appropriate processes"). As the Court noted in *Coastal States*, such a formal

withdrawal process "would hardly be necessary if the documents contained merely

informal suggestions to staff which could be disregarded." 617 F.2d at 860.

The OLC Opinion, which shapes a multitude of rights and constitutes a

controlling, precedential statement of executive authority under federal law, bears

all the hallmarks of an agency "working law." Therefore, its continued withholding

is improper.

**2.     The OLC Opinion's Status as "Working Law" is
Supported by Forty Years of This Circuit's Precedent**

The prohibition against withholding agency working law stems from an

unbroken, forty-year line of this Court's decisions. When compared with the

records at issue in those decisions, the OLC Opinion closely resembles the types of

documents this Court has ordered released in the past.

Since at least 1971, this Court's decisions have evinced the "strong

theme . . . that an agency will not be permitted to develop a body of 'secret law,'

used by it in the discharge of its regulatory duties and in its dealings with the

public, but hidden behind a veil of privilege." *Coastal States*, 617 F.2d at 867

(citing *Sterling Drug*, 450 F.2d at 708); *see also Brinton v. Dep't of State*, 636 F.2d

600, 605 (D.C. Cir. 1980) (Exemption 5 does not protect records "which have the

force of law[.]"); *Schlefer*, 702 F.2d at 244 ("authoritative Agency decisions" that

24

"guide[d] subsequent Agency rulings" ineligible for withholding under deliberative process privilege); *Tax Analysts v. IRS*, 294 F.3d 71, 81 (D.C. Cir. 2002) ("*Tax Analysts II*"). Other circuits, too, have followed this Court's longstanding aversion to agency "secret law." *See*, *e.g.*, *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 360 (2d Cir. 2005) (agency's assertion "that it may adopt a legal position while shielding from public view the analysis that yielded that position is offensive to FOIA").

This Court's decision in *Tax Analysts I* is directly analogous to the circumstances present here. There, the Court held that IRS legal opinions concerning the application of federal tax laws to case-specific situations were not protected under the deliberative process privilege. 117 F.3d at 617. The primary purpose of the opinions was "ensuring that field personnel apply the law correctly and uniformly." *Id*. at 609. And, although the analyses may have "precede[d] the field office's decision in a particular taxpayer's case, they d[id] not precede the decision regarding the agency's *legal position*." *Id*. at 617 (emphasis added). Because the records constituted the "considered statements of the agency's legal position," they could not be withheld under the deliberative process privilege. *Id*. (citation omitted).

Identically, here, the OLC Opinion's primary purpose was to "ensure that any information-gathering procedures" used by officials in the FBI and other

25

Executive Branch agencies "compl[ied] fully with the law." Colborn Decl. ¶ 13; *cf.*

*Tax Analysts I*, 117 F.3d at 609 (record's purpose was ensuring agency applied

"law correctly and uniformly"). And, unquestionably, the OLC Opinion constituted

the "considered statement[] of the agency's legal position," *id*. at 617: OLC

opinions are "effectively the final word on controlling law" within the Executive

Branch. OLC Best Practices at 1. Thus, the OLC Opinion, like the documents in

*Tax Analyst I*, constitutes the agency's working law.

Similarly, in *Tax Analysts II*, this Court again found the records at issue—

Technical Assistance Memoranda ("TAs") containing "legal analysis, conclusions,

and advice" authored by the IRS's Office of Chief Counsel ("OCC")—to constitute

the agency's working law. 294 F.3d at 80. The agency asserted that, because IRS

program managers retained the final decision to act in particular cases, the TAs

were part of an intra-agency dialogue and exempt from disclosure. *Id*. Rejecting

that argument, the Court held:

> IRS characterizes the TAs as part of a dialogue among equals, rather
> than pronouncements from senior officials to junior field agents.
> These arguments are unpersuasive. It is not necessary that the TAs
> reflect the final *programmatic* decisions of the program officers who
> request them. It is enough that they represent OCC's final *legal*
> position concerning the Internal Revenue Code, tax exemptions, and
> proper procedures.

*Id*. at 81 (emphasis in original). Likewise, here, the OLC Opinion sets forth the

Executive branch's authority to obtain communications records without legal

process in certain circumstances. *Exigent Letter Report* at 264-65. Although the

FBI and other Executive Branch agencies may retain the final "programmatic"

decision—that is, officials outside OLC may decide how, when, and under what

circumstances to implement the authority announced by the OLC—the Opinion

establishes the parameters within which those officials can act. *See* Colborn Decl. ¶

13 (Opinion used to ensure compliance with law). Here, as in *Tax Analysts I & II*,

the agency's "'working law' must be disclosed whether or not those who use the

working law make the final decisions about program implementation." *Tax

Analysts II*, 294 F.3d at 81.

     This Court's decisions in *Tax Analysts I & II* were not novel: rather, they

carefully followed 30 years of circuit precedent. Indeed, twenty years prior to

issuance of the *Tax Analysts* decisions, the Court in *Schlefer* held that Maritime

Administration Chief Counsel Opinions ("CCOs") constituted the agency's

working law and could not be withheld under Exemption 5. 702 F.2d at 235-237.

The Court, analogizing the CCOs to the documents at issue in its earlier decision in

*Coastal States*, stated:

     Both sets of documents comprise legal memoranda that announce, in
     straight-forward, objective, and impersonal prose, counsels'
     constructions of regulations or statutes. The documents are not cast as
     suggestions or recommendations, and do not address general
     questions of agency policy. They do not invite a response from the
     requesting official; they contain no hint that they are anything but
     final.

*Id.* at 243 (internal citations omitted). Here, as in *Schlefer* and in *Coastal States*, the OLC Opinion is written in "straight-forward, objective, and impersonal prose." *Id.*; *cf.* OLC Best Practices at 1 (OLC opinions are "candid, independent, and principled"). The Opinion is not a "suggestion[] or recommendation[], and do[es] not address general questions of agency policy." *Schlefer*, 702 F.2d at 243; *cf.* Colborn Decl. ¶ 2 ("OLC does not purport, and in fact lacks authority, to make policy decisions."). Nor does the Opinion "invite a response" from the FBI, *Schlefer*, 702 F.2d at 243; *cf.* OLC Best Practices at 3 (views of interested agencies solicited *before* issuance of opinions). And, like the records at issue in *Schlefer*, the OLC Opinion "contain[s] no hint that [it] is anything but final." 702 F.2d at 243.

Finally, this Court's decision in *Coastal States* further supports the OLC Opinion's status as the agency's working law. Stressing that "an understanding of the function the documents serve within the agency is crucial" in determining the propriety of an agency withholding claim, 617 F.2d at 858 (citation omitted), the *Coastal States* court emphasized that

> [the withheld] opinions were routinely used by agency staff as *guidance* in conducting their audits, and were retained and referred to as precedent. If this occurs, the agency has promulgated a body of secret law which it is actually applying in its dealings with the public but which it is attempting to protect behind a label.

*Id.* at 869 (emphasis added). Here, the record establishes that the disputed OLC Opinion "constitutes advice used by decision-makers at the FBI and by other

28

Executive Branch agencies and Department components in the context of their

*efforts to ensure that any information-gathering procedures comply fully with the*

*law*." Colborn Decl. ¶ 13. Thus, the OLC Opinion—like the records in *Coastal*

*States*—constitutes "guidance" used by federal agencies in their "dealings with the

public." 617 F.2d at 869. Notwithstanding the "label" that DOJ attempts to attach

to such guidance, the Opinion cannot properly be withheld.

> **3.      The OLC Opinion's Status as "Working Law" is**
> **Supported by the Fact That the Opinion Is Neither**
> **"Predecisional" Nor "Deliberative"**

The OLC Opinion's status as the agency's "working law" is bolstered by the

fact that it is neither "predecisional" nor "deliberative," the necessary attributes of

records eligible for withholding under the deliberative process privilege. *Public*

*Citizen v. OMB* ("*Public Citizen II*"), 598 F.3d 865, 875 (D.C. Cir. 2009).   Indeed,

to be withheld under the privilege, records must be *both* "predecisional," meaning

they were "generated before the adoption of an agency policy," *and* "deliberative,"

meaning they "reflect[ ] the give-and-take of the consultative process." *Judicial*

*Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006) (internal quotation marks

omitted). The OLC Opinion is neither.

For an agency record to be "predecisional," the agency must demonstrate

that the document at issue was "actually antecedent to the adoption of an agency

policy." *Jordan v. Dep't of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978); *Petroleum*

*Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992)

(Predecisional records are "'prepared in order to assist an agency decision maker in

arriving at [a] decision,' rather than to support a decision already made.") (quoting

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975)).

Critical to this analysis is "the nature of the decisionmaking authority vested in the

office or person issuing the disputed document," *Taxation With Representation*

*Fund*, 646 F.2d at 679, and "the positions in the chain of command of the parties to

the documents." *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 258 (D.C. Cir.

1982). When the office issuing the record has the authority to bind its recipients, it

is far more likely to represent "the denouement of the decisionmaking." *Access*

*Reports v. Dep't. of Justice*, 926 F.2d 1192, 1195 (D.C. Cir. 1991).

> The OLC Opinion cannot be characterized as "predecisional" because the

Executive Branch, including the FBI, lacks the authority to disregard it. OLC

opinions are binding on the Executive until withdrawn by the Attorney General or

President, or overruled by the courts. *Edwards v. Carter*, 580 F.2d 1055, 1103 n.42

(D.C. Cir. 1978) ("[T]here is considerable authority that [an opinion of the

Attorney General] is binding on an executive official who requests the opinion on a

30

matter of law."); *see also Public Citizen I*, 655 F. Supp. 318, 321-22 n.5 (D.D.C.

1987) (citing *Smith v. Jackson*, 246 U.S. 388, 390-91 (1918)).[9]

 As noted, the OLC Opinion at issue here represents the final position of the

DOJ and the Executive Branch on the scope of the Executive's authority to obtain

communications records without process or qualifying emergency. *Exigent Letter

Report* at 264-65; *see* OLC Best Practices at 1 ("OLC's central function is to

provide . . . *controlling legal advice* to Executive Branch officials in furtherance of

the President's constitutional duties . . . .") (emphasis added). Indeed, the Opinion

continues to carry the force of law within the Executive Branch: DOJ has not

shown (or even suggested) that the Attorney General or President has withdrawn it.

To the contrary, as the agency concedes, the Opinion is "used by [federal

agencies] . . . to ensure that any information-gathering procedures comply fully

with the law."  Colborn Decl. ¶ 13. Thus, because the OLC Opinion has "operative

and controlling effect," it may not, by any stretch, be characterized as

"predecisional" under the deliberative process privilege. *Coastal States*, 617 F.2d

at 867.

---

[9]  As noted, *supra* at 4 n.1, the Attorney General is authorized by statute to advise
the President, heads of executive departments, and the heads of the military on
questions of law. 28 U.S.C. § 511-513. The Attorney General has delegated this
authority to the Office of Legal Counsel. 8 U.S.C. § 510 (providing that Attorney
General may delegate duties); 28 C.F.R. § 0.25(a) (delegating Attorney General's
authority to OLC).

Nor is the Opinion "deliberative."  A document is "deliberative" if it
"reflects the give-and-take of the consultative process." *Id*.  at 866. Deliberative
documents encompass "advisory opinions, recommendations" or records
"comprising . . . the personal opinions of the writer."  *Public Citizen II*, 598 F.3d at
875 (citing *Taxation With Representation Fund*, 646 F.2d at 677); *see also Morley
v. CIA*, 508 F.3d 1108, 1127 (D.C. Cir. 2007) (deliberative records "must reflect
the personal opinions of the writer rather than the policy of the agency") (internal
citations omitted). Further, deliberative documents "weigh[] the pros and cons of
agency adoption of one viewpoint or another." *Coastal States*, 617 F.2d at 866.

First, the OLC Opinion is not part of the "give-and-take" of an ongoing
policy discussion. Instead, the Opinion—itself the "product of a careful and
deliberate process," OLC Best Practices at 3—represents the Executive Branch's
"final word on the controlling law." *Id*. at 1. Rather than a give-and-take, the
Opinion reflects the *end* of the discussion.[10]

Further, the OLC Opinion is neither advisory nor recommendatory. The
Opinion is a neutral, objective analysis of federal law, setting forth the Executive

---

[10]   EFF acknowledges that there was likely a "deliberative process" within OLC as
it endeavored to respond to the legal question posed by the FBI, and that such
process would have included the kind of  "give-and-take" that typically gives rise
to a legitimate claim of privilege. *See* OLC Best Practices at 2-5; Colborn Decl. ¶
9. Materials reflecting those deliberations, however, are not at issue here.  Rather,
EFF seeks only the final product of those OLC deliberations—the eleven-page
Opinion disputed in this case.

Branch's controlling position on the acquisition of communications records in certain circumstances. *See* OLC Best Practices at 1 ("[I]n rendering legal advice, OLC seeks to provide an accurate and honest appraisal of applicable law, even if that appraisal will constrain the Administration's or agency's pursuit of desired practices or policy objectives."); *cf. Sterling Drug*, 450 F.2d at 708 (documents were "neither argumentative in nature nor slanted to reflect a particular [agency official's] view"). Nor does the Opinion "weigh the pros and cons" of adoption of agency policy. *Coastal States*, 617 F.2d at 866. OLC's opinions are not an "advocate's defense of the contemplated action" or designed "merely to advance the policy preferences" of its author or a policymaker. OLC Best Practices at 1-2. Rather, its opinions give "candid, independent, and principled advice—even when that advice is inconsistent with the aims of policymakers." *Id*. at 1.

Finally, the "opinions" expressed in the withheld document are not "personal position[s]" or "personal opinions," *Coastal States*, 617 F.2d at 866, but rather are the Executive Branch's definitive interpretation, "pursuant to the Attorney General's delegation," of federal law. OLC Best Practices at 1. The FBI did not seek—nor does OLC purport to give—advice on whether application of this authority would constitute sound policy: instead, it posed a legal question to the entity within the Executive Branch tasked with formally resolving legal questions. *See Exigent Letter Report* at 264; OLC Best Practices at 1. Thus, because the OLC

33

Opinion "neither make[s] recommendations for policy change nor reflect[s] internal deliberations on the advisability of any particular course of action," it cannot be characterized as deliberative. *Public Citizen II*, 598 F.3d at 875. The Opinion, therefore, may not properly be withheld under the deliberative process privilege.

### B. Even if the Opinion Does Not Constitute the Agency's "Working Law," It Has Lost its Protection Because the Agency Adopted and Relied Upon It

The Supreme Court held in *Sears* (as a corollary to its determination that agency "final opinions" may never be withheld under Exemption 5) that otherwise privileged documents can lose any protection they might previously have held when "an agency chooses expressly to adopt or incorporate by reference" the opinion into the agency's final decision or determination. 421 U.S. at 161; *see also Brennan Ctr. for Justice v. Dep't of Justice*, 697 F.3d 184, 196-197 (2d Cir. 2012) (describing the alternate "path" to a disputed record's loss of Exemption 5's protections). Thus, even if a document may come within the deliberative process privilege at the time it is prepared, it can "lose that status if it is adopted, formally or informally, as the agency position on an issue." *Coastal States*, 617 F.2d at 866; *see also Arthur Andersen*, 679 F.2d at 257-58 (same). Adoption requires only that a record be "expressly" adopted within the agency, not that the adoption be public, formal, or repeated. *Sears*, 421 U.S. at 161. Here, even if the OLC Opinion was at

34

one time protected by the privilege, the record demonstrates it ultimately was used to support ongoing government surveillance activities and, as such, lost any privilege it might have possessed.

Even setting aside the fact that the OLC Opinion is binding (and therefore necessarily adopted), the record shows the agency relied upon the Opinion's conclusions. From 2002 to 2006, the FBI engaged in surveillance practices that, on their face, appeared to violate federal law. *Exigent Letter Report* at 65-71. In July 2009, "after reviewing a draft of [the *Exigent Letter Report*]," which sharply criticized the FBI's practices, the Bureau "asserted for the first time" its novel interpretation of law. *Exigent Letter Report* at 263. In November 2009, the FBI sought a formal opinion from OLC on the questions raised by the Bureau's interpretation of the applicable statutory provisions. Colborn Decl. ¶ 9. In January 2010, the OLC issued its Opinion which, "[i]n short . . .  agreed with the FBI['s]" previous legal interpretation of its purported authority under the law. *See Exigent Letter Report* at 264-65. Executive agencies, including the FBI, then used the OLC Opinion to "ensure that any information-gathering procedures compl[ied] fully with the law." Colborn Decl. ¶ 13.

Further demonstrating its adoption of the Opinion, the agency has publicly referenced the Opinion's reasoning and conclusions.  The *Exigent Letter Report* discusses the OLC Opinion at length. *See*, *e.g.*, *Exigent Letter Report* at 264

35

(quoting OLC Opinion). DOJ also provided the Opinion to its congressional oversight committees, and the FBI's general counsel offered to discuss the Opinion with elected officials. Caproni Testimony at 10.[11]

Such agency action—approving, public references in non-privileged agency documents (like the OIG report) and reliance in congressional testimony—has been held sufficient to demonstrate agency adoption. *See*, *e.g.*, *Taxation With Representation Fund*, 646 F.2d at 678 (noting that deliberative process privilege may evaporate if a document "is used by the agency in its dealings with the public") (quoting *Coastal States*, 617 F.2d at 866); *Brennan Center*, 697 F.3d at 204 (holding a footnote reference in a public document and congressional testimony "taken together establish express adoption or incorporation by reference"); *La Raza*, 411 F.3d at 357 ("[R]eferences to the OLC Memorandum made by the Attorney General and his high-ranking advisors, the substance of their comments, and the way in which their comments were used—that is, to assure third parties as to the legality of the actions the third parties were being urged to take"—demonstrated adoption) (internal footnote omitted).

---

[11] Ms. Caproni's testimony noted that because of the classified information in the Opinion, she could only discuss the Opinion in a "secure setting." Caproni Testimony at 10. However, the agency's adoption of the Opinion behind closed doors in no way mitigates the Opinion's loss of protection under the deliberative process privilege. *See Coastal States*, 617 F.2d at 866 (adoption can be formal or informal, but no requirement that adoption be public).

Because the agency has expressly adopted the OLC Opinion, the "public is vitally concerned" with the Opinion's reasoning and rationale. *Sears*, 421 U.S. at 152. Thus, disclosure is required because "[i]n these circumstances, 'the public can only be enlightened by knowing what the [agency] believes the law to be.'" *La Raza*, 411 F.3d at 360 (citing *Tax Analysts I*, 117 F.3d at 618) (brackets in original).

### C. The OLC Opinion May Not Be Withheld Because the Attorney-Client Privilege Does Not Apply to an Agency's Working Law and, Under Any Circumstances, the Privilege Here Has Been Waived

The OLC Opinion is also improperly withheld under the attorney-client privilege. The privilege protects "confidential communications from clients to their attorneys made for the purpose of securing legal advice or services," as well as "communications from attorneys to their clients if the communications rest on confidential information obtained from the client." *Tax Analysts I*, 117 F.3d at 618 (internal citations omitted). However, the attorney-client privilege is "not lightly created nor expansively construed, for [the privilege operates] in derogation of the search for the truth." *United States v. Nixon*, 418 U.S. 683, 710 (1974). Thus, this Court has held privilege cannot apply to records that constitute an agency's "working law," *Tax Analysts I*, 117 F.3d at 619; nor can the privilege attach when the allegedly privileged material has been shared with non-client third parties. *In re*

37

*Sealed Case*, 676 F.2d 793, 809 (D.C. Cir. 1982). For these reasons, the Opinion was improperly withheld under the attorney-client privilege.[12]

> **1.    Because the OLC Opinion Constitutes the Agency's Working Law, the Attorney-Client Privilege Does Not Shield It from Disclosure**

As with the deliberative process privilege, the attorney-client privilege cannot shield "agency law from disclosure to the public." *Tax Analysts I*, 117 F.3d at 619.[13] Because the OLC Opinion constitutes agency law, it cannot be shielded from disclosure behind the attorney-client privilege.

In rejecting the withholding of records that constitute agency law in *Sears*, the Supreme Court did not limit its holding to the deliberative process privilege; specifically, the Court held that "*Exemption 5*, properly construed, calls for 'disclosure of all 'opinions and interpretations' which embody the agency's effective law and policy[.]" 421 U.S. at 153 (emphasis added). Indeed, the same

---

[12] The district court declined to address the agency's attorney-client privilege claim. Mem. Op. at 15-16. As noted *infra*, Section III at 51, this was in error. Although the district court failed to address the claim, there is sufficient evidence in the record for this Court to determine as a matter of law that the attorney-client privilege does not apply.

[13] Although distinct from an agency's "working law," previously privileged documents that have been "adopted" by an agency likewise cannot be shielded under the attorney-client privilege. *See La Raza*, 411 F.3d at 360 ("Like the deliberative process privilege, the attorney-client privilege may not be invoked to protect a document adopted as . . . an agency's policy."). For simplicity, however, this section will refer only to an agency's working law.

reasons requiring disclosure under the deliberative process privilege apply with equal force in the attorney-client context. *See id*. at 161-62. As the Second Circuit has emphasized, once an attorney's opinion "becomes agency law, the agency is then responsible for defending that policy, and the attorney (or employee) 'will generally be encouraged rather than discouraged' by public knowledge that their . . . legal analys[e]s have been adopted by the agency." *La Raza*, 411 F.3d at 360 (quoting *Sears*, 421 U.S. at 161); *see also Tax Analysts I*, 117 F.3d at 619; *Brennan Center*, 697 F.3d at 207.

EFF acknowledges that, in certain contexts not relevant here, OLC may function in a role such that its communications might be protected by the attorney-client privilege.[14] However, when OLC issues a final written opinion (exercising its authority on behalf of the Attorney General) to a component within DOJ bound to follow it, the opinion constitutes the final agency legal position and may not be shielded by the attorney-client privilege. *See Tax Analysts I*, 117 F.3d at 619 ("[A]ttorney-client privilege may not be used to protect this growing body of agency law from disclosure to the public."); *see also Cuneo v. Schlesinger*, 484

---

[14] For example, if OLC provided legal advice to the Attorney General or the President—two officials within the Executive Branch with the discretion to disregard or overrule an OLC Opinion—invocation of the privilege might be appropriate. In that context, and if not adopted, an opinion of OLC would constitute legal *advice*. In the context of this case, as we have shown, the Opinion is a binding statement of law.

F.2d 1086, 1090-91 (D.C. Cir. 1973) (noting government's concession that "secret law" containing "interpretations of rules and statutes" must be disclosed under FOIA). Consequently, because of the OLC Opinion's status as working law, it is not the type of "advice" generated by an attorney that may be shielded from disclosure under the attorney-client privilege.

> **2.**    **The Attorney-Client Privilege Has Been Waived Through the OLC Opinion's Disclosure and Distribution to Non-Client Third Parties**

Under any conception of the attorney-client privilege, its scope is not broad enough to shield the OLC Opinion at issue here. DOJ argued below that the "client," the FBI, had jealously guarded the communications of its "attorney," the OLC. *See* Colborn Decl. ¶ 14. Yet the record shows the Opinion has been shared throughout two branches of government and, possibly, outside the government. *See* Colborn Decl. ¶ 13; Caproni Testimony at 10.

The privilege does not give an agency the ability to withhold a document merely because it is a communication between the agency and its lawyer. *Coastal States*, 617 F.2d at 862-63. Rather, the agency must show that the information provided to its lawyer was intended to be confidential and was not disclosed to a third party. *In re Sealed Case*, 676 F.2d at 809 ("[A]ny voluntary disclosure by the client to a third party breaches the confidentiality of the attorney-client relationship and therefore waives the privilege[.]"); *see also In re Sealed Case*, 877 F.2d 976,

980 (D.C. Cir. 1989) (privilege must be "jealously guarded . . . lest it be waived.");
*Mead Data Cent.*, 566 F.2d at 253-54 ("If the information [at issue] has been or is later shared with third parties, the [attorney-client] privilege does not apply."). Indeed, in the private sector context, even an *inadvertent* disclosure of attorney-client privileged material can affect a waiver of the privilege. *In re Sealed Case*, 877 F.2d at 980; *see also Texaco Puerto Rico, Inc v. Dep't of Consumer Affairs*, 60 F.3d 867, 883 (1st Cir. 1995) ("It is apodictic that inadvertent disclosures may work a waiver of the attorney-client privilege.").

By willingly disclosing the OLC Opinion to various "non-client" third parties, the agency waived its claim of privilege. The agency has not demonstrated that it has "jealously guarded" the confidentiality of communications between OLC and the FBI. In fact, the record shows precisely the opposite: the Opinion has been shared with 1) personnel throughout the DOJ (including the FBI, OLC, and OIG), *Exigent Letter Report* at 264-68; 2) personnel within "other Executive Branch agencies," Colborn Decl. ¶ 13; Hardy Decl. ¶ 20; and 3) members of Congress and their staffs,[15] Caproni Testimony at 10.

---

[15] Ms. Caproni's testimony stated the OLC Opinion had been provided to the FBI's "oversight committees." Caproni Testimony at 10. Congressional committees charged with overseeing the FBI include the Senate and House Committees on the Judiciary, Intelligence, Appropriations, and Governmental Affairs/Government Reform. *See Office of Congressional Affairs*, FBI, https://www.fbijobs.gov/311173.asp (last visited Mar. 10, 2013).

Indeed, the agency's declarations even failed to establish that the Opinion had not been shared outside of the government.[16] Instead, DOJ only asserted that, because the Opinion contained classified information, those who "reviewed the Opinion would have understood the need for confidentiality." Colborn Decl. ¶ 12. It is insufficient for the Agency to assert that only those with an appropriate security clearance viewed the Opinion and "understood the need for confidentiality." *See*, *e.g.*, *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 584 F. Supp. 2d 65, 79 (D.D.C. 2008) ("It is not the case that just because the documents at issue contain classified information the documents are protected by the attorney-client privilege."). The classified status of some material within an otherwise privileged attorney-client communication does not create the presumption that,

---

[16] The agency's declarations nowhere state that the OLC Opinion has not been shared outside the federal government. *See*, *e.g.*, Colborn Decl. ¶ 12. Even after EFF raised questions concerning the Opinion's distribution, and after an opportunity to proffer supplemental declarations, the agency failed to clarify whether the Opinion was, in fact, distributed beyond the federal government. Instead, Mr. Colborn's declaration merely states that "anyone who reviewed the Opinion would have understood the need for confidentiality." Colborn Decl. ¶ 12. In contrast to unequivocal agency declarations proffered in other cases, *see*, *e.g.*, *Nat'l Day Laborer Organizing Net. v. ICE*, 827 F. Supp. 2d 242, 256 (S.D.N.Y. 2011) (noting agency declarants stated neither "sender nor the recipients" of agency opinion had "disseminated the withheld documents to any non-Agency personnel"), the language in the Colborn Declaration falls far short of demonstrating that the attorney-client privilege has been "jealously guarded[.]" *In re Sealed Case*, 877 F.2d at 980.

when shared with third parties who may also have an appropriate security clearance, that the attorney-client privilege is maintained.

It is not EFF's position that the OLC Opinion's disclosure to a single member of Congress, a single Congressional committee, or even a single distribution to another government agency, taken individually and in every circumstance, would work a waiver of the attorney-client privilege. Rather, here, taking the various disclosures as a whole—to "non-client" personnel within other components of DOJ, to other "non-client" Executive agencies, and to "non-client" Congressional committees and their staffs, and, perhaps, to "non-client" parties outside government—the Opinion cannot be said to be "confidential" within the meaning of the privilege. Such wide distribution of the Opinion (and the purportedly "confidential" facts on which it is based) is inconsistent with the privilege's purpose and the requirement to guard the purportedly privileged information. *See Coastal States*, 617 F.2d at 864 (finding agency had "failed to affirmatively establish confidentiality" where "copies of the memoranda were circulated to all area offices, filed and indexed for future use, relied on as precedent and used as training materials" within the agency) (internal footnotes omitted).

The "raison d'etre" of the attorney client privilege—"that persons, including organizations, will be induced to consult counsel when needed[,]" *In re Sealed*

*Case*, 877 F.2d at 979—is defeated when the client, the attorney, or both intentionally distribute that advice to third parties. Given the OLC Opinion's wide distribution to "non-client" third parties, any attorney-client protection that may have attached to the Opinion has been waived.

## II. THE DISTRICT COURT'S EXEMPTION 1 RULING WAS CONTRARY TO THIS CIRCUIT'S LONGSTANDING PRECEDENT ON THE SPECIFICITY AN AGENCY MUST PROVIDE TO WARRANT SUMMARY JUDGMENT

The district court erred by granting summary judgment in DOJ's favor based on unspecific and inadequately supported claims under Exemption 1 of FOIA. From the outset of this case, EFF has acknowledged that the OLC Opinion likely contains *some* properly classified, factual information that may be withheld under Exemption 1. But the existence of *some* classified information does not relieve the agency from describing, or the district court from assessing, the scope and extent of the exemption claim. Here, DOJ provided no information about "what proportion of the information" in the OLC Opinion was classified "and how that material is dispersed throughout the document." *Mead Data Cent.*, 566 F.2d at 261. DOJ's averments that "portions" of the Opinion contain classified information are simply inadequate to sustain the withholding of all but one page of an eleven-page legal analysis. Moreover, in a case—such as this one—where there is indisputable record evidence of agency misconduct associated with the requested records, agency declarations should be held to an even more exacting standard.

44

This Court has repeatedly emphasized the specificity required of agency *Vaughn* submissions. *See King v. Dep't of Justice*, 830 F.2d 210, 223-24 (D.C. Cir. 1987) ("A withholding agency must describe *each* document or portion thereof withheld, and for *each* withholding it must discuss the consequences of disclosing the sought-after information.") (emphasis in original); *Mead Data Cent.*, 566 F.2d at 251 (agency must "specifically identify[] the reasons why a particular exemption is relevant and correlat[e] those claims with the particular part of [a] withheld document"). This specificity requirement applies with no less force when Exemption 1 claims are at issue. *Ray v. Turner*, 587 F.2d 1187, 1197 (D.C. Cir. 1978) (generalized agency affidavits insufficient "even in a national security context"); *see also King*, 830 F. 2d. at 223 (emphasizing that the Court's "dissatisfaction with the FBI's Exemption 1 showing arises from the character of the *Vaughn* index tendered"); *Oglesby v. Dep't of the Army*, 79 F.3d 1172, 1178 (D.C. Cir. 1996) (even in Exemption 1 context, it is "vital that the agency specify in detail which portions of the document . . . are allegedly exempt") (quoting *Vaughn v. Rosen*, 484 F.2d 820,827 (D.C. Circuit 1973). Indeed, whatever deference may typically attach in national security cases, "deference is not equivalent to acquiescence," and summary judgment is not warranted where an agency's affidavits lack "detail and specificity." *Campbell v. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998).

The district court unquestioningly accepted DOJ's unspecific Exemption 1 claims, despite the agency's utter failure to tie its Exemption 1 claims to particular parts of the Opinion. *See* Mem. Op. at 10-11. DOJ's declarations only asserted that "portions" of the OLC Opinion contained classified information; yet, in a footnote, the agency's declarant stated that all but a single page of the eleven-page document was exempt in its *entirety* under Exemption 1. Hardy Decl. ¶ 6 n. 3. Such sweeping exemption claims are inconsistent with "*Vaughn* itself," which "requires agencies to specify in detail which portions of the document are disclosable and which are allegedly exempt. A submission that does not do that does not even qualify as a *Vaughn* index." *Kimberlin v. Dep't of Justice*, 139 F.3d 944, 950 (D.C. Cir. 1998) (internal citations and quotations omitted).

Given the small size of the OLC Opinion (11 pages), there is no justification for DOJ's failure to provide a line-by-line or, even, a word-by-word description of the distribution of classified information throughout the document. *See*, *e.g.*, *Mead Data Cent.*, 566 F.2d at 261 (noting line-by-line analysis will be necessary for agency to describe "what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document"); *see also King*, 830 F.2d at 224 (even repetitive exemption claims do not "supplant the demand for particularity," and agency *Vaughn* indices must still identify withholding by "type and location in the body of documents requested"). Without

"such a description, both litigants and judges" are prevented from testing the

"validity of the agency's" exemption claim. *Mead Data Cent.*, 566 F.2d at 261.

To illustrate the shortcomings of DOJ's showing, the agency has even failed

to release citations to cases or public statutes contained within the OLC Opinion.[17]

However, from the agency's declarations, it is not clear if its claim is that case or

statutory citations: 1) are, themselves, classified; 2) are somehow derivatively

classified, in that revealing the cases and statutes on which the agency relies would

reveal classified information; or, 3) are withheld only under one of the agency's

other privilege claims. DOJ's failure to explain the basis for its broad Exemption 1

withholding claim renders meaningful adversarial testing and *de novo* review

impossible.

Further, the district court's acceptance of DOJ's vague representations was

unwarranted given the context in which the OLC Opinion was generated. Where

requests seek information relating to agency misconduct or illegality, "the agency

often deems it in its best interest to stifle or inhibit the probes[, and it] is in these

instances that the judiciary plays an important role in reviewing the agency's

withholding of information." *Allen v CIA*, 636 F.2d 1287, 1299 (D.C. Cir. 1980)

---

[17]  Given that OLC is primarily tasked with resolving legal questions, it is likely that, somewhere in the ten pages of legal analysis classified "in the aggregate," there is a citation to a case or statute.  The agency has not even attempted to articulate a reason that would justify the classification of such information.

(remanding where the district court, without reviewing the document *in camera*, upheld agency claims under Exemptions 1 and 3 to withhold a 15-page document). As described above, the Opinion stemmed from a lengthy, Congressionally mandated OIG investigation of the FBI's surveillance practices. The inquiry revealed the Bureau was employing techniques that violated federal statutes and agency regulations. *Exigent Letter Report* at 65-71. Given this context, and the apparent concern with which the OIG viewed the OLC's legal interpretation, *id*. at 268, the district court's review of the agency's classification claims should have been more, rather than less, exacting.[18]

Indeed, in *Jones v. FBI*, 41 F.3d 238 (6th Cir. 1994), the Sixth Circuit found that such circumstances compelled a more searching review of the agency's withholding claims:

> Even where there is no evidence that the agency acted in bad faith with regard to the FOIA action itself *there may be evidence of bad faith or illegality with regard to the underlying activities which generated the documents at issue*. Where such evidence is strong, it would be an abdication of the court's responsibility to treat the case in the standard way . . . It would risk straining the public's ability to believe — not to mention the plaintiff's — that the courts are neutral arbiters of disputes whose procedures are designed to produce justice out of the clash of adversarial arguments.

---

[18] Notably, the current Executive Order governing national security classification explicitly prohibits the classification of information to "conceal violations of the law" or to "prevent embarrassment to a person, organization, or agency." E.O. 13526 § 1.7(1), (2).

*Id.* at 242-243 (emphasis added). Where, as here, there is unquestionable evidence of illegality "with regard to the underlying activities" which led to the generation of the record at issue, the public interest in disclosure is at its apex, and *de novo* judicial review of the agency's classification decisions must be more exacting than it was below.

## III.    THE DISTRICT COURT ERRED BY FAILING TO ADDRESS THE SECREGABILITY OF UNCLASSIFIED FACTUAL INFORMATION WITHIN THE OLC OPINION AND BY IMPERMISSIBLY SHIFTING THE BURDEN TO EFF

The district court's treatment of DOJ's segregability obligations, standing alone, warrants reversal in this case. First, the court failed to address the segregability of unclassified, factual information contained within the OLC Opinion. Second, the court impermissibly shifted the burden to EFF to demonstrate that segregable material existed in the OLC Opinion. Both holdings constitute error.

FOIA requires disclosure of non-exempt information that is "reasonably segregable" from exempt information, 5 U.S.C. § 552(b), and the statute puts the burden on the agency to "show[] that no such segregable information exists." *Army Times Publ'g Co. v. Dep't of Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993).  A district court has "an affirmative duty to consider the segregability issue *sua sponte*" and "clearly errs when it approves the government's withholding of

49

information under the FOIA without making an express finding on segregability."

*Morley*, 508 F.3d at 1123 (citation and quotation marks omitted); *see also*

*Billington v. U.S. Dep't of Justice*, 233 F.3d 581, 586 (D.C. Cir. 2000).

Here**,** the district court erred by failing to determine whether there was

unclassified, factual information within the OLC Opinion that was "reasonably

segregable" from the Opinion's other content. DOJ asserted Exemption 1 to protect

"portions" of the Opinion, but asserted both the deliberative process privilege and

attorney-client privilege to withhold the Opinion in its entirety. The district court,

however, only addressed the agency's claims under Exemption 1 and the

deliberative process. But, "the deliberative process privilege does not protect

documents in their entirety; if the government can segregate and disclose non-

privileged factual information within a document, it must." *Loving*, 550 F.3d at 38

(citing *Army Times*, 998 F.2d at 1071); *see also EPA v. Mink*, 410 U.S. 73, 87-88

(1973) (noting "factual material contained in deliberative memoranda and

severable from its context" not exempt under the deliberative process privilege).

By DOJ's own admission, the Opinion contains unclassified, factual

information. Colborn Decl. ¶ 11 ("Those portions of the Opinion that are marked

unclassified reflect other confidential factual . . . communications provided by the

FBI to OLC.") However, because factual material cannot generally be withheld

under the deliberative process privilege, those unclassified, factual portions of the

50

Opinion are only privileged—and, thus, properly exempt from FOIA—if they: 1) are protected by the attorney-client privilege, or 2) are so "inextricably intertwined" with the deliberative portions of the document that they cannot be separated and released. *Trans-Pacific Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1027 (D.C. Cir. 1999) ("It has long been the rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions.") (citation and internal quotation marks omitted).

The district court did not address DOJ's attorney-client privilege claims. Likewise, the court failed to determine whether factual information was "inextricably intertwined" with the purportedly deliberative portions of the Opinion. Indeed, on the record before it, it was impossible for the district court to make the requisite determination: DOJ's declarations did not even mention the possibility of segregability of factual information,[19] and the court did not review the Opinion *in camera*. Thus, the district court's segregability determinations were in error.

---

[19] The district court's decision states that "DOJ's declarations explicate that, although only portions of the OLC Opinion were withheld under Exemption 1, the entirety of the OLC Opinion was withheld under Exemption 5, leaving nothing significant that could be disclosed in a redacted format." Mem. Op. at 16 (citing Hardy Decl. ¶ 5; Colborn Decl. ¶ 11). But neither cited declaration even mentions the possibility or feasibility of segregating and releasing unclassified, factual information.

The district court compounded its error by impermissibly shifting the burden to EFF to demonstrate that segregable portions of the Opinion were withheld. Mem. Op. at 16. Such an approach is plainly inconsistent with FOIA's basic requirement that the agency carry the burden of justifying nondisclosure. 5 U.S.C. § 552(a)(4)(B); *Army Times*, 998 F.2d at 1071. As noted, the agency's declarations failed to address the possibility of segregation. Nevertheless, the district court suggested that EFF needed to offer "contrary evidence or specific cites to potentially unsegregated portions" of the Opinion to preclude summary judgment in the agency's favor. Mem. Op. at 16. As with all agency obligations under FOIA, however, Congress expressly placed the burden "on the agency to sustain its action." *Reporters Committee*, 489 U.S. at 755 (citing 5 U.S.C. § 552(a)(4)(B)). Thus, the district court's requirement that EFF identify potentially segregable information was in error.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Dated this 15th day of March, 2013.

Respectfully Submitted,


     */s/ David L. Sobel*
**DAVID L. SOBEL**
Electronic Frontier Foundation
1818 N Street, N.W., Suite 410
Washington, DC 20036
Phone: (202) 797-9009
Fax: (202) 797-9066


**MARK RUMOLD**
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110
(415) 436-9333

Counsel for Plaintiff-Appellant

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
      28.1(e)(2) or 32(a)(7)(B) because:

      [ X ] this brief contains [*11,486*] words, excluding the parts of the brief
      exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

      [    ] this brief uses a monospaced typeface and contains [*state the number
      of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P.
      32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.
      32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

      [ X ] this brief has been prepared in a proportionally spaced typeface using
      [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

      [    ] this brief has been prepared in a monospaced typeface using [*state
      name and version of word processing program*] with [*state number of
      characters per inch and name of type style*].

Dated: March 15, 2013                 /s/ David L. Sobel
                                      *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 15th day of March, 2013, I caused this Page

Proof Brief of Appellant to be filed electronically with the Clerk of the Court using

the CM/ECF System, which will send notice of such filing to the following

registered CM/ECF users:

> Daniel Tenny
> Michael S. Raab
> U.S. DEPARTMENT OF JUSTICE
> 950 Pennsylvania Avenue, NW
> Washinton, DC  20530
> (202) 514-1838
>
> *Counsel for Appellee*

I further certify that on this 15th day of March, 2013, I caused the required

copies of the Page Proof Brief of Appellant to be hand filed with the Clerk of the

Court.

/s/ David L. Sobel

*Counsel for Appellant*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

Page

Freedom of Information Act, 5 U.S.C. § 552 ..........................................................1

Freedom of Information Act, 5 USC § 552

§ 552.  Public information; agency rules, opinions, orders, records, and proceedings

(a) Each agency shall make available to the public information as follows:

  (1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public--

    (A) descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

    (B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

    (C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

    (D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

    (E) each amendment, revision, or repeal of the foregoing.

  Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

  (2) Each agency, in accordance with published rules, shall make available for public inspection and copying--

    (A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

    (B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;

    (C) administrative staff manuals and instructions to staff that affect a member of the public;

    (D) copies of all records, regardless of form or format, which have been released to any person under paragraph (3) and which, because of the nature of

1

their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; and

    (E) a general index of the records referred to under subparagraph (D);

  unless the materials are promptly published and copies offered for sale.  For records created on or after November 1, 1996, within one year after such date, each agency shall make such records available, including by computer telecommunications or, if computer telecommunications means have not been established by the agency, by other electronic means. To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, staff manual, instruction, or copies of records referred to in subparagraph (D). However, in each case the justification for the deletion shall be explained fully in writing, and the extent of such deletion shall be indicated on the portion of the record which is made available or published, unless including that indication would harm an interest protected by the exemption in subsection (b) under which the deletion is made. If technically feasible, the extent of the deletion shall be indicated at the place in the record where the deletion was made. Each agency shall also maintain and make available for public inspection and copying current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published. Each agency shall make the index referred to in subparagraph (E) available by computer telecommunications by December 31, 1999. Each agency shall promptly publish, quarterly or more frequently, and distribute (by sale or otherwise) copies of each index or supplements thereto unless it determines by order published in the Federal Register that the publication would be unnecessary and impracticable, in which case the agency shall nonetheless provide copies of such index on request at a cost not to exceed the direct cost of duplication. A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if--

    (i) it has been indexed and either made available or published as provided by this paragraph; or

    (ii) the party has actual and timely notice of the terms thereof.

  (3) (A) Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

(B) In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.

(C) In responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system.

(D) For purposes of this paragraph, the term "search" means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request.

(E) An agency, or part of an agency, that is an element of the intelligence community (as that term is defined in section 3(4) of the National Security Act of 1947 (*50 U.S.C. 401a(4)*)) shall not make any record available under this paragraph to--

(i) any government entity, other than a State, territory, commonwealth, or district of the United States, or any subdivision thereof; or

(ii) a representative of a government entity described in clause (i).

(4)

(A) (i) In order to carry out the provisions of this section, each agency shall promulgate regulations, pursuant to notice and receipt of public comment, specifying the schedule of fees applicable to the processing of requests under this section and establishing procedures and guidelines for determining when such fees should be waived or reduced. Such schedule shall conform to the guidelines which shall be promulgated, pursuant to notice and receipt of public comment, by the Director of the Office of Management and Budget and which shall provide for a uniform schedule of fees for all agencies.

(ii) Such agency regulations shall provide that--

(I) fees shall be limited to reasonable standard charges for document search, duplication, and review, when records are requested for commercial use;

(II) fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by an educational or noncommercial scientific institution, whose purpose is scholarly or scientific research; or a representative of the news media; and

(III) for any request not described in (I) or (II), fees shall be limited to reasonable standard charges for document search and duplication.

In this clause, the term "a representative of the news media" means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and

distributes that work to an audience. In this clause, the term "news" means information that is about current events or that would be of current interest to the public. Examples of news-media entities are television or radio stations broadcasting to the public at large and publishers of periodicals (but only if such entities qualify as disseminators of "news") who make their products available for purchase by or subscription by or free distribution to the general public. These examples are not all-inclusive. Moreover, as methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through telecommunications services), such alternative media shall be considered to be news-media entities. A freelance journalist shall be regarded as working for a news-media entity if the journalist can demonstrate a solid basis for expecting publication through that entity, whether or not the journalist is actually employed by the entity. A publication contract would present a solid basis for such an expectation; the Government may also consider the past publication record of the requester in making such a determination.

(iii) Documents shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.

(iv) Fee schedules shall provide for the recovery of only the direct costs of search, duplication, or review. Review costs shall include only the direct costs incurred during the initial examination of a document for the purposes of determining whether the documents must be disclosed under this section and for the purposes of withholding any portions exempt from disclosure under this section. Review costs may not include any costs incurred in resolving issues of law or policy that may be raised in the course of processing a request under this section. No fee may be charged by any agency under this section--

(I) if the costs of routine collection and processing of the fee are likely to equal or exceed the amount of the fee; or

(II) for any request described in clause (ii)(II) or (III) of this subparagraph for the first two hours of search time or for the first one hundred pages of duplication.

(v) No agency may require advance payment of any fee unless the requester has previously failed to pay fees in a timely fashion, or the agency has determined that the fee will exceed $ 250.

(vi) Nothing in this subparagraph shall supersede fees chargeable under a statute specifically providing for setting the level of fees for particular types of records.

4

(vii) In any action by a requester regarding the waiver of fees under this section, the court shall determine the matter de novo: *Provided*, That the court's review of the matter shall be limited to the record before the agency.

(viii) An agency shall not assess search fees (or in the case of a requester described under clause (ii)(II), duplication fees) under this subparagraph if the agency fails to comply with any time limit under paragraph (6), if no unusual or exceptional circumstances (as those terms are defined for purposes of paragraphs (6)(B) and (C), respectively) apply to the processing of the request.

(B) On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).

(C) Notwithstanding any other provision of law, the defendant shall serve an answer or otherwise plead to any complaint made under this subsection within thirty days after service upon the defendant of the pleading in which such complaint is made, unless the court otherwise directs for good cause shown.

(D) [Repealed]

(E) (i) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed.

(ii) For purposes of this subparagraph, a complainant has substantially prevailed if the complainant has obtained relief through either--

(I) a judicial order, or an enforceable written agreement or consent decree; or

(II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.

(F) (i) Whenever the court orders the production of any agency records improperly withheld from the complainant and assesses against the United States reasonable attorney fees and other litigation costs, and the court additionally issues a written finding that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect

5

to the withholding, the Special Counsel shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible for the withholding. The Special Counsel, after investigation and consideration of the evidence submitted, shall submit his findings and recommendations to the administrative authority of the agency concerned and shall send copies of the findings and recommendations to the officer or employee or his representative. The administrative authority shall take the corrective action that the Special Counsel recommends.

(ii) The Attorney General shall--

(I) notify the Special Counsel of each civil action described under the first sentence of clause (i); and

(II) annually submit a report to Congress on the number of such civil actions in the preceding year.

(iii) The Special Counsel shall annually submit a report to Congress on the actions taken by the Special Counsel under clause (i).

(G) In the event of noncompliance with the order of the court, the district court may punish for contempt the responsible employee, and in the case of a uniformed service, the responsible member.

(5) Each agency having more than one member shall maintain and make available for public inspection a record of the final votes of each member in every agency proceeding.

(6) (A) Each agency, upon any request for records made under paragraph (1), (2), or (3) of this subsection, shall--

(i) determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination; and

(ii) make a determination with respect to any appeal within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of such appeal. If on appeal the denial of the request for records is in whole or in part upheld, the agency shall notify the person making such request of the provisions for judicial review of that determination under paragraph (4) of this subsection.

The 20-day period under clause (i) shall commence on the date on which the request is first received by the appropriate component of the agency, but in any event not later than ten days after the request is first received by any component of the agency that is designated in the agency's regulations under this section to receive requests under this section. The 20-day period shall not be tolled by the agency except--

(I) that the agency may make one request to the requester for information and toll the 20-day period while it is awaiting such information that it has reasonably requested from the requester under this section; or

(II) if necessary to clarify with the requester issues regarding fee assessment. In either case, the agency's receipt of the requester's response to the agency's request for information or clarification ends the tolling period.

(B)

(i) In unusual circumstances as specified in this subparagraph, the time limits prescribed in either clause (i) or clause (ii) of subparagraph (A) may be extended by written notice to the person making such request setting forth the unusual circumstances for such extension and the date on which a determination is expected to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days, except as provided in clause (ii) of this subparagraph.

(ii) With respect to a request for which a written notice under clause (i) extends the time limits prescribed under clause (i) of subparagraph (A), the agency shall notify the person making the request if the request cannot be processed within the time limit specified in that clause and shall provide the person an opportunity to limit the scope of the request so that it may be processed within that time limit or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request. To aid the requester, each agency shall make available its FOIA Public Liaison, who shall assist in the resolution of any disputes between the requester and the agency.  Refusal by the person to reasonably modify the request or arrange such an alternative time frame shall be considered as a factor in determining whether exceptional circumstances exist for purposes of subparagraph (C).

(iii) As used in this subparagraph, "unusual circumstances" means, but only to the extent reasonably necessary to the proper processing of the particular requests--

(I) the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request;

(II) the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or

(III) the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein.

(iv) Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for the aggregation of certain requests by the same

requestor, or by a group of requestors acting in concert, if the agency reasonably believes that such requests actually constitute a single request, which would otherwise satisfy the unusual circumstances specified in this subparagraph, and the requests involve clearly related matters. Multiple requests involving unrelated matters shall not be aggregated.

(C)

(i) Any person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph. If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records. Upon any determination by an agency to comply with a request for records, the records shall be made promptly available to such person making such request. Any notification of denial of any request for records under this subsection shall set forth the names and titles or positions of each person responsible for the denial of such request.

(ii) For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.

(iii) Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

(D) (i) Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for multitrack processing of requests for records based on the amount of work or time (or both) involved in processing requests.

(ii) Regulations under this subparagraph may provide a person making a request that does not qualify for the fastest multitrack processing an opportunity to limit the scope of the request in order to qualify for faster processing.

(iii) This subparagraph shall not be considered to affect the requirement under subparagraph (C) to exercise due diligence.

(E) (i) Each agency shall promulgate regulations, pursuant to notice and receipt of public comment, providing for expedited processing of requests for records--

(I) in cases in which the person requesting the records demonstrates a compelling need; and

(II) in other cases determined by the agency.

8

(ii) Notwithstanding clause (i), regulations under this subparagraph must ensure--

(I) that a determination of whether to provide expedited processing shall be made, and notice of the determination shall be provided to the person making the request, within 10 days after the date of the request; and

(II) expeditious consideration of administrative appeals of such determinations of whether to provide expedited processing.

(iii) An agency shall process as soon as practicable any request for records to which the agency has granted expedited processing under this subparagraph. Agency action to deny or affirm denial of a request for expedited processing pursuant to this subparagraph, and failure by an agency to respond in a timely manner to such a request shall be subject to judicial review under paragraph (4), except that the judicial review shall be based on the record before the agency at the time of the determination.

(iv) A district court of the United States shall not have jurisdiction to review an agency denial of expedited processing of a request for records after the agency has provided a complete response to the request.

(v) For purposes of this subparagraph, the term "compelling need" means--

(I) that a failure to obtain requested records on an expedited basis under this paragraph could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

(II) with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity.

(vi) A demonstration of a compelling need by a person making a request for expedited processing shall be made by a statement certified by such person to be true and correct to the best of such person's knowledge and belief.

(F) In denying a request for records, in whole or in part, an agency shall make a reasonable effort to estimate the volume of any requested matter the provision of which is denied, and shall provide any such estimate to the person making the request, unless providing such estimate would harm an interest protected by the exemption in subsection (b) pursuant to which the denial is made.

(7) Each agency shall--

(A) establish a system to assign an individualized tracking number for each request received that will take longer than ten days to process and provide to each person making a request the tracking number assigned to the request; and

(B) establish a telephone line or Internet service that provides information about the status of a request to the person making the request using the assigned tracking number, including--

(i) the date on which the agency originally received the request; and

9

    (ii) an estimated date on which the agency will complete action on the request.

(b) This section does not apply to matters that are—

  (1)
   (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;
  (2) related solely to the internal personnel rules and practices of an agency;
  (3) specifically exempted from disclosure by statute (other than section 552b of this *title [5 USCS § 552b]*), if that statute--
   (A) (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or
    (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and
   (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009 [enacted Oct. 28, 2009], specifically cites to this paragraph.
  (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;
  (5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;
  (6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;
  (7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;

(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(9) geological or geophysical information and data, including maps, concerning wells.

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.  The amount of information deleted, and the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made. If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made.

(c)

(1) Whenever a request is made which involves access to records described in subsection (b)(7)(A) and--

(A) the investigation or proceeding involves a possible violation of criminal law; and

(B) there is reason to believe that (i) the subject of the investigation or proceeding is not aware of its pendency, and (ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings,

the agency may, during only such time as that circumstance continues, treat the records as not subject to the requirements of this section.

(2) Whenever informant records maintained by a criminal law enforcement agency under an informant's name or personal identifier are requested by a third party according to the informant's name or personal identifier, the agency may treat the records as not subject to the requirements of this section unless the informant's status as an informant has been officially confirmed.

(3) Whenever a request is made which involves access to records maintained by the Federal Bureau of Investigation pertaining to foreign intelligence or counterintelligence, or international terrorism, and the existence of the records is classified information as provided in subsection (b)(1), the Bureau may, as long as the existence of the records remains classified information, treat the records as not subject to the requirements of this section.

(d) This section does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section. This section is not authority to withhold information from Congress.

11

(e) (1) On or before February 1 of each year, each agency shall submit to the Attorney General of the United States a report which shall cover the preceding fiscal year and which shall include--

(A) the number of determinations made by the agency not to comply with requests for records made to such agency under subsection (a) and the reasons for each such determination;

(B)

(i) the number of appeals made by persons under subsection (a)(6), the result of such appeals, and the reason for the action upon each appeal that results in a denial of information; and

(ii) a complete list of all statutes that the agency relies upon to authorize the agency to withhold information under subsection (b)(3), the number of occasions on which each statute was relied upon, a description of whether a court has upheld the decision of the agency to withhold information under each such statute, and a concise description of the scope of any information withheld;

(C) the number of requests for records pending before the agency as of September 30 of the preceding year, and the median and average number of days that such requests had been pending before the agency as of that date;

(D) the number of requests for records received by the agency and the number of requests which the agency processed;

(E) the median number of days taken by the agency to process different types of requests, based on the date on which the requests were received by the agency;

(F) the average number of days for the agency to respond to a request beginning on the date on which the request was received by the agency, the median number of days for the agency to respond to such requests, and the range in number of days for the agency to respond to such requests;

(G) based on the number of business days that have elapsed since each request was originally received by the agency--

(i) the number of requests for records to which the agency has responded with a determination within a period up to and including 20 days, and in 20-day increments up to and including 200 days;

(ii) the number of requests for records to which the agency has responded with a determination within a period greater than 200 days and less than 301 days;

(iii) the number of requests for records to which the agency has responded with a determination within a period greater than 300 days and less than 401 days; and

(iv) the number of requests for records to which the agency has responded with a determination within a period greater than 400 days;

12

(H) the average number of days for the agency to provide the granted information beginning on the date on which the request was originally filed, the median number of days for the agency to provide the granted information, and the range in number of days for the agency to provide the granted information;

(I) the median and average number of days for the agency to respond to administrative appeals based on the date on which the appeals originally were received by the agency, the highest number of business days taken by the agency to respond to an administrative appeal, and the lowest number of business days taken by the agency to respond to an administrative appeal;

(J) data on the 10 active requests with the earliest filing dates pending at each agency, including the amount of time that has elapsed since each request was originally received by the agency;

(K) data on the 10 active administrative appeals with the earliest filing dates pending before the agency as of September 30 of the preceding year, including the number of business days that have elapsed since the requests were originally received by the agency;

(L) the number of expedited review requests that are granted and denied, the average and median number of days for adjudicating expedited review requests, and the number adjudicated within the required 10 days;

(M) the number of fee waiver requests that are granted and denied, and the average and median number of days for adjudicating fee waiver determinations;

(N) the total amount of fees collected by the agency for processing requests; and

(O) the number of full-time staff of the agency devoted to processing requests for records under this section, and the total amount expended by the agency for processing such requests.

(2) Information in each report submitted under paragraph (1) shall be expressed in terms of each principal component of the agency and for the agency overall.

(3) Each agency shall make each such report available to the public including by computer telecommunications, or if computer telecommunications means have not been established by the agency, by other electronic means. In addition, each agency shall make the raw statistical data used in its reports available electronically to the public upon request.

(4) The Attorney General of the United States shall make each report which has been made available by electronic means available at a single electronic access point. The Attorney General of the United States shall notify the Chairman and ranking minority member of the Committee on Government Reform and Oversight of the House of Representatives and the Chairman and ranking minority member of the Committees on Governmental Affairs and the Judiciary of the Senate, no

later than April 1 of the year in which each such report is issued, that such reports are available by electronic means.

   (5) The Attorney General of the United States, in consultation with the Director of the Office of Management and Budget, shall develop reporting and performance guidelines in connection with reports required by this subsection by October 1, 1997, and may establish additional requirements for such reports as the Attorney General determines may be useful.

   (6) The Attorney General of the United States shall submit an annual report on or before April 1 of each calendar year which shall include for the prior calendar year a listing of the number of cases arising under this section, the exemption involved in each case, the disposition of such case, and the cost, fees, and penalties assessed under subparagraphs (E), (F), and (G) of subsection (a)(4). Such report shall also include a description of the efforts undertaken by the Department of Justice to encourage agency compliance with this section.

(f) For purposes of this section, the term--

   (1) "agency" as defined in section 551(1) of this *title [5 USCS § 551(1)]* includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency; and

   (2) "record" and any other term used in this section in reference to information includes--

     (A) any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format; and

     (B) any information described under subparagraph (A) that is maintained for an agency by an entity under Government contract, for the purposes of records management.

(g) The head of each agency shall prepare and make publicly available upon request, reference material or a guide for requesting records or information from the agency, subject to the exemptions in subsection (b), including--

   (1) an index of all major information systems of the agency;

   (2) a description of major information and record locator systems maintained by the agency; and

   (3) a handbook for obtaining various types and categories of public information from the agency pursuant to chapter 35 of title 44 [*44 USCS §§ 3501* et seq.], and under this section.

14

 (h) (1) There is established the Office of Government Information Services within the National Archives and Records Administration.

   (2) The Office of Government Information Services shall--

     (A) review policies and procedures of administrative agencies under this section;

     (B) review compliance with this section by administrative agencies; and

     (C) recommend policy changes to Congress and the President to improve the administration of this section.

   (3) The Office of Government Information Services shall offer mediation services to resolve disputes between persons making requests under this section and administrative agencies as a non-exclusive alternative to litigation and, at the discretion of the Office, may issue advisory opinions if mediation has not resolved the dispute.

(i) The Government Accountability Office shall conduct audits of administrative agencies on the implementation of this section and issue reports detailing the results of such audits.

(j) Each agency shall designate a Chief FOIA Officer who shall be a senior official of such agency (at the Assistant Secretary or equivalent level).

(k) The Chief FOIA Officer of each agency shall, subject to the authority of the head of the agency--

   (1) have agency-wide responsibility for efficient and appropriate compliance with this section;

   (2) monitor implementation of this section throughout the agency and keep the head of the agency, the chief legal officer of the agency, and the Attorney General appropriately informed of the agency's performance in implementing this section;

   (3) recommend to the head of the agency such adjustments to agency practices, policies, personnel, and funding as may be necessary to improve its implementation of this section;

   (4) review and report to the Attorney General, through the head of the agency, at such times and in such formats as the Attorney General may direct, on the agency's performance in implementing this section;

   (5) facilitate public understanding of the purposes of the statutory exemptions of this section by including concise descriptions of the exemptions in both the agency's handbook issued under subsection (g), and the agency's annual report on this section, and by providing an overview, where appropriate, of certain general categories of agency records to which those exemptions apply; and

   (6) designate one or more FOIA Public Liaisons.

15

 (l) FOIA Public Liaisons shall report to the agency Chief FOIA Officer and shall serve as supervisory officials to whom a requester under this section can raise concerns about the service the requester has received from the FOIA Requester Center, following an initial response from the FOIA Requester Center Staff. FOIA Public Liaisons shall be responsible for assisting in reducing delays, increasing transparency and understanding of the status of requests, and assisting in the resolution of disputes.