NO. 12-5363

_____

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED
_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

ELECTRONIC FRONTIER FOUNDATION,

*Plaintiff – Appellant,*

v.

UNITED STATES DEPARTMENT OF JUSTICE,

*Defendant – Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

JOINT APPENDIX
_____

| | | |
|---|---|---|
| **David L. Sobel**<br>**ELECTRONIC FRONTIER**<br>**FOUNDATION**<br>**1818 N Street, N.W., Suite**<br>**410**<br>**Washington, DC 20036**<br>**(202) 797-9009** | **Mark Rumold**<br>**ELECTRONIC FRONTIER**<br>**FOUNDATION**<br>**815 Eddy Street**<br>**San Francisco, CA 94109**<br>**(415) 436-9333** | **Daniel Tenny**<br>**Michael S. Raab**<br>**U.S. DEPARTMENT OF**<br>**JUSTICE**<br>**950 Pennsylvania Ave., N.W.**<br>**Washington, D.C. 20530**<br>**(202) 514-1838** |
| *Counsel for Appellant* | *Counsel for Appellant* | *Counsel for Appellee* |

# TABLE OF CONTENTS

Appendix Page

Docket Entries ................................................................................1

Complaint
    (May 19, 2011)................................................................6

Defendant's Answer to Complaint
    (June 20, 2011)............................................................12

Exhibits to
Government's Memorandum of Points and Authorities In Support of Motion for
Summary Judgment
    (November 10, 2011):

    1.    Declaration of Paul P. Colborn
        (November 10, 2011)................................................18

    2.    (Corrected) Declaration of David M. Hardy
        (December 13, 2011)................................................33

Exhibits to
Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary
Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment
(December 13, 2011):

    1.    Excerpt from
        Department of Justice, Office of Inspector General,
        *A Review of the Federal Bureau of Investigation's Use of Exigent
        Letters and Other Informal Requests for Telephone Records*
        (January 2010) ......................................................45

    2.    *Memorandum for Attorneys of the Office, Re: Best Practices for OLC
        Legal Advice and Written Opinions*
        By David Barron, Department of Justice
        (July 16, 2010) ......................................................53

Exhibit to
Plaintiff's Reply Memorandum in Support of Plaintiff's Cross-Motion for
Summary Judgment:

1.   *Report by the Office of Inspector General on the FBI's Use of Exigent
        Letters and Other Informal Requests for Telephone Records: Hearing
        Before the Subcomm. On the Constitutiton of the H. Comm. On the
        Judiciary*, 111th Cong.
        Statement of Valerie Caproni, General Counsel, FBI
            (April 14, 2010) ........................................................................60

United States District Court Memorandum Opinion of
    The Honorable Richard J. Leon
        (September 21, 2012) ....................................................................73

United States District Court Order of
    The Honorable Richard J. Leon
        (September 21, 2012) ....................................................................90

Dated this 6th day of June, 2013.

                                        Respectfully submitted,

                                          /s/ David L. Sobel
                                        DAVID L. SOBEL
                                        Electronic Frontier Foundation
                                        1818 N Street, N.W., Suite 410
                                        Washington, DC 20036

                                        MARK RUMOLD
                                        Electronic Frontier Foundation
                                        454 Shotwell Street
                                        San Francisco, CA 94110

                                        *Counsel for Plaintiff-Appellant*

                                        2

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 6th day of June, 2013, I caused this Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Daniel Tenny
Michael S. Raab
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washinton, DC 20530
(202) 514-1838

*Counsel for Appellee*

I declare under penalty of perjury that the foregoing is true and correct. Executed this 6th day of June, 2013 at Washington, D.C.

                                        /s/ David L. Sobel
                                        *Counsel for Appellant*

3

APPEAL,CLOSED,TYPE I-FOIA

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:11-cv-00939-RJL

ELECTRONIC FRONTIER FOUNDATION v.
DEPARTMENT OF JUSTICE
Assigned to: Judge Richard J. Leon
Case in other court: 12-05363
Cause: 05:552 Freedom of Information Act

Date Filed: 05/19/2011
Date Terminated: 09/21/2012
Jury Demand: None
Nature of Suit: 895 Freedom of
Information Act
Jurisdiction: U.S. Government
Defendant

**Plaintiff**

**ELECTRONIC FRONTIER
FOUNDATION**

represented by **David L. Sobel**
ELECTRONIC FRONTIER
FOUNDATION
1818 N Street, NW
Suite 410
Washington, DC 20036
(202) 246-6180
Fax: (202) 797-9066
Email: sobel@att.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DEPARTMENT OF JUSTICE**

represented by **Elisabeth Layton**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs
Branch
20 Massachusetts Avenue, NW
Suite 7110
Washington, DC 20530
(202) 514-3183
Email: elisabeth.layton@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/19/2011 | 1 [R] | COMPLAINT against DEPARTMENT OF JUSTICE ( Filing fee $ 350, receipt number 4616038972) filed by ELECTRONIC FRONTIER FOUNDATION. (Attachments: # 1 Civil Cover Sheet)(jf, ) (Entered: 05/20/2011) |
| 05/19/2011 | | SUMMONS (3) Issued as to DEPARTMENT OF JUSTICE, U.S. Attorney and U.S. Attorney General (jf, ) (Entered: 05/20/2011) |
| 05/19/2011 | 2 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests NONE by ELECTRONIC FRONTIER FOUNDATION (jf, ) (Entered: 05/20/2011) |
| 06/10/2011 | 3 | STANDING ORDER. Signed by Judge Richard J. Leon on 6/10/2011. (lcrjl3) (Entered: 06/10/2011) |
| 06/20/2011 | 4 | ANSWER to 1 [R] Complaint by DEPARTMENT OF JUSTICE.(Layton, Elisabeth) (Entered: 06/20/2011) |
| 07/20/2011 | 5 | MEET AND CONFER STATEMENT. (Layton, Elisabeth) (Entered: 07/20/2011) |
| 08/04/2011 | 6 | ERRATA *Proposed Order* by DEPARTMENT OF JUSTICE 5 Meet and Confer Statement. (Layton, Elisabeth) (Entered: 08/04/2011) |
| 08/08/2011 | 7 | ORDER : Defendant's Motion for Summary Judgment due by 10/7/2011. Plaintiff's Opposition thereto and Cross-Motion for Summary Judgment due by 11/7/2011. Defendant's Reply and Opposition due by 11/21/2011. Plaintiff's Reply by 12/5/2011. Signed by Judge Richard J. Leon on 8/5/2011. (see order) (kc) (Entered: 08/08/2011) |
| 09/30/2011 | 8 | Unopposed MOTION for Extension of Time to *File Defendant's Motion For Summary Judgment* by DEPARTMENT OF JUSTICE (Attachments: # 1 Text of Proposed Order)(Layton, Elisabeth) (Entered: 09/30/2011) |
| 10/07/2011 | 9 | ORDER granting 8 Defendant's Motion for Extension of Time. Defendant's Motion for Summary Judgment is due by 11/4/2011; Plaintiff's Opposition and Cross-Motion is due by 12/7/2011; Defendant's Reply to Summary Judgment and Opposition to the Cross-Motion is due by 12/21/2011; Plaintiff's Reply to the Cross-Motion is due by 1/6/2012. Signed by Judge Richard J. Leon on 10/3/2011. (jth) (Entered: 10/07/2011) |
| 11/04/2011 | 10 [R] | Unopposed MOTION for Extension of Time to *File Defendant's Motion For Summary Judgment* by DEPARTMENT OF JUSTICE (Attachments: # 1 [R] Text of Proposed Order)(Layton, Elisabeth) (Entered: 11/04/2011) |
| 11/07/2011 | | MINUTE ORDER granting 10 [R] Unopposed Motion for Extension of Time to File Defendant's Motion for Summary Judgment. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on |

| | | |
|---|---|---|
| | | 11/7/2011. (lcrjl3) (Entered: 11/07/2011) |
| 11/10/2011 | 11 | MOTION for Summary Judgment by DEPARTMENT OF JUSTICE (Attachments: # 1 Statement of Facts, # 2 Memorandum in Support, # 3 Declaration of David M. Hardy, # 4 Declaration of Paul P. Colborn, # 5 Text of Proposed Order)(Layton, Elisabeth) (Entered: 11/10/2011) |
| 12/13/2011 | 12 | NOTICE *OF FILING CORRECTED DECLARATION OF DAVID M. HARDY* by DEPARTMENT OF JUSTICE re 11 MOTION for Summary Judgment (Attachments: # 1 Errata Corrected Declaration of David M. Hardy)(Layton, Elisabeth) (Entered: 12/13/2011) |
| 12/13/2011 | 13 | Memorandum in opposition to re 11 MOTION for Summary Judgment filed by ELECTRONIC FRONTIER FOUNDATION. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Statement of Facts (Response), # 4 Text of Proposed Order)(Sobel, David) (Entered: 12/13/2011) |
| 12/13/2011 | 14 | Cross MOTION for Summary Judgment by ELECTRONIC FRONTIER FOUNDATION (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Statement of Facts, # 4 Text of Proposed Order)(Sobel, David) (Entered: 12/13/2011) |
| 12/19/2011 | 15 | Unopposed MOTION for Extension of Time to File Response/Reply as to 11 MOTION for Summary Judgment, 14 Cross MOTION for Summary Judgment by DEPARTMENT OF JUSTICE (Attachments: # 1 Text of Proposed Order)(Layton, Elisabeth) (Entered: 12/19/2011) |
| 12/27/2011 | | MINUTE ORDER granting 15 Unopposed Motion for Extension of Time to File Response. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 12/27/11.(lcrjl3) (Entered: 12/27/2011) |
| 12/28/2011 | | Set/Reset Deadlines: Defendant's Reply to the Motion for Summary Judgment and Response to Plaintiff's Cross Motion is due by 1/9/2012. Plaintiff's Reply to the Cross Motion is due by 1/25/2012. (jth) (Entered: 12/28/2011) |
| 01/09/2012 | 16 R | Unopposed MOTION for Extension of Time to *File Defendant's Opposition To Plaintiff's Cross-Motion For Summary Judgment And Reply In Support Of Defendant's Motion For Summary Judgment* by DEPARTMENT OF JUSTICE (Attachments: # 1 Text of Proposed Order)(Layton, Elisabeth) (Entered: 01/09/2012) |
| 01/10/2012 | 17 | REPLY to opposition to motion re 11 MOTION for Summary Judgment, filed by DEPARTMENT OF JUSTICE. (Layton, Elisabeth) Modified link on 1/11/2012 (znmw, ). (Entered: 01/10/2012) |
| 01/10/2012 | 18 | Memorandum in opposition to re 14 Cross MOTION for Summary Judgment filed by DEPARTMENT OF JUSTICE. (See Docket Entry 17 to view document. Counsel is reminded to file a combined reply and opposition as two separate docket entries in future). (znmw, ) (Entered: 01/11/2012) |

| 01/11/2012 | | MINUTE ORDER granting 16 R Unopposed Motion for Extension of Time to File Defendant's Opposition. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 01/11/12. (lcrjl3) (Entered: 01/11/2012) |
|---|---|---|
| 01/24/2012 | 19 | Consent MOTION for Extension of Time to File Response/Reply *(Two Days)* by ELECTRONIC FRONTIER FOUNDATION (Attachments: # 1 Text of Proposed Order)(Sobel, David) (Entered: 01/24/2012) |
| 01/27/2012 | | MINUTE ORDER granting 19 Consent Motion for Extension of Time to File Response/Reply. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 1/27/2012. (lcrjl3) (Entered: 01/27/2012) |
| 01/30/2012 | 20 | REPLY to opposition to motion re 14 Cross MOTION for Summary Judgment filed by ELECTRONIC FRONTIER FOUNDATION. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Sobel, David) (Entered: 01/30/2012) |
| 02/07/2012 | 21 | NOTICE OF SUPPLEMENTAL AUTHORITY by ELECTRONIC FRONTIER FOUNDATION (Sobel, David) (Entered: 02/07/2012) |
| 09/21/2012 | 22 R | MEMORANDUM OPINION. Signed by Judge Richard J. Leon on 9/21/2012. (kc ) (Entered: 09/21/2012) |
| 09/21/2012 | 23 R | ORDER, For the reasons set forth in the Memorandum Opinion entered this date, it is this 21st day of September, 2012, hereby ORDERED that defendant's Motion 11 for Summary Judgment is GRANTED; it is further ORDERED that plaintiff's Cross-Motion 14 for Summary Judgment is DENIED. Signed by Judge Richard J. Leon on 9/21/2012. (see order) (kc ) (Entered: 09/21/2012) |
| 11/15/2012 | 24 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 23 R Order on Motion for Summary Judgment,,, 22 R Memorandum & Opinion by ELECTRONIC FRONTIER FOUNDATION. Filing fee $ 455, receipt number 0090-3133183. Fee Status: Fee Paid. Parties have been notified. (Sobel, David) (Entered: 11/15/2012) |
| 11/16/2012 | 25 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re 24 Notice of Appeal to DC Circuit Court,. (znmw, ) (Entered: 11/16/2012) |
| 11/16/2012 | | USCA Case Number 12-5363 for 24 Notice of Appeal to DC Circuit Court, filed by ELECTRONIC FRONTIER FOUNDATION. (jf, ) (Entered: 11/16/2012) |

**PACER Service Center**

| Transaction Receipt | | | |
|---|---|---|---|
| 05/31/2013 12:57:45 | | | |
| **PACER Login:** | ef0084 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:11-cv-00939-RJL |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

FILED

MAY 19 2011

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ELECTRONIC FRONTIER FOUNDATION**           )
1818 N Street, N.W.                          )
Suite 410                                    )
Washington, DC 20036,                        )
                                             \
                    Plaintiff,               )

          v.

**DEPARTMENT OF JUSTICE**                    )
950 Pennsylvania Avenue, N.W.                )
Washington DC 20530,                         )
                                             )
                    Defendant.               )
_____  )

Case: 1:11-cv-00939
Assigned To : Leon, Richard J.
Assign. Date : 5/19/2011
Description: FOIA/Privacy Act

## COMPLAINT FOR INJUNCTIVE RELIEF

1. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. §
552. Plaintiff Electronic Frontier Foundation ("EFF") seeks injunctive and other
appropriate relief for the processing and release of agency records requested by plaintiff
from defendant Department of Justice ("DOJ"). Specifically, plaintiff seeks disclosure
of a memorandum prepared by DOJ's Office of Legal Counsel ("OLC") in January 2010
concerning statutory provisions governing the conduct of electronic surveillance.

### Jurisdiction and Venue

2. This Court has both subject matter jurisdiction over this action and personal
jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(B). This Court also has
jurisdiction over this action pursuant to 28 U.S.C. § 1331. Venue lies in this district
under 5 U.S.C. § 552(a)(4)(B).

**Parties**

3. Plaintiff  EFF is a not-for-profit corporation established under the laws of the

Commonwealth of Massachusetts, with offices in San Francisco, California and

Washington, DC.  EFF is a donor-supported membership organization that works to

inform policymakers and the general public about civil liberties issues related to

technology, and to act as a defender of those liberties.  In support of its mission, EFF uses

the FOIA to obtain and disseminate information concerning the activities of federal

agencies.

4.  Defendant DOJ is a Department of the Executive Branch of the United States

Government.  DOJ is an "agency" within the meaning of 5 U.S.C. § 552(f).  OLC is a

component of defendant DOJ.

**Government Acquisition of Communications Data and the OLC Memorandum**

5.  In January 2010, DOJ's Office of the Inspector General ("OIG") released a

report entitled, "A Review of the Federal Bureau of Investigation's Use of Exigent

Letters and Other Informal Requests for Telephone Records," its third report in response

to the requirements of the USA PATRIOT Improvement and Reauthorization Act of

2005.  The first two reports issued in response to that Act focused on the FBI's massive

abuse and misuse of National Security Letters ("NSLs"), a secret administrative subpoena

authority that was expanded under the USA PATRIOT Act of 2001 and is used to obtain,

*inter alia*, telephone records in national security investigations.  The third OIG report

focused on the FBI's widespread use of informal requests to communications service

providers to obtain telephone records without any legal process at all, and in violation of

18 U.S.C. § 2702 of the Stored Communications Act, that portion of the Electronic

Communications Privacy Act ("ECPA") regulating provider disclosures and government demands for communications records and content.

6. The final, publicly released OIG report revealed that after it reviewed a draft of the report before release, the FBI asserted for the first time a new legal theory defending the legality of its obtaining certain types of telephone records in national security investigations without the use of NSLs or any other legal process. The report further revealed that the FBI had requested the OLC's opinion on the issue, and that the resulting OLC opinion—issued on January 8, 2010—concurred with the FBI's argument that ECPA allowed the FBI to seek and obtain certain types of telephone records on a voluntary basis from providers without legal process or a qualifying emergency.

7. Due to redactions, the unclassified version of the OIG report did not specify the particular exception in the statute that the FBI and OLC were relying on for their novel legal conclusion, or what category of telephone records it purportedly applied to. However, the public version of the report did clearly express the OIG's grave concerns about the FBI's and OLC's new reading of the law, noting the OIG's belief that the newly argued exception "creates a significant gap in FBI accountability and oversight that should be examined closely by the FBI, the Department, and Congress," and further noting that although "[t]he FBI has stated that it does not intend to reply on [its newly argued exception] . . . that could change, and we believe that appropriate controls on such authority should be considered now, in light of the FBI's past practices . . . ." The OIG concluded with a recommendation that DOJ notify Congress of the issue and of the OLC opinion interpreting the scope of the FBI's authority, so that Congress could consider the matter.

8.  In response to a FOIA request by a journalist for the January 8, 2010, OLC memorandum discussed in the OIG report, the OLC revealed in a response letter dated February 8, 2011, that the memo specifically addressed the FBI's authority under 18 U.S.C. 2511(2)(f), thereby identifying the statutory provision relied upon by the FBI in arguing that it did not require legal process to obtain voluntary disclosure of certain telephone records.

### Plaintiff's FOIA Request and DOJ's Withholding Decision

9.  By letter sent by electronic mail to defendant DOJ's component OLC on February 15, 2011, plaintiff requested under the FOIA "a copy of an OLC memorandum dated January 8, 2010, analyzing the authority of the FBI under [18 U.S.C. § 2511]."

10.  By letter to plaintiff dated February 25, 2011, OLC acknowledged its receipt of plaintiff's FOIA request and stated that  it "found one document that is responsive to [the] request" and that "[w]e are withholding the document pursuant to FOIA Exemptions One and Five, 5 U.S.C. § 552(b)(1) and (5)."  OLC advised plaintiff of its right to file an administrative appeal of OLC's adverse determination.

11.  By letter to defendant DOJ's Office of Information Policy ("OIP") dated March 9, 2011, plaintiff appealed OLC's determination to withhold the requested records.

12.  By letter to plaintiff dated March 22, 2011, OIP acknowledged its receipt of plaintiff's administrative appeal on March 18, 2011.

13.  To date, defendant DOJ has not issued a determination in response to plaintiff's administrative appeal under the FOIA.

14.  Defendant DOJ has violated the applicable statutory time limit for rendering decisions on administrative appeals under the FOIA.

15.  Plaintiff has exhausted the applicable administrative remedies.

16.  Defendant DOJ has wrongfully withheld the requested records from plaintiff.

## CAUSE OF ACTION

### Violation of the Freedom of Information Act for
### Wrongful Withholding of Agency Records

17.  Plaintiff repeats and realleges paragraphs 1-16.

18.  Defendant DOJ has wrongfully withheld agency records requested by
plaintiff by determining to withhold the requested material, and failing to comply with
the statutory time limit for rendering decisions on administrative appeals under the FOIA.

19.  Plaintiff has exhausted the applicable administrative remedies with respect to
defendant DOJ's wrongful withholding of the requested records.

20.  Plaintiff is entitled to injunctive relief with respect to the release and
disclosure of the requested records.

## Requested Relief

WHEREFORE, plaintiff prays that this Court:

A.  order defendant DOJ to disclose the requested records in their entirety
and make copies available to plaintiff;

B.  provide for expeditious proceedings in this action;

C.  award plaintiff its costs and reasonable attorneys fees incurred in this
action; and

D.  grant such other relief as the Court may deem just and proper.

Respectfully submitted,

DAVID L. SOBEL
D.C. Bar No. 360418
Electronic Frontier Foundation
1818 N Street, N.W.
Suite 410
Washington, DC 20036
(202) 797-9009

Counsel for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
ELECTRONIC FRONTIER FOUNDATION,          )
                                        )
        Plaintiff,                       )
                                        )
        v.                               )
                                        )   Civ. A. No. 1:11-cv-00939 (RJL)
DEPARTMENT OF JUSTICE,                   )
                                        )
        Defendant.                       )
_____ )

## ANSWER

Defendant, the United States Department of Justice ("DOJ"), by and through counsel,

hereby answers and otherwise responds to the Complaint for Injunctive Relief ("Complaint"),

upon information and belief as follows:

## FIRST DEFENSE

The Court lacks jurisdiction over the subject matter of this complaint because no records

have been improperly withheld.

## SECOND DEFENSE

The Complaint fails to state a claim upon which relief can be granted.


## RESPONSES TO INDIVIDUAL AVERMENTS

Defendant responds to the numbered paragraphs of plaintiff's Complaint as set forth

below.

1.      This paragraph contains plaintiff's characterization of this lawsuit and does not

contain averments of fact to which a response is required.

## JURISDICTION AND VENUE

2.      This paragraph contains plaintiff's averments of jurisdiction and venue, to which no response is required.

### PARTIES

3.      Defendant lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in this paragraph.

4.      Defendant admits the averments in this paragraph.

### Plaintiff's Averments Concerning "Government Acquisition of Communications Data and the OLC Memorandum"

5.      Defendant denies the averments in the first sentence of this paragraph except to admit that, in January 2010, the United States Department of Justice's ("Department" or "DOJ") Office of the Inspector General ("OIG") issued a report entitled "A Review of the Federal Bureau of Investigations's Use of Exigent Letters and Other Informal Requests for Telephone Records," which contained significant redactions to protect classified information and other sensitive information.  The remainder of the first sentence contains plaintiff's characterization of this report, to which no response is required, and defendant respectfully refers the Court to the report itself.  The second sentence of this paragraph contains plaintiff's characterization of reports issued by OIG in March 2007 and March 2008, to which no response is required.   To the extent that a response is deemed necessary, defendant  respectfully refers the Court to the OIG reports themselves.  The third sentence of this paragraph contains plaintiff's characterizations of the report issued by OIG in January 2010, to which no response is required.  To the extent a response is deemed necessary, Defendant respectfully refers the Court to the January 2010 OIG report itself.

2

6.   This paragraph contains plaintiff's characterizations of the contents of the OIG's January 2010 report, to which no response is necessary.  Defendant respectfully refers the Court to the report itself.  To the extent a response is deemed necessary, the allegations in this paragraph are denied.

7.   This paragraph contains plaintiff's characterizations of the contents of the OIG's January 2010 report, to which no response is necessary.   Defendant respectfully refers the Court to the report itself.  To the extent a response is deemed necessary, the allegations in this paragraph are denied.

8.   The allegations in this paragraph are denied, except that defendant admits that, by letter dated February 8, 2011, DOJ's Office of Legal Counsel ("OLC") responded to a January 8, 2010 FOIA request by identifying a January 8, 2010 OLC opinion as one of 237 documents responsive to that request.  Defendant respectfully refers the Court to OLC's letter of February 8, 2011.

**Plaintiff's FOIA Request and DOJ'S Withholding Decision**

9.    Defendant admits that plaintiff Electronic Frontier Foundation made a FOIA request via a letter to OLC dated February 14, 2011, and respectfully refers the Court to the letter itself.

10.    Defendant admits that OLC timely responded to plaintiff's request via letter dated February 25, 2011 withholding a single record, and respectfully refers the Court to the letter itself.

3

11.     Defendant admits that, by letter to DOJ's Office of Information Policy (OIP) dated March 9, 2011, plaintiff asserted that it was appealing OLC's determination to withhold the requested record, and respectfully refers the Court to the letter itself.

12.     Defendant admits that, by letter to plaintiff dated March 22, 2011, OIP acknowledged receipt on March 18, 2011 of plaintiff's administrative appeal via letter dated March 22, 2011, and respectfully refers the Court to the letter itself.

13.      Denies all allegations contained in this paragraph except that defendant admits that DOJ had not issued a determination in response to plaintiff's administrative appeal at the time the Complaint was filed on May 19, 2011 and that Defendant closed the appeal file on May 24, 2011.

14.     Defendant denies all allegations contained in this paragraph.

15.     Defendant denies all allegations contained in this paragraph except that defendant admits that OIP did not rule on  plaintiff's administrative appeal prior to the filing of the Complaint.

16.     Defendant denies all allegations contained in this paragraph.

4

## CAUSE OF ACTION

### Plaintiff's Averments Concerning alleged "Violation of the Freedom of Information Act for Wrongful Withholding of Agency Records"

17.     Defendant repeats its answers in paragraphs 1-16.

18.     Defendant denies all allegations contained in this paragraph

19.     Defendant denies all allegations contained in this paragraph except that defendant admits that OIP did not rule on  on plaintiff's administrative appeal prior to the filing of the Complaint.

20.     Defendant denies all allegations contained in this paragraph.

### Requested Relief

This remaining unnumbered paragraph, including subparts A through D, contain plaintiff's demands for relief to which an answer is not required; however, insofar as an answer may be required, defendant denies that plaintiff is entitled to the relief requested or to any relief whatsoever.

Defendant further denies any and all allegations in the Complaint not expressly admitted herein.

5

WHEREFORE, defendant prays for an order: (1) denying plaintiff's requests for relief;

and (2) awarding defendant such other and further relief as the Court deems just and proper.


Respectfully submitted,

TONY WEST
 Assistant Attorney General

RONALD C. MACHEN JR.
United States Attorney

JOHN R. TYLER
Assistant Director
Federal Programs Branch


Dated: June 20, 2011                          */s Elisabeth Layton*
                                              ELISABETH LAYTON (D.C. Bar No.462227)
                                              Senior Counsel
                                              U.S. Department of Justice, Civil Division
                                              20 Massachusetts Ave., NW, Rm. 7110
                                              Washington, D.C.  20001
                                              Telephone: (202) 514-3183
                                              Fax: (202) 616-8470
                                              elisabeth.layton@usdoj.gov

                                              Counsel for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC FRONTIER FOUNDATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civ. A. No. 1:11-cv-00939 (RJL) |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF PAUL P. COLBORN

I, Paul P. Colborn, declare as follows:

     1.     I am a Special Counsel in the Office of Legal Counsel ("OLC") of the United

States Department of Justice (the "Department") and a career member of the Senior Executive

Service. I joined OLC in 1986, and since 1987 I have had the responsibility, among other things,

of supervising OLC's responses to requests it receives under the Freedom of Information Act

("FOIA"), 5 U.S.C. § 552. I submit this declaration in support of the Government's Motion for

Summary Judgment. These statements are based on my personal knowledge, on information

provided to me by OLC attorneys and staff working under my direction, and on information

provided to me by others within the Executive Branch of the Government.

## OLC'S RESPONSIBILITIES

     2.     The principal function of OLC is to assist the Attorney General in his role as legal

advisor to the President of the United States and to departments and agencies of the Executive

Branch. OLC provides advice and prepares opinions addressing a wide range of legal questions

involving the operations of the Executive Branch. OLC does not purport, and in fact lacks

authority, to make policy decisions. OLC's legal advice and analysis may inform the decision-making of Executive Branch officials on matters of policy, but OLC's legal advice is not itself dispositive as to any policy adopted.

3.      As part of its regular practice, OLC reviews its formal legal opinions after they are issued to determine whether they may be appropriate for publication. This process involves consultation with affected agencies or offices. Likewise, as part of OLC's processing of FOIA requests, it considers whether to make discretionary releases of final legal analysis (again, after appropriate consultation with affected agencies or offices).

4.      Although OLC thus publishes some opinions and makes discretionary releases of others, much of the office's legal advice must be kept confidential. One important reason OLC legal advice needs to stay confidential is that it often constitutes part of a larger deliberative process—a process that itself requires confidentiality to be effective. The Supreme Court long ago recognized that "efficiency of Government would be greatly hampered if, with respect to legal and policy matters, all Government agencies were prematurely forced to 'operate in a fishbowl.'" *Environmental Protection Agency v. Mink*, 410 U.S. 73, 87 (1973) (quoting S. Rep. 813, 89th Cong., 1st Sess., 9 (1965)). These concerns apply with particular force at OLC where attorneys are often asked to provide advice and analysis with respect to very difficult and unsettled issues of law. Frequently, such issues arise in connection with highly complex and sensitive operations of the Executive Branch on matters that can be quite controversial. It is essential to the mission of the Executive Branch that OLC legal advice provided in the context of internal deliberations not be inhibited by concerns about public disclosure in order to ensure the

-2-

candor of Executive Branch deliberations so that Executive Branch officials may continue to request and rely on legal advice from OLC on such sensitive matters.

5.     A second reason OLC legal opinions may need to stay confidential is to protect the relationship of trust between OLC and the client seeking its legal advice.  As the Supreme Court has observed, "[t]he attorney-client privilege is the oldest of the privileges for confidential communications known to the common law.  Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  The law generally protects the special relationship of trust between a client and an attorney when the one seeks and the other provides independent legal advice.  If the request for advice is made in confidence, both request and advice are protected from compelled disclosure.  *Id.* at 390 ("the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice.").  In the governmental context, this relationship of trust is especially important to protect, where a free and candid flow of information between agency decision makers and their outside legal advisors promotes broad public interests in the rule of law and the administration of justice.  *See In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) *citing Confidentiality of the Attorney General's Communications in Counseling the President,* 6 Op. Off. Legal Counsel 481, 495 (1982) (Opinion of Theodore B. Olsen, Assistant Attorney General).

## EFF's FOIA REQUEST

6.     On February 15, 2011, OLC received a FOIA request from David Sobel, Senior Counsel of the Electronic Frontier Foundation, seeking "a copy of an OLC memorandum dated

January 8, 2009, analyzing the authority of the FBI under section 2511 of the Stored

Communications Act." (Attached as Exhibit A.)

       7.      By letter dated February 25, 2011 (attached as Exhibit B), I responded to Mr.

Sobel on behalf of OLC, informing him that OLC had identified one document that was

responsive to his request, that we were withholding it pursuant to FOIA Exemptions One and

Five, 5 U.S.C. § 552(b)(1) and (5), because it was both classified and protected by the

deliberative process privilege, and that he had the right to appeal OLC's withholding decision to

the Office of Information Policy of the Department of Justice ("OIP"). On March 18, 2011, Mr.

Sobel filed an appeal of OLC's decision with OIP. (Attached as Exhibit C.)

       8.      On May 19, 2011, before OIP ruled on Mr. Sobel's appeal, Plaintiff Electronic

Frontier Foundation filed the instant lawsuit.

## DOCUMENT AT ISSUE

       9.      The document at issue in this case is a January 8, 2010 Memorandum for Valerie

Caproni, General Counsel of the Federal Bureau of Investigation (the "FBI"), from David J.

Barron, Acting Assistant Attorney General for the Office of Legal Counsel (the "Opinion"). The

OLC Opinion was prepared in response to a November 27, 2009 opinion request from the FBI's

General Counsel and a supplemental request from Ms. Caproni dated December 11, 2009. These

two requests were made in order to obtain OLC advice that would assist FBI's evaluation of how

it should respond to a draft Report by the Office of Inspector General of the Department of

Justice (the "OIG") in the course of a review by the OIG of the FBI's use of certain investigatory

-4-

procedures.[1]  In the context of preparing the Opinion, OLC, as is common,[2] also sought and

obtained the views of other interested agencies and components of the Department.  OIG was

aware that the FBI was seeking legal advice on the question from OLC, but it did not submit its

views on the question.

10.      The factual information contained in the FBI's requests to OLC for legal advice

concerned certain sensitive techniques used in the context of national security and law

enforcement investigations—in particular, significant information about intelligence activities,

sources, and methodology.  Many of the individual paragraphs in the FBI's opinion request are

classified at the "S/NF" level, permitting only individuals with an appropriate security clearance

and a need to know to have access to the document.  Those portions of the two letters that are

unclassified contain factual and legal discussions to assist OLC in formulating its Opinion, and

given their context, were clearly intended by the FBI to remain confidential.

11.      The Opinion issued by OLC on January 8, 2010 contains content derived from

confidential and classified communications made by the FBI to OLC.  Those portions of the

Opinion which reflect classified factual information provided to OLC by the FBI are marked

classified.  Those portions of the Opinion that are marked unclassified reflect other confidential

---

[1]  The final OIG report was released with redactions later in January 2010 under the title,
A REVIEW OF THE FEDERAL BUREAU OF INVESTIGATION'S USE OF EXIGENT LETTERS AND OTHER
INFORMAL REQUESTS FOR TELEPHONE RECORDS ("OIG Report").  *Accessible at:*
http://www.justice.gov/oig/special/s1001r.pdf.

[2]  See Memorandum for Attorneys of the Office, from David J. Barron, Acting Assistant
Attorney General, Office of Legal Counsel, *Re: Best Practice for OLC Legal Advice and Written
Opinions*, 3 (July 16, 2010), accessible at http://www.justice.gov/olc/memoranda-opinions.html.

-5-

factual as well as confidential legal communications provided by the FBI to OLC for the purpose

of obtaining legal advice.

12.    The Opinion has not been made public, and to the extent that it has been shared

with others within the Government, these individuals would, pursuant to Executive Order

13,526, only have been persons with an appropriate security clearance and a need to know—that

is, individuals whose job responsibilities related to national security.  There is no question that

anyone who reviewed the Opinion would have understood the need for confidentiality.

13.    The OLC Opinion is protected by the deliberative process privilege because it is

both pre-decisional and deliberative.  It is pre-decisional because it was prepared in connection

with the FBI's re-evaluation of sensitive techniques used in national security and law

enforcement investigations in response to questions raised about these techniques by the OIG, as

well as in the context of the FBI's evaluation of how it would respond to drafts of the OIG

Report.  The Opinion is deliberative because it constitutes advice used by decision-makers at the

FBI and by other Executive Branch agencies and Department components in the context of their

efforts to ensure that any information-gathering procedures comply fully with the law.

Compelled disclosure of the Opinion would undermine the deliberative processes of the

government and chill the candid and frank communications necessary for effective governmental

decision-making.

14.    The foregoing considerations regarding the need for confidential deliberations are

particularly compelling in the context of the provision of legal advice, and thus the attorney-

client privilege also applies to the OLC Opinion.  The Opinion was requested by the FBI and

reflects confidential communications to OLC from the FBI and other agencies.  In providing the

-6-

Opinion, OLC was serving an advisory role as legal counsel to the Executive Branch.  In the context of the FBI's evaluation of its procedures, the general counsel at the FBI sought OLC advice regarding the proper interpretation of the law with respect to information-gathering procedures employed by the FBI and other Executive Branch agencies.  Having been requested to provide counsel on the law, OLC stood in a special relationship of trust with the FBI and the other affected agencies.  Just as disclosure of client confidences in the course of seeking legal advice would seriously disrupt the relationship of trust so critical when attorneys formulate legal advice to their clients, disclosure of the advice itself would be equally disruptive to that trust.

15.  In conclusion, I respectfully submit that the OLC Opinion is covered by both the deliberative process and the attorney-client privileges and accordingly falls squarely within Exemption Five of the FOIA, 5 U.S.C. § 552(b)(5), which authorizes withholding of any document that is protected by any of the privileges available to the government in litigation with the agency.  The compelled disclosure of the OLC Opinion would harm the deliberative processes of the government and would disrupt the attorney-client relationship between OLC and its clients throughout the Executive Branch.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: November 10, 2011

_____
PAUL P. COLBORN

-7-

# EXHIBIT A



**Electronic Frontier Foundation**
Protecting Rights and Promoting Freedom on the Electronic Frontier

February 15, 2011

**BY EMAIL** — Bette.Farris@usdoj.gov

Bette Farris, Supervisory Paralegal
Office of Legal Counsel
Department of Justice
Room 5515
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

                    RE:    Freedom of Information Act Request

Dear Ms. Farris:

This letter constitutes an expedited request under the Freedom of Information Act
("FOIA"), 5 U.S.C. § 552, and is submitted to the Office of Legal Counsel ("OLC") on
behalf of the Electronic Frontier Foundation ("EFF"). We make this request as part of
EFF's FOIA Litigation for Accountable Government ("FLAG") Project, which works to
obtain government documents and make them widely available to the public.

We hereby request a copy of an OLC memorandum dated January 8, 2010, analyzing the
authority of the FBI under Section 2511 of the Stored Communications Act.

**Request for News Media Fee Status**

EFF asks that it not be charged search or review fees for this request because EFF
qualifies as a representative of the news media pursuant to the FOIA and 28 C.F.R. §
16.11(b)(6). In requesting this classification, we note that the Department of Homeland
Security, National Security Agency, and Department of State have recognized that EFF
qualifies as a "news media" requester, based upon the publication activities set forth
below. We further note that the U.S. Court of Appeals for the D.C. Circuit has stressed
that "different agencies [must not] adopt inconsistent interpretations of the FOIA." *Al-
Fayed v. CIA*, 254 F.3d 300, 307 (D.C. Cir. 2001), quoting *Pub. Citizen Health Research
Group v. FDA*, 704 F.2d 1280, 1287 (D.C. Cir. 1983).

EFF is a non-profit public interest organization that works "to protect and enhance our
core civil liberties in the digital age."[1] One of EFF's primary objectives is "to educate the
press, policymakers and the general public about online civil liberties."[2] To accomplish
this goal,

---

[1] Guidestar Basic Report, Electronic Frontier Foundation, http://www.guidestar.org/pqShowGsReport.do?
npoId=561625 (last visited Feb. 1, 2008).
[2] *Id.*

1818 N Street, N.W., Suite 410 • Washington, DC 20036
☎ +1 202 797 9009   ✆ +1 202 797 9066   🌐 www.eff.org   ✉ information@eff.org

Office of Legal Counsel
February 15, 2011
Page two


First, EFF maintains a frequently visited web site, http://www.eff.org, which received 46,682,194 hits in July 2007 — an average of 62,744 per hour. The web site reports the latest developments and contains in-depth information about a variety of civil liberties and intellectual property issues.

EFF has regularly published an online newsletter, the EFFector, since 1990. The EFFector currently has more than 77,000 subscribers. A complete archive of past EFFectors is available at http://www.eff.org/effector/.

Furthermore, EFF publishes a blog that highlights the latest news from around the Internet. DeepLinks (http://www.eff.org/deeplinks/) reports and analyzes newsworthy developments in technology. It also provides miniLinks, which direct readers to other news articles and commentary on these issues. DeepLinks had 510,633 hits in July 2007.[1]

In addition to reporting hi-tech developments, EFF staff members have presented research and in-depth analysis on technology issues in no fewer than eighteen white papers published since 2002. These papers, available at http://www.eff.org/wp/, provide information and commentary on such diverse issues as electronic voting, free speech, privacy and intellectual property.

EFF has also published several books to educate the public about technology and civil liberties issues. *Everybody's Guide to the Internet* (MIT Press 1994), first published electronically as *The Big Dummy's Guide to the Internet* in 1993, was translated into several languages, and is still sold by Powell's Books (http://www.powells.com). EFF also produced *Protecting Yourself Online: The Definitive Resource on Safety, Freedom & Privacy in Cyberspace* (HarperEdge 1998), a "comprehensive guide to self-protection in the electronic frontier," which can be purchased via Amazon.com (http://www.amazon.com). Finally, *Cracking DES: Secrets of Encryption Research, Wiretap Politics & Chip Design* (O'Reilly 1998) revealed technical details on encryption security to the public. The book is available online at http://cryptome.org/cracking -des.htm and for sale at Amazon.com.

Most recently, EFF has begun broadcasting podcasts of interviews with EFF staff and outside experts. *Line Noise* is a five-minute audio broadcast on EFF's current work, pending legislation, and technology-related issues. A listing of *Line Noise* podcasts is available at feed://www.eff.org/rss/linenoisemp3.xml and feed://www.eff.org/rss/ linenoiseogg.xml. These podcasts were downloaded more than 2,600 times from EFF's web site in July 2007.

---

[1] These figures include hits from RSS feeds through which subscribers can easily track updates to DeepLinks and miniLinks.

Office of Legal Counsel
February 15, 2011
Page three

Thank you for your consideration of this request.  If you have any questions or concerns, please do not hesitate to contact me at (202) 797-9009 x. 104.  As the FOIA provides, I will anticipate a determination on this request from your office within 20 working days.

I certify that, to the best of my knowledge, all information within this request is true and correct.

Sincerely,

David L. Sobel
Senior Counsel

# EXHIBIT B

Office of Legal Counsel

_____

*Washington, D.C. 20530*

February 25, 2011

David L. Sobel
Electronic Frontier Foundation
1818 N Street, N.W.
Suite 410
Washington, DC 20036

Dear Mr. Sobel:

This is in response to your Freedom of Information Act ("FOIA") request dated February 15, 2011. We have searched the files of the Office of Legal Counsel and have found one document that is responsive to your request. We are withholding the document pursuant to FOIA Exemptions One and Five, 5 U.S.C. § 552(b)(1) and (5). It is classified and protected by the deliberative process privilege.

I am required by statute and regulation to inform you that you have the right to file an administrative appeal. Any administrative appeal must be received within 60 days of the date of this letter by the Office of Information Policy, United States Department of Justice, Flag Building, Suite 570, Washington, D.C. 20530-0001. Both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

*Paul P. Colborn*

Paul P. Colborn
Special Counsel

# EXHIBIT C

EFF Protecting Rights and Promoting Freedom in the Electronic Frontier   1439951   Filed: 06/06/2013   Page 36 of 94

AP-2011-01420

March 9, 2011

Office of Information Policy
Department of Justice
Flag Building, Suite 570
Washington, DC 20530-0001

FOIA
(P)
RECEIVED
MAR 1 8 2011
Office of Information Policy

KWC

Re: <u>Freedom of Information Act Appeal</u>

Dear Sir or Madam:

<u>This letter constitutes an appeal</u> under the Freedom of Information Act ("FOIA"), 5
U.S.C. 552, and is submitted on behalf of the Electronic Frontier Foundation ("EFF").
By letter to the DOJ Office of Legal Counsel ("OLC") dated February 15, 2011 (attached
hereto), EFF requested disclosure of an OLC memorandum dated January 8, 2010,
analyzing the authority of the FBI under Section 2511 of the Stored Communications
Act. The memorandum was discussed in a DOJ Inspector General's report titled, "A
Review of the Federal Bureau of Investigation's Use of Exigent Letters and Other
Informal Requests for Telephone Records" (January 2010) at pp. 264-265.

By letter to EFF dated February 25, 2011 (attached hereto), the OLC denied the request,
stating that the document is being withheld in its entirety under FOIA Exemptions One
and Five. EFF appeals that determination on the ground that a legal analysis that
apprently governs the FBI's exercise of its statutory authority cannot properly be
classified or withheld under the "deliberative process" privilege. At the very least,
substantial portions of the document should be reasonably segregable and subject to
disclosure.

As the FOIA requires, I wil anticipate your determination of this appeal within twenty
(20) working days. Thank you for your consideration of this matter.

Sincerely,

David L. Sobel
Senior Counsel

attachments

1818 H Street, N.W., Suite 410 ∙ Washington, DC 20036 USA
+1 202 797 9009      +1 202 797 9066      www.eff.org      information@eff.org

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELECTRONIC FRONTIER FOUNDATION,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| v.  ) | Civil Action No. 1:11-CV-00939 |
| ) | |
| U.S. DEPARTMENT OF JUSTICE,  ) | |
| ) | |
| Defendant.  ) | |

## CORRECTED DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)      I am currently the Section Chief of the Record/Information Dissemination Section

("RIDS"), Records Management Division ("RMD"), formerly at Federal Bureau of Investigation

Headquarters ("FBIHQ") in Washington, D.C., and currently relocated to Winchester, Virginia.  I

have held this position since August 1, 2002. Prior to my joining the FBI, from May 1, 2001 to

July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that

capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures,

appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy

Judge Advocate at various commands and routinely worked with FOIA matters. I am also an

attorney who has been licensed to practice law in the State of Texas since 1980.

(2)      In my official capacity as Section Chief of RIDS, I supervise approximately 279

1

employees who staff a total of ten (10) units and two field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA; Privacy Act of 1974; Executive Order ("E.O.") 13526 (Dec. 29, 2009); Presidential, Attorney General and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith. My responsibilities also include the review of FBI information for classification purposes as mandated by E.O. 13526 and the preparation of declarations in support of Exemption 1 claims under the FOIA, 5 U.S.C. § 552 (b)(1).  I have been designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to E.O. 13526, §§ 1.3 and 3.1.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to FOIA, 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a. Specifically, I have been advised that on or about September 16, 2010, the Office of Legal Counsel ("OLC"), U.S. Department of Justice ("DOJ"), contacted the FBI's Office of the General Counsel ("OGC"), to request that the FBI review and defend the classification determinations in an OLC-originated 11-page document (hereinafter "OLC Memo") which analyzes the FBI's authority under 28 U.S.C. § 2511.

(4)     We have been advised that this OLC document, which had been requested at the administrative stage by plaintiff (via letter dated February 15, 2011), was withheld in full by OLC pursuant to FOIA Exemptions (b)(1) and (b)(5), 5 U.S.C. §§ 552 (b)(1) and (b)(5).

2

Furthermore, we learned that the OLC Memo has now become the subject of the present

litigation, which EFF filed on or about May 19, 2011. In order to properly defend its motion for

summary judgment, OLC has requested that the FBI provide this declaration to support the

application of Exemption 1 in the OLC Memo. We have been advised by OLC that the

classification markings in the OLC Memo were derived from the classification markings

contained in two letters in which the FBI requested legal advice from OLC, and which provided

OLC with factual information as to which the legal advice was sought. These two letters are as

follows: A November 27, 2009 opinion request letter from Valerie Caproni, General Counsel,

FBI to David Barron, Acting Assistant Attorney General, Office of Legal Counsel; and a

December 11, 2009 letter from Ms. Caproni to Ms. Barron supplementing the previous letter by

providing additional factual information and expanding upon the request for legal advice. The

FBI requested OLC's legal advice in order to assist its evaluation of how it should respond to a

draft Report by the Office of Inspector General of the Deparment of Justice (the "OIG") in the

course of a review by the OIG of the FBI's use of certain investigatory procedures ("OIG

Review") used by the FBI to obtain telephone records. Many of the individual paragraphs of

these two letters were marked by the FBI as classified at the "S/NF" level, which permits limits

access to the documents to those individuals with an appropriate security clearance and a need to

know. See U.S. Dep't of Justice Office of the Inspector General, *"A Review of the Federal*

*Bureau of Investigation's Use of Exigent Letters and Other Informal Requests for Telephone*

*Records"* (Jan. 2010) (unclassified) (hereinafter "OIG Report"),

http://www.justice.gov/oig/special/s1001r.pdf, at 264 & n. 280. I have reviewed the

classification markings contained in FBI's letters of November 27, 2009 and December 11, 2009,

3

as well as the classification markings contained in the OLC Memo of January 8, 2010.

(5)     As a result, in accordance with Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), the FBI submits this declaration in support of DOJ's motion for summary judgment,[1] which provides the Court and plaintiff with a detailed justification for the continued withholding of the classified portions of the OLC Memo pursuant to FOIA Exemption 1.[2]

(6)     The FBI's analysis of the withholding of classified information contained in this document is based on the standards articulated in the FOIA statute, 5 U.S.C. § 552 (b)(1).[3] Exemption (b)(1) protects from disclosure those records that are:

(A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy; and

(B) are in fact properly classified pursuant to such Executive Order.

(7)     The FBI's analysis of whether Exemption (b)(1) permits the withholding of agency records consists of two significant steps. First, the FBI must determine whether the information contained in the record is information that satisfies both the substantive and procedural criteria of the applicable E.O. governing the classification and protection of national security information; and second, that it complies with the various substantive and procedural

---

[1]  We have been advised that OLC will be submitting a separate Vaughn declaration defending its assertion of Exemption 5, 5 U.S.C. § 552 (b)(5), contemporaneously herewith, and that OLC will provide additional details regarding the applicability of that exemption. Thus, this declaration will only address applicability of Exemption 1.

[2]  Upon completion of its classification review, the FBI provided to OLC an appropriately marked version of the OLC Memo which reflected that classification review and determinations reached in accordance therewith.

[3]  Exemption (b)(1) has been asserted in the aggregate on the following pages of the OLC

4

criteria of the current E.O., E.O. 13526, which governs the classification and protection of information which affects the national security,[4] and prescribes various substantive and procedural criteria. I am bound by the requirements of E.O. 13526 when making classification determinations.

    (8)    In order for information to be properly classified, and thus properly withheld from disclosure pursuant to Exemption (b)(1), the information must meet the following requirements set forth in E.O. 13526, §1.1 (a):

    (1)    an original classification authority is classifying the information;

    (2)    the information is owned by, produced by or for, or is under the control of the United States Government;

    (3)    the information falls within one or more of the categories of information listed in section 1.4 of this order; and

    (4)    original classification authority determines that the unauthorized disclosure of the information reasonably could be result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

    (9)    As I will explain in further detail below, in my role as an original classification authority, I have determined that the information withheld pursuant to Exemption (b)(1) is under the control of the United States Government, is classified and requires a classification marking at the "SECRET" level, since the unauthorized disclosure of this information "reasonably could be expected to cause serious damage to the national security . . ." which I will describe in further

---

Memo: pp. 1-2, 4-11.

    [4] Section 6.1(cc) of E.O. 13526 defines "National security" as "the national defense or foreign relations of the United States."

5

detail herein. See E.O. 13526, § 1.2(a)(2).

(10)    In addition to these substantive requirements, certain procedural and administrative requirements of E.O. 13526 must be followed before information can be considered to be properly classified, including, but not limited to, the proper identification and marking of the document itself, which the FBI has now completed. In particular, I have made certain that all procedural requirements of E.O. 13526 were followed:

(1)    the document was marked as required and stamped with the proper classification designation;[5]

(2)    the document was marked to indicate clearly which portions are classified, which portions are exempt from declassification as set forth in E.O. 13526, §1.6 (c), and which portions are unclassified;[6]

(3)    the prohibitions and limitations on classification specified in E.O. 13526, § 1.7,7 were adhered to;

(4)    the declassification policies set forth in E.O. 13526, §§ 3.1 ("Authority for Declassification") and 3.3 ("Automatic Declassification") were followed; and

(5)    any reasonably segregable portions of this classified document which did not meet the standards for classification under E.O. 13526 were declassified and marked for release, unless withholding was otherwise

---

[5] E.O. 13526, §1.6 (a)(1) - (5).

[6] E.O. 13526, §1.6 (a)(5)(c).

[7] E.O. 13526, § 1.7(a) specifically states that "[i]n no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to:

(1) conceal violations of law, inefficiency, or administrative error;
(2) prevent embarrassment to a person, organization, or agency;
(3) restrain competition; or
(4) prevent or delay the release of information that does not require protection in the interest of the national security."

6

warranted under applicable law.[8]

## FINDINGS OF DECLARANT

(11)   As explained above, the 11-page OLC Memo was written by OLC in response to a specific request by the FBI for legal advice and guidance concerning the FBI's evaluation of how it should respond to a draft OIG Report concerning the FBI's use of certain investigative techniques in the course of certain national security and law enforcement investigations.[9]

(12)   With the above requirements in mind, I personally and independently examined the FBI information contained in the OLC Memo and withheld pursuant to Exemption (b)(1). As a result of this examination, I determined that the classified information contained in the OLC Memo continues to warrant classification at the "SECRET" level, and is exempt from disclosure pursuant to E.O. 13526, §1.4 (c) – ("intelligence activities (including covert action), intelligence sources or methods or cryptology,") as the unauthorized disclosure of the information in the OLC Memo "reasonably could be expected to cause serious damage to the national security . . . ." See E.O. 13526, § 1.2 (a)(2).

---

[8] 5 U.S.C. § 552(b) provides in part, that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."

[9] Congress enacted ECPA to extend government restrictions on wire taps from telephone calls to include transmissions of electronic data by computer. ECPA itself was an amendment to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, which was primarily designed to prevent unauthorized government access to private electronic communications. The amendments to ECPA also added new provisions prohibiting access to stored electronic communications – through the Stored Communications Act, 18 U.S.C. §§ 2701-2712.

7

## INTELLIGENCE ACTIVITIES, INTELLIGENCE SOURCES OR METHODS

(13)     E.O. 13526, §1.4 (c), exempts from disclosure "intelligence activities (including

covert action), intelligence sources or methods or cryptology." An intelligence activity or method

includes any intelligence action or technique utilized by the FBI against a targeted individual or

organization that has been determined to be of national security interest.  An intelligence method

is used to indicate any procedure (human or non-human) utilized to obtain information

concerning such individual or organization.  An intelligence activity or method has two

characteristics. First, the intelligence activity or method -- and information generated by it -- is

needed by U.S. intelligence/counterintelligence agencies to carry out their missions.  Second,

confidentiality must be maintained with respect to the activity or method if the viability,

productivity and usefulness of its information are to be preserved. Classified information is

withheld on certain pages to protect intelligence methods utilized by the FBI for gathering

intelligence data.[10]

(14)     The classification markings of certain portions of the OLC Memo were made in

order to protect from disclosure classified information which would reveal actual intelligence

activities, sources or methods used by the FBI against targets of foreign counterintelligence and

counterterrorism investigations or operations; and disclose the intelligence activities, sources or

methods, as well as intelligence-gathering capabilities used by the FBI to gather specific

information on targets of national security investigations. The intelligence activities or methods

detailed in the withheld information are an effective means for the FBI to gather, store, or

---

[10] Exemption (b)(1) has been asserted as to intelligence activities, intelligence sources, or

8

disseminate intelligence information.  The activities or methods that are discussed in the January

8, 2010 OLC Memo are used in the FBI's current intelligence or counterintelligence

investigations, and are in accordance with the Attorney General's guidelines on FBI

counterintelligence and counterterrorism investigations.

(15)     The classification markings were made to protect from disclosure information that

would reveal the actual intelligence activities and methods used by the FBI against targets of

foreign counterintelligence investigations or operations; and disclose the intelligence gathering

capabilities of the activities or methods directed at particular targets. The intelligence activities or

methods detailed in the withheld information are effective means for the FBI to gather, store or

disseminate intelligence information.  As the records reflect, the criteria applied and priorities

assigned are used in the FBI's present investigations and conducted in accordance with the

Attorney General's guidelines.

(16)     The information in the January 8, 2010 OLC Memo concerning activities and

methods is highly specific in nature and known to very few individuals. Disclosure of the specific

information which describes these intelligence activities and methods -- which are still used by

the FBI today to gather intelligence information -- could reasonably be expected to cause serious

damage to national security because disclosure would allow hostile entities to discover the

current methods and activities used and could then develop countermeasures which could

severely disrupt the FBI's intelligence-gathering capabilities. The countermeasures could include

the alteration of behavior to evade detection as well as utilize these same methods and activities

---

intelligence methods on the following pages of the OLC Memo: pp. 1-2, 4-11.

9

to engage in disinformation. This would severely damage the FBI's efforts to detect and apprehend violators of the United States' national security and criminal laws.

(17)    Release of the exempted classified material would reveal actual intelligence activities or methods utilized by the FBI and disclose the intelligence-gathering capabilities of those activities or methods employed. The release of this information could permit hostile governments to appraise the scope, focus, location, and capabilities of the FBI's intelligence-gathering methods and activities, and allow hostile agents to devise countermeasures to circumvent these intelligence activities or methods and render them useless in providing intelligence information. This would severely disrupt the FBI's intelligence gathering capabilities. This information is properly classified at the "SECRET" level and withheld pursuant to E.O. 13526, §1.4(c), and exempt from disclosure pursuant to FOIA Exemption (b)(1).

## DEFENDANT'S BURDEN OF ESTABLISHING EXEMPTION (b)(1) CLAIMS

(18)    The information withheld in this case pursuant to Exemption 1 was examined in light of the body of information available to me concerning the national defense and foreign relations of the United States. This information was not examined in isolation. Instead, each piece of information contained in the FBI's letters of November 27, 2009 and December 11, 2009, and OLC's memorandum of January 8, 2010, was evaluated with careful consideration given to the impact that disclosure of this information will have on other sensitive information contained elsewhere in the United States intelligence community's files, including the secrecy of that other information. Equal consideration was given to the impact that other information either in the public domain or likely known or suspected by present or potential adversaries of the

10

United States, would have upon the information I examined, and upon attempts by a hostile

entity to analyze such information.

(19)    In those instances where, in my judgment, the disclosure of this information could

reasonably be expected to cause serious damage to the national security, and its withholding

outweighed the benefit of disclosure, I exercised my prerogative as an original classification

authority and designated that information as classified in the interest of national security at the

"SECRET" level, and invoked FOIA Exemption (b)(1) to prevent disclosure.  Likewise, the

justifications for the withheld classified information were prepared with the intent that they be

read with consideration given to the context in which the classified information is found.  This

context includes not only the surrounding unclassified information, but also other information

already in the public domain, as well as information likely known or suspected by hostile

intelligence entities. It is my judgment that any greater specificity in the descriptions and

justifications set forth with respect to the intelligence activities (including special activities),

intelligence sources or methods, or foreign relations and activities could reasonably be expected

to jeopardize the national security of the United States, and as a result, all information appearing

in these documents has been appropriately classified pursuant to E.O. 13526,§ 1.4(c) and

withheld pursuant to FOIA Exemption (b)(1).

### OLC MEMORANDUM – CONSULTATION WITH OTHER AGENCIES

(20)    As part of its classification review of the OLC Memorandum, the FBI identified

potential equities and interests of other government agencies ("OGAs") with regard to the OLC

Memo.  As a result, in accordance with the U.S. Department of Justice ("DOJ") DOJ regulations,

28 C.F.R. § 16.4, the FBI referred the OLC Memo for consultation with those OGAs.  One OGA,

11

which has requested non-attribution, affirmatively responded to our consultation and concurs in all of the classification markings, including the reclassification of footnote 4 from "(U)"to the "(S//NF)" level." Based on that consultation, as well as pursuant to my own designation as an original classification authority, the FBI continues to require that the portions of the OLC Memo marked as classified be withheld on the basis of FOIA Exemption (b)(1).

## CONCLUSION

(21) Based on a careful classification review of the January 8, 2010 OLC Memo, the FBI has concluded that all sections of the Memo previously marked "SECRET/NOFORN" – ("S//NF") should remain marked accordingly; that all paragraphs previously marked "UNCLASSIFIED" "(U)" should remain marked accordingly as "(U);" and that one footnote which had been marked "UNCLASSIFIED" required re-designation to "SECRET/NOFORN" for the reasons articulated herein.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of December, 2011.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, Virginia

12

# EXHIBIT A

Memorandum in Opposition to Defendant's Motion for Summary Judgment and in
Support of Plaintiff's Cross-Motion for Summary Judgment

*Electronic Frontier Foundation v. Department of Justice*, C.A. No. 11-cv-0939 (RJL)

**U.S. Department of Justice**
Office of the Inspector General

# A Review of the Federal Bureau of Investigation's Use of Exigent Letters and Other Informal Requests for Telephone Records



Oversight and Review Division
Office of the Inspector General
January 2010

not request voluntary disclosure, but instead stated that compulsory legal
process (generally grand jury subpoenas) had already been requested and
would be served "as expeditiously as possible." In addition, employees of
the on-site providers told us they usually were given no information about
the circumstances underlying the exigent letters or other informal requests
for records, and that they "assumed" the circumstances were exigent.
Further, at least one of the provider's employees told us he had doubts
about whether the requests were truly exigent.[276] Under these
circumstances, it is difficult to determine whether and when the providers'
employees had the statutorily required "reasonable" or "good faith" belief
that the requisite emergency circumstances existed.[277]

    After reviewing a draft of this report, the FBI also asserted for the first
time that as a matter of law the FBI is not required to serve NSLs to obtain
"records associated ███████████████████████" in national security
investigations. According to the FBI, the majority of exigent letter and other
informal requests discussed in this report were for telephone records ██
███████████████████████████████████████ the FBI
could have obtained these records without any legal process or qualifying
emergency through voluntary production by the communications service
providers.[278]



---

    [276] This provider ultimately required FBI requesters to endorse a stamped
certification that tracked the statutory language in Section 2702 before the provider would
provide records in response to exigent letters.

    [277] After reviewing a draft of this report, the FBI asserted that the legal standard of
Section 2702 could be met when an FBI employee requested telephone records in a
qualifying emergency, regardless of whether the FBI employee was aware of the statute.
The FBI also asserted that the providers could form a "reasonable" or "good faith" belief that
an emergency existed without necessarily knowing the facts surrounding the emergency.
As described above, however, with some exceptions the providers frequently received no
information about the investigation for which records were requested, or even a generalized
representation that an emergency situation existed.

    [278] We disagree with the FBI's statement that the majority of exigent letter and
other informal requests discussed in this report were for telephone records ██████████
███████ In fact, we determined, based on the FBI's records, that the majority of its
exigent letter requests were for toll billing records associated ████████████████
█████████████████████ We were unable to reach a conclusion concerning the percentage █
█████████████████████████ requested through informal means other than
exigent letters, because the records for these requests (some of which were oral or written
on post-it notes) are incomplete and therefore unreliable.

263



The FBI did not rely on this section when it requested and obtained the records discussed in this report.  However, after reviewing a draft of the OIG report the FBI asked the Office of Legal Counsel (OLC) for a legal opinion on this issue.[280]  When making the request for an OLC opinion, the FBI stated that

On January 8, 2010, the OLC issued its opinion, concluding that the ECPA "would not forbid electronic communications service providers [281]  In short, the OLC agreed with the FBI that under certain circumstances ████████████ allows the FBI to ask for and obtain these records on a

---

[279] The *Stored Communications Act*, codified in Chapter 121 of Title 18 at 18 U.S.C. §§ 2701-2712, was enacted in 1986 as part of the ECPA.  The *Stored Communications Act* contains the relevant NSL and other FBI access to toll billing records provisions at issue in this report.

[280] The FBI presented the issue to the OLC as follows: "Whether Chapter 121 of Title 18 of the United States Code applies to call detail records associated



voluntary basis from the providers, without legal process or a qualifying emergency.

It is important to note that the FBI acknowledged in its July 2009 comments to a draft of this report that it had never considered or relied upon ████████████ when it obtained any of the telephone records at issue in this report. Moreover, it cannot be known at this point whether any provider would have divulged such records based on ████ ████████████ alone, and without the FBI's representation to the provider that an NSL or other compulsory legal process would be served.

For the reasons discussed below, we believe the FBI's potential use of ████████████ to obtain records has significant policy implications that need to be considered by the FBI, the Department, and the Congress.



---



283 The FBI has stated that it does not intend to rely on ████████████ However, that could change, and we believe that appropriate controls on such authority should be considered now, in light of the FBI's past practices and the OLC opinion.

265



285

287

---

[284] Under 18 U.S.C. § 2709(b) the FBI may only issue NSLs to obtain such records upon the certification that the records sought are relevant to an authorized counterterrorism or counterintelligence investigation.  In the voluntary context, the FBI may request and obtain such records under 18 U.S.C. § 2702(c)(4) only if "the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency."

[285] For example, requests for voluntary disclosure under the emergency circumstances provisions of the ECPA NSL statute must be approved at a level not lower than an Assistant Special Agent in Charge in a field office and a Section Chief at Headquarters.  See FBI OGC Electronic Communication (EC) to all Divisions (March 1, 2007), at 4.  The EC also advises that approval of such requests must be in writing, even if the initial approval was oral.  The rank of the approving official for NSLs is set by statute at Special Agent in Charge in field offices and Deputy Assistant Director at Headquarters.  See 18 U.S.C. § 2709(b).

[286] Under the ECPA NSL statute, the FBI is required to report to certain congressional committees, on a semiannual basis, concerning all NSL requests made under Section 2709(b).  See 18 U.S.C. § 2709(e).

[287] Moreover, other collections of similar types of records for intelligence activities contain statutorily mandated approval, minimization, and reporting requirements.  For example, the FISA business records provisions provide useful comparisons as to how such intelligence activities are regulated, ███████████████████████  Under these provisions, the FBI may apply to the FISA Court for an order requiring the production (Cont'd.)

266



of business records and other tangible things "to obtain foreign intelligence information not concerning a United States person." See 50 U.S.C. § 1861. By statute, use of this authority is subject to extensive Attorney General-approved minimization procedures governing how information acquired concerning U.S. persons must be retained and disseminated. Id. at § 1861(g). The FBI is also subject to comprehensive congressional reporting requirements as to all orders it obtains, ████████████████████████████ ████████████ Id. at § 1862.

288 As discussed in this report, under the ECPA NSL statute, the FBI may only seek toll billing records when relevant to an authorized counterterrorism or counterintelligence investigation, provided that the investigation of a U.S. person is not conducted solely on the basis of activities protected by the First Amendment to the Constitution. See 18 U.S.C. § 2709(b). Provisions in the FISA statute similarly protect U.S. persons with respect to FBI applications to the FISA Court seeking orders to produce business records (50 U.S.C. § 1861(a)(2)(B)) and to conduct electronic surveillance (50 U.S.C. § 1805(a)).

289 We recognize that the FBI's Domestic Investigations and Operations Guide (DIOG) and Executive Order 12,333, as amended, contain restrictions on how the FBI can collect, use, and disseminate intelligence, particularly with respect to the privacy and civil liberties interests of U.S. persons. However, these constraints are not statutory.

290 ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

267

In sum, the potential use of ███████████████████ by the FBI has important policy implications for ████████████████████ ███████████████████ We believe that █████████ creates a significant gap in FBI accountability and oversight that should be examined closely by the FBI, the Department, and Congress.

It is also important to recognize that the FBI advanced the ████████ ████████████████ only after the OIG found repeated misuses of its statutory authority to obtain telephone records through NSLs or the ECPA's emergency voluntary disclosure provisions. We believe that, given the abuses described in this report, it is critical for the Department and Congress to consider appropriate controls on any use by the FBI of its authority to obtain records voluntarily ████████████████████ ████████

The OIG therefore recommends that the FBI and the Department consider how the FBI may use ████████████████ when seeking telephone billing records, particularly with respect to ████████████ ██████████ We also recommend that the Department notify Congress of this issue and of the OLC opinion interpreting the scope of the FBI's authority under it, so that Congress can consider ████████████████ and the implications of its potential use.

### B.    Other Informal Requests for Telephone Records

We found that without any documentation for the requests except possibly e-mail messages, CAU personnel routinely asked the on-site providers' employees to provide calling activity information in response to what were referred to as "sneak peeks." Using sneak peeks, the FBI requested the providers' employees █████████ their databases and tell the FBI whether they had any records on specified telephone numbers. At the FBI's request, the providers would conduct sneak peeks and sometimes give the FBI additional information about the telephone records, such as whether there was calling activity between specified numbers or calls to or from certain █████████████ These sneak peeks were conducted without any legal process whatsoever.

We also concluded that many of these sneak peeks violated the ECPA, which prohibits communications service providers from knowingly divulging "a record or other information pertaining to a subscriber to or customer of such service . . . to any governmental entity" except pursuant to legal process or in certain limited circumstances set forth in the statute. 18 U.S.C. § 2702(a)(3). The relevant exceptions require providers to disclose such records or information in response to compulsory process, such as

268

# EXHIBIT B

Memorandum in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment

*Electronic Frontier Foundation v. Department of Justice*, C.A. No. 11-cv-0939 (RJL)

**U.S. Department of Justice**

Office of Legal Counsel

---

Office of the Assistant Attorney General          *Washington, D.C.  20530*

July 16, 2010

## MEMORANDUM FOR ATTORNEYS OF THE OFFICE

*Re:  Best Practices for OLC Legal Advice and Written Opinions*[*]

By delegation, the Office of Legal Counsel (OLC) exercises the Attorney General's authority under the Judiciary Act of 1789 to provide the President and executive agencies with advice on questions of law.  OLC's core function, pursuant to the Attorney General's delegation, is to provide controlling advice to Executive Branch officials on questions of law that are centrally important to the functioning of the Federal Government.  In performing this function, OLC helps the President fulfill his or her constitutional duties to preserve, protect, and defend the Constitution, and to "take Care that the Laws be faithfully executed."  It is thus imperative that the Office's advice be clear, accurate, thoroughly researched, and soundly reasoned.  The value of OLC advice depends upon the strength of its analysis.  OLC must always give candid, independent, and principled advice—even when that advice is inconsistent with the aims of policymakers.  This memorandum reaffirms the longstanding principles that have guided and will continue to guide OLC attorneys in all of their work, and then addresses the best practices OLC attorneys should follow in providing one particularly important form of controlling legal advice the Office conveys: formal written opinions.

### I. Guiding Principles

Certain fundamental principles guide all aspects of the Office's work.  As noted above, OLC's central function is to provide, pursuant to the Attorney General's delegation, controlling legal advice to Executive Branch officials in furtherance of the President's constitutional duties to preserve, protect, and defend the Constitution, and to "take Care that the Laws be faithfully executed."  To fulfill this function, OLC must provide advice based on its best understanding of what the law requires—not simply an advocate's defense of the contemplated action or position proposed by an agency or the Administration.  Thus, in rendering legal advice, OLC seeks to provide an accurate and honest appraisal of applicable law, even if that appraisal will constrain the Administration's or an agency's pursuit of desired practices or policy objectives.  This practice is critically important to the Office's effective performance of its assigned role, particularly because it is frequently asked to opine on issues of first impression that are unlikely to be resolved by the courts—a circumstance in which OLC's advice may effectively be the final word on the controlling law.

---

[*] This memorandum updates a prior memorandum, "Best Practices for OLC Opinions," issued May 16, 2005.

In providing advice, the Office should focus intensively on the central issues raised by a request and avoid addressing issues not squarely presented by the question before it. As much as possible, the Office should be attentive to the particular facts and circumstances at issue in the request, and should avoid issuing advice on abstract questions that lack the concrete grounding that can help focus legal analysis. And regardless of the Office's ultimate legal conclusions, it should strive to ensure that it candidly and fairly addresses the full range of relevant legal sources and significant arguments on all sides of a question. To be sure, the Office often operates under severe time constraints in providing advice. In such instances, the Office should make clear when it needs additional time to permit proper and thorough review of the relevant issues. If additional time is not available, the Office should make clear that its advice has been given with only limited time for review, and thus that more thorough consideration of the issue has not been possible.

On any issue involving a constitutional question, OLC's analysis should focus on traditional sources of constitutional meaning, including the text of the Constitution, the historical record illuminating the text's meaning, the Constitution's structure and purpose, and judicial and Executive Branch precedents interpreting relevant constitutional provisions. Particularly where the question relates to the authorities of the President or other executive officers or the allocation of powers between the Branches of the Government, precedent and historical practice are often of special relevance. On other questions of interpretation, OLC's analysis should be guided by the texts of the relevant documents, and should use traditional tools of construction in interpreting those texts. Because OLC is part of the Executive Branch, its analyses may also reflect the institutional traditions and competencies of that branch of the Government. For example, OLC opinions should consider and ordinarily give great weight to any relevant past opinions of Attorneys General and the Office. The Office should not lightly depart from such past decisions, particularly where they directly address and decide a point in question, but as with any system of precedent, past decisions may be subject to reconsideration and withdrawal in appropriate cases and through appropriate processes.

Finally, OLC's analyses may appropriately reflect the fact that its responsibilities also include facilitating the work of the Executive Branch and the objectives of the President, consistent with the law. As a result, unlike a court, OLC will, where possible and appropriate, seek to recommend lawful alternatives to Executive Branch proposals that it decides would be unlawful. Notwithstanding this aspect of OLC's mission, however, its legal analyses should always be principled, forthright, as thorough as time permits, and not designed merely to advance the policy preferences of the President or other officials.

## II. Opinion Preparation

While the Office frequently conveys its controlling legal advice in less formal ways, including through oral presentations and by e-mail, the best practices for preparing the Office's formal written opinions merit particular attention. These opinions take the form of signed memoranda, issued to an Executive Branch official who has requested the Office's opinion.

**A. *Evaluating opinion requests*.** Each opinion request is assigned initially to at least one Deputy Assistant Attorney General and one Attorney-Adviser, who will review the question

presented and any relevant primary materials, prior OLC opinions, and leading cases to
determine preliminarily whether the question is appropriate for OLC advice and whether it
appears to merit a signed written opinion.  The legal question presented should be focused and
concrete; OLC generally avoids providing a general survey of an area of law or issuing broad,
abstract legal opinions.  There should also be a practical need for the written opinion; OLC
should avoid giving unnecessary advice, such as where it appears that policymakers are likely to
move in a different direction.  A written opinion is most likely to be necessary when the legal
question is the subject of a concrete and ongoing dispute between two or more executive
agencies.  If we are asked to provide an opinion to an executive agency the head of which does
not serve at the pleasure of the President (*e.g.*, an agency head subject to a "for cause" removal
restriction), our practice is to issue our opinion only if we have received in writing from that
agency an agreement that it will conform its conduct to our conclusion.  As a prudential matter,
OLC generally avoids opining on questions likely to arise in pending or imminent litigation
involving the United States as a party (although the Office may provide assistance to Justice
Department divisions engaged in ongoing litigation).  Finally, the opinions of the Office should
address legal questions prospectively; OLC avoids opining on the legality of past conduct
(though from time to time we may issue prospective opinions that confirm or memorialize past
advice or that necessarily bear on past conduct in addressing an ongoing legal issue).

  **B.  *Soliciting the views of interested agencies*.**  Before we proceed with an opinion, our
general practice is to ask the requesting agency for a detailed memorandum setting forth the
agency's own analysis of the question; in many cases, we will have preliminary discussions with
the requesting agency before it submits a formal opinion request to OLC, and the agency will be
able to provide its analysis along with the opinion request.  (A detailed analysis is not required
when the request comes from the Counsel to the President, the Attorney General, or one of the
other senior management offices of the Department of Justice.)  In the case of an interagency
dispute, we will ask each side to submit such a memorandum.  We expect the agencies on each
side of a dispute to share their memoranda with the other side, or permit us to share them, so that
we may have the benefit of reply comments, when necessary.  When appropriate and helpful, and
consistent with the confidentiality interests of the requesting agency, we will also solicit the
views of other agencies not directly involved in the opinion request that have subject-matter
expertise or a special interest in the question presented.  We will not, however, circulate a copy
of an opinion request to third-party agencies without the prior consent of the requesting agency.

  **C.  *Researching, outlining, and drafting*.**  A written OLC opinion is the product of a
careful and deliberate process.  After reviewing agency submissions and relevant primary
materials, including prior OLC opinions and leading judicial decisions, the Deputy and Attorney-
Adviser should meet to map out a plan for researching the issues and preparing an outline and
first draft of the opinion.  The Deputy and Attorney-Adviser should set target deadlines for each
step in the process and should meet regularly to review progress on the opinion.  Consultation
with others in the Office is encouraged, as are meetings, as needed, with other Deputies and the
Assistant Attorney General (AAG).  An early first draft often will help identify weaknesses or
holes in the analysis requiring greater attention than initially anticipated.  As work on the opinion
progresses, it will generally be useful for the Deputy and the Attorney-Adviser to meet from time
to time with the AAG to discuss the status and direction of the draft opinion.

The Office must strive in our opinions for clear and concise analysis and a balanced presentation of arguments on each side of an issue. If the opinion resolves an issue in dispute between executive agencies, we should take care to consider fully and address impartially the points raised on both sides. In doing so, we generally avoid characterizing agencies with differing views as the "prevailing" and "losing" parties. OLC's obligation is to provide its view of the correct answer on the law, taking into account all reasonable counterarguments, whether provided by an agency or not.

**D. *Review of draft opinions*.** Before an OLC opinion is signed it undergoes rigorous review within OLC. When the primary Deputy and the Attorney-Adviser responsible for the opinion are satisfied that the draft opinion is ready for secondary review, they should provide the draft opinion to a second Deputy for review. Along with the draft opinion, the Attorney-Adviser should provide to the second Deputy copies of any key materials, including statutes, regulations, important cases, relevant prior OLC opinions, and the views memoranda received from interested agencies. Once the second Deputy review is complete and the second Deputy's comments and proposed edits have been addressed, the primary Deputy should circulate the draft opinion for final review by the AAG, the remaining Deputies (though it is not necessary in each case for each of them to review an opinion), and any other attorneys within the Office with relevant expertise.

Because OLC issues opinions pursuant to the Attorney General's delegated authority, the Office keeps the Office of the Attorney General and the Office of the Deputy Attorney General apprised of its work through regular meetings and other communications. This practice ensures that the leadership offices are kept informed about OLC's work, and also permits OLC to benefit from suggestions about additional interests OLC should consider or views OLC should solicit before finalizing its opinions, which are nevertheless based on its own independent analysis and judgment. The Office also keeps the Office of the Counsel to the President appropriately apprised of its work.

Consistent with its tradition of providing advice that reflects its own independent judgment, OLC does not ordinarily circulate draft opinions outside the Office. However, as part of our process, we may share an aspect of a draft opinion's analysis with the requestor or others who will be affected by the opinion, particularly when their submissions have not addressed issues that arise in the draft. In some other cases, OLC may share the substance of an entire draft opinion or the opinion itself within the Department of Justice or with others, primarily to ensure that the opinion does not misstate any facts or legal points of interest.

**E. *Finalizing opinions*.** Once all substantive work on an opinion is complete, it must undergo a thorough cite-check by our paralegal staff to ensure that all citations are accurate and that the opinion is consistent with the Office's rules of style. After all cite-checking changes have been approved and implemented, the final opinion should be printed on bond paper for signature. Each opinion ready for signature should include a completed opinion control sheet signed by the primary and secondary Deputies and the Attorney-Adviser. If the opinion is unclassified, after it is signed and issued to the requesting agency it must be loaded into our ISYS database and included in the Office's unclassified Day Books. A separate file containing a copy of the signed opinion, the opinion control sheet, and copies of key materials not readily

available, such as the original opinion request, the views memoranda of interested agencies, and obscure sources cited in the opinion, should also be retained in our files for future reference.

### III. Opinion Publication and Other Public Disclosure

Pursuant to Executive Order 12146 and directives from the Attorney General, OLC has a longstanding internal process in place for regular consideration and selection of significant opinions for official publication. At the first stage of the process, the attorneys who have worked on an opinion and the front-office personnel who have reviewed it are asked for a recommendation about whether the opinion should be published. After these recommendations are collected, the opinion is forwarded to an internal publication review committee, made up of attorneys from the front office, as well as at least one career attorney. If the committee makes a preliminary judgment that the opinion should be published, the opinion is circulated to the requesting Executive Branch official or agency and any other agencies that have interests that might be affected by publication, to solicit their views on whether there are reasons why the opinion should not be published. Taking this input into account, the publication committee then makes a final judgment about whether the Office should publish the opinion. After the Office makes a final decision to publish an opinion, the opinion is rechecked and reformatted for online publication; a headnote is prepared and added to the opinion; and the opinion is posted to the Department of Justice Web site at www.usdoj.gov/olc/opinions.htm. All opinions posted on the Web site as published opinions of the Office are eventually published in OLC's hardcover bound volumes.

In deciding whether an opinion is significant enough to merit publication, the Office considers such factors as the potential importance of the opinion to other agencies or officials in the Executive Branch; the likelihood that similar questions may arise in the future; the historical importance of the opinion or the context in which it arose; and the potential significance of the opinion to the Office's overall jurisprudence. In applying these factors, the Office operates from the presumption that it should make its significant opinions fully and promptly available to the public. This presumption furthers the interests of Executive Branch transparency, thereby contributing to accountability and effective government, and promoting public confidence in the legality of government action. Timely publication of OLC opinions is especially important where the Office concludes that a federal statutory requirement is invalid on constitutional grounds and where the Executive Branch acts (or declines to act) in reliance on such a conclusion. In such situations, Congress and the public benefit from understanding the Executive's reasons for non-compliance, so that Congress can consider those reasons and respond appropriately, and so that the public can be assured that Executive action is based on sound legal judgment and in furtherance of the President's obligation to take care that the laws, including the Constitution, are faithfully executed.

At the same time, countervailing considerations may lead the Office to conclude that it would be improper or inadvisable to publish an opinion that would otherwise merit publication. For example, OLC will decline to publish an opinion when disclosure would reveal classified or other sensitive information relating to national security. (Declassification decisions are made by the classifying agency, not OLC.) Similarly, OLC will decline to publish an opinion if doing so would interfere with federal law enforcement efforts or is prohibited by law. OLC will also

decline to publish opinions when doing so is necessary to preserve internal Executive Branch deliberative processes or protect the confidentiality of information covered by the attorney-client relationship between OLC and other executive offices. The President and other Executive Branch officials, like other public- and private-sector clients, sometimes depend upon the confidentiality of legal advice in order to fulfill their duties effectively. An example is when an agency requests advice regarding a proposed course of action, the Office concludes it is legally impermissible, and the action is therefore not taken. If OLC routinely published its advice concerning all contemplated actions of uncertain legality, Executive Branch officials would be reluctant to seek OLC advice in the early stages of policy formulation—a result that would undermine rule-of-law interests. Some OLC opinions also may concern issues that are of little interest to the public or others besides the requesting agency. OLC's practice of circulating opinions selected for publication to the requesting Executive Branch official or agency and any other agencies that have interests that might be affected by publication helps ensure that the Office is aware of these competing considerations. In cases where delaying publication may be sufficient to address any of these concerns, OLC will reconsider the publication decision at an appropriate time.

OLC also receives a large number of Freedom of Information Act (FOIA) requests for its unpublished legal opinions. The volume of such requests has increased substantially in recent years, particularly with respect to opinions concerning national security matters. By definition, these requests seek disclosure of documents that the Office has not yet chosen to release pursuant to its own internal publication procedures. In responding to these requests, OLC is guided by President Obama's January 21, 2009 FOIA Memorandum and Attorney General Holder's March 19, 2009 FOIA memorandum. As the Attorney General's memorandum observes, various FOIA exemptions protect "national security, . . . privileged records, and law enforcement interests." OLC will consult with relevant agencies in determining whether particular requested documents fall within and should be withheld under any applicable FOIA exemptions. If a requested document does not fall within an exemption, OLC will disclose it promptly. In addition, OLC will consider disclosing documents even if they technically fall within the scope of a FOIA exemption. As the Attorney General also stated in his March 19, 2009 memorandum, "an agency should not withhold information simply because it may do so legally." In particular, consistent with President Obama's directions, the Office will not withhold an opinion merely to avoid embarrassment to the Office or to individual officials, to hide possible errors in legal reasoning, or "because of speculative or abstract fears."

OLC has a unique mission, and a long-established tradition—sustained across many administrations—as to how its work should be carried out. The Office depends not only upon its leadership but also upon each of its attorneys to ensure that this tradition continues.

David J. Barron
Acting Assistant Attorney General

# EXHIBIT B

Reply Memorandum in Support of Plaintiff's Cross-Motion for Summary Judgment

*Electronic Frontier Foundation v. Dep't of Justice*, C.A. No. 11-0939

**Statement of**
**Valerie E. Caproni**
**General Counsel**
**Federal Bureau of Investigation**
**Before the**
**The Subcommittee on the Constitution, Civil Rights, and Civil Liberties Committee on the**
**Judiciary**
**United States House of Representatives**
**At a Hearing Concerning**
**The Report of the Department of Justice Office of Inspector General Concerning the FBI's**
**use of Exigent Letters and Other Informal Requests for Telephone Records**

**April 14, 2010**

Good morning Mr. Chairman, Ranking Member Smith, and members of the Committee. It is my pleasure to appear before you today to discuss the recent report by Department of Justice's Office of the Inspector General (OIG) on the FBI's Use of Exigent Letters and Other Informal Requests for Telephone Records.

The 2010 OIG report is a follow-on to the OIG's 2007 report on the FBI's use of National Security Letters (NSLs). The 2010 Report discusses in detail a practice utilized between 2003 and 2006 by one FBI Headquarters unit, of issuing so-called "exigent letters" to obtain telephone toll records – i.e., the date, time, duration, and originating and terminating numbers of calls – but not the content of any calls. That practice, which ended almost 3.5 years ago, reflected a failure of internal controls at the FBI. It was, however, a wake-up call for the FBI. Although we cannot unring the bell or undo the fact that exigent letters were issued, the FBI used the lessons we learned from that event to substantially change our control and compliance environment.

The FBI has significantly improved its policies, training, and procedures for requests for information protected by the Electronic Communications Privacy Act (ECPA) . Indeed, in 2008, the OIG concluded that the FBI had made significant progress in addressing the serious problems and deficiencies identified in the 2007 report.  But the lessons learned from this entire experience went well beyond ECPA and exigent letters.  Instead, we saw the exigent letter situation – where a good-faith decision to co-locate telephone company employees with FBI agents and analysts to ensure rapid receipt of telephone records when responding to terrorist threats, led to an extremely negative OIG report because we did not follow that action with adequate internal controls – as emblematic of the need to systematically and carefully assess compliance risks, particularly in the national security arena.  That realization has led to the formation of the Office of Integrity and Compliance, whose mission is to ensure that there are processes and procedures in place that facilitate FBI compliance with both the letter and spirit of all applicable laws, regulations, rules, and policies, as well as to assist FBI management at all levels in maintaining a culture where ethics and compliance are emphasized as paramount considerations in all decision making.  We think that program is a positive step and should help prevent future situations like the one encountered with exigent letters.

The OIG makes 13 recommendations in its 2010 report, most of which have already been satisfied.  The FBI is working on the few recommendations that have not been fully satisfied to date.

- 2 -

**Exigent Letters**

In 2007, the OIG found that one unit at FBI Headquarters had issued over 700 exigent letters requesting toll billing records for various telephone numbers. All of the letters stated that there were exigent circumstances but did not describe the exigency. In fact, sometimes there was no emergency. Although ECPA's emergency disclosure provision found at 18 U.S.C. § 2702(c)(4) (discussed in more detail below) does not require the FBI to provide any legal process to obtain records voluntarily from a telephone company in order to respond to a qualifying emergency, many of the letters stated that federal grand jury subpoenas had been requested for the records. In fact, no such request for grand jury subpoenas had been made, and no one intended that such a request would be made. Similarly, other exigent letters promised NSLs, which – though also legally unnecessary if there is a qualifying emergency -- the agents and analysts, in fact, intended would be sent. Unfortunately, the FBI did not keep adequate records reflecting the nature of the emergencies, the telephone numbers for which records were sought, and whether the promised future process – whether legally required or not – was ever actually issued.

It should be emphasized, however, that exigent letters were not – and were never intended to be – NSLs. Rather, they appear to have been a sort of "place-holder," borne out of a misunderstanding of the import of the USA Patriot Act's amendments to ECPA. For reasons lost in the fog of history – but no doubt partially the result of the intense pace of activity in the months following the 9/11 attacks – the FBI did not adequately educate our workforce that Congress had provided a clear mechanism to obtain records in emergency situations. Although

- 3 -

guidance was eventually provided in August 2005, the employees who had been using exigent letters for several years simply did not recognize the applicability of that guidance to their situation.

In its most recent report on the issue, the OIG confirmed what the FBI acknowledged to Congress and the public in 2007: exigent letters were sometimes used when there was no emergency and the FBI had inadequate internal controls to ensure that the promised legal process was provided. The 2010 report confirmed that these practices resulted in the FBI requesting telephone toll billing records associated with approximately 4,400 telephone numbers between 2003 and 2006.

In response to the OIG's 2007 report, in March 2007 the FBI formally barred the use of exigent letters to obtain telephone records and established detailed policies for obtaining toll billing records during an emergency situation. Since that time, employees who need to obtain ECPA-protected records on an emergency basis must do so in accordance with 18 U.S.C. § 2702. Section 2702(c)(4) permits a carrier to provide information regarding its customers to the government "if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency." In addition to providing guidance on Section 2702 itself, we established approval and documentation requirements for requests made under this provision.

- 4 -

As promised by Director Mueller and me in our testimony following the OIG's first report and by me in repeated briefings of Congressional staff, beginning in 2007, the FBI commenced an effort to ensure that we retained *only* exigent letter-related telephone records for which we had a lawful basis. To that end, we dedicated significant resources to researching all of the numbers that appeared on known exigent letters and on the so-called "blanket NSLs" (discussed in more detail below). The reconciliation project team conducted a complete review, even though the disclosure of approximately half of the records at issue was not forbidden by ECPA and/or was connected to a clear emergency situation. The reconciliation project team used a conservative approach: they initially retained records for which already-existing legal process (usually an NSL or grand jury subpoena) was located. If no legal process was found, then new "corrective" NSLs were issued where ECPA allowed us to do so (*i.e.*, the national security investigation to which the telephone records were relevant was still pending). In fact, we located or issued legal process for the overwhelming majority of the 4,400 telephone numbers. If we found no previously existing legal process and we could not legally issue new process (*e.g.*, the case to which the records were relevant had since been closed), we would only then consider whether emergency circumstances existed at the time we requested the records. As to that group of telephone numbers, if we could not conclude that there had, in fact, been an emergency that would have qualified under section 2702, we purged the telephone records from our files and databases. These actions were fully briefed to the FBI's Congressional oversight committees last year, and we appreciate the finding of the OIG that our "approach to determine which records to retain and which to purge was reasonable" (Report at 276).

- 5 -

We are currently developing an automated system – similar in concept to the NSL system that we have briefed and demonstrated to your staffs – to generate and document emergency disclosure requests pursuant to Section 2702.  Our experience with the NSL system is that it has greatly reduced non-substantive errors in NSLs, and we believe that an automated Section 2702 system would do the same.

I would now like to address a few specific matters raised by the OIG's 2010 report.

**Blanket NSLs**

The OIG's 2010 report discusses in detail 11 so-called "blanket NSLs."  These blanket NSLs were not discussed with an FBI attorney prior to their preparation nor reviewed by an FBI attorney prior to their issuance.  We continue to believe – as we briefed this Committee in 2007 – that the blanket NSLs were a good-faith but ill-conceived attempt by the Counterterrorism Division to address the backlog of numbers for which the FBI believed it had unfulfilled obligations to provide legal process as they had promised through exigent letters.  The common problem with all of the blanket NSLs was that there was no electronic communication (EC) prepared describing how the information sought by the NSL was relevant to a national security investigation.  Under FBI policy, such ECs are required for all NSLs.  Because there was no EC, there was no documentation that connected the telephone numbers listed on the blanket NSLs to specific, pending  national security investigations.  As discussed above, following the 2007 report, the FBI examined each telephone number included on a blanket NSLs to determine

- 6 -

whether there was a legal basis to retain any records obtained for the number. If we could not confirm a legal basis for retention, we purged any records we had for the number.

As noted, none of the blanket NSLs was reviewed by an FBI attorney. In March 2007, the FBI changed its policy to require attorney approval before an NSL may be issued. That policy requirement is enforced through the NSL system that automatically routes all NSLs though an attorney prior to issuance.

**Other Informal Requests**

In addition to exigent letters and blanket NSLs, the 2010 report discusses other informal means by which the FBI Headquarters unit obtained information regarding telephone numbers. "Quick peeks" and "sneak peeks" are the terms used in the report to describe an FBI employee asking a telephone company employee to determine *whether* records for a telephone number existed, not what those records actually contained.

In a similar type of request, FBI employees would ask whether there was "calling activity" associated with a particular number (*i.e.*, whether the particular telephone number was being used). Such information was conveyed to the FBI for 39 telephone numbers.[1]

---

[1] The 2010 report states that such information was obtained for 42 telephone numbers (Report at 84). In fact, there were three duplicated numbers in the OIG's list of 42.

- 7 -

As the OIG noted, the mere existence of records or the fact that there is calling activity associated with a particular telephone number is protected by ECPA. Accordingly, we made clear in March 2007 that no telephone records may be acquired in advance of legal process, unless there is an emergency situation under Section 2702 and the emergency request procedures are followed. In addition, our Domestic Investigation Operational Guidelines (DIOG), which compiled all FBI operational policy into one document, provides an exclusive list of acceptable methods for obtaining telephone toll records.

**Reporter Records**

The OIG's 2010 report describes three situations in which the FBI might have come into contact with protected telephone toll information of reporters. In fact, in only one case were any reporter's toll records actually provided to the FBI, and that occurred over five years ago. In that one instance, neither the substantive case agent nor any member of the investigative or prosecutorial team was aware that records had been obtained, and the FBI made no use of them. Furthermore, the only FBI employees who ever accessed the records were the analyst who initially uploaded them to our telephone records databases and an analyst involved in the exigent letter reconciliation project described above. When we learned in 2008 that we had such records, we purged them from our telephone records databases.

Although we did not use the records, Department of Justice (DOJ) regulations require Attorney General approval before the issuance of grand jury subpoenas seeking toll billing records of

- 8 -

members of the media. While no grand jury subpoena was issued in this instance, such legal

process would have been the appropriate way, if at all, to obtain the records at issue given the

nature of the investigation. Accordingly, when we learned that we had reporters' toll records

without advance Attorney General approval, we notified the reporters that their toll records had

been obtained, and the Director personally called the editors of the newspapers to apologize.

Although this appears to have been an isolated incident, we issued guidance in 2008 making

clear the requirements for obtaining toll records of members of the media. The DIOG similarly

discusses the steps required to seek such records.

**FISA**

The OIG's 2010 report examined a non-random sample of 37 applications that had been

submitted to the Foreign Intelligence Surveillance Court (FISA Court). In that sample, which

was selected by the OIG because the applications referenced telephone numbers that appeared on

an exigent letter or on a blanket NSL, there were 5 misstatements related to telephone records

that had some connection to exigent letters. There is no evidence that anyone intended to

provide inaccurate information to the Court. Moreover, as the OIG and DOJ National Security

Division (NSD) found, the substantive information provided in the application was entirely

accurate; the misstatements pertained only to *how* the FBI obtained the information. NSD

determined, and the OIG agreed, that the misstatements were non-material (meaning they did not

affect the probable cause determination made by the FISA Court), but nonetheless NSD notified

- 9 -

the FISA Court of the misstatements. Since the time those FISA applications were prepared, the

FBI has made significant changes to its FISA accuracy procedures to catch errors like these.

Those procedures, which were substantially revised beginning in February 2006 independently

of either the 2007 or 2010 OIG reports, have proven effective in reducing the rate and

significance of errors in FISA applications.

**OLC Opinion**

The OIG's 2010 report discusses a January 8, 2010 opinion issued by the Department of Justice's

Office of Legal Counsel (OLC), which concluded that ECPA does not forbid electronic

communications service providers, in certain circumstances, from disclosing certain call detail

records to the FBI on a voluntary basis without legal process or a qualifying emergency under

Section 2702. Many members of Congress have asked questions about this OLC opinion, which

is classified. It is my understanding that this opinion has been shared with our oversight

committees, including this Committee, at the appropriate security level. Because of the

classified nature of the OLC opinion, I cannot address it in this forum, but am available to

discuss it in a secure setting. I can, however, state that the OLC opinion did not in any way

factor into the FBI's flawed practice of using exigent letters between 2003 and 2006 nor did it

affect in any way the records-retention decisions made by the FBI as part of the reconciliation

project discussed above.

- 10 -

**Accountability**

The 2010 report notes that the OIG provided its findings to the Department of Justice's Public Integrity Section. The Public Integrity Section declined prosecution of any individuals relating to the exigent letters matter. Now that the OIG's report is complete, the FBI's Office of Professional Responsibility will have an opportunity to review the OIG's findings and determine whether any discipline of any employee is appropriate.

**Conclusion**

Finally, the FBI appreciates the 2010 report's recognition that FBI employees involved in this matter were attempting to advance legitimate FBI investigations, and that FBI personnel "typically requested the telephone records to pursue [their] critical counterterrorism mission" (Report at 214). This does not excuse our failure to have in place appropriate internal controls, but it places the practices of that one FBI Headquarters unit in context: "some of the exigent letters and other improper practices [described] in this report were used to obtain telephone records that the FBI used to evaluate some of the most serious terrorist threats posed to the United States in the last few years" (Report at 281). These employees were and many remain on the front lines of our fight against terrorists.

At the same time, as Director Mueller has repeatedly acknowledged, we can only achieve our mission of keeping the country safe if we are trusted by all segments of the American public. As

- 11 -

the events of the last several months demonstrate, the risk of a catastrophic attack from home-grown and foreign-based terrorists continues. Our single best defense against such an attack is the eyes and ears of all Americans -- but particularly of those segments of the population in which the risk of radicalization is at its highest. We need those communities to call us when they hear or see something that seems amiss. We know that we reduce the probability of that call immeasurably if we lose the confidence of those we are responsible for protecting.

Since the OIG's 2007 report, the FBI has endeavored to be more proactive in the areas described above and others: to assure all Americans that we respect individual rights, including privacy rights, and that we use the tools that have been provided to us consistent with the rules set out by Congress.

I appreciate the opportunity to appear before the Committee and look forward to answering your questions.

Thank you.

- 12 -

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **ELECTRONIC FRONTIER FOUNDATION,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Civil Case No. 11-939 (RJL)** |
| **DEPARTMENT OF JUSTICE.** | ) ) | |
| **Defendant.** | ) ) ) | |

## MEMORANDUM OPINION
(September 2*l*, 2012) [#11, #14]

Plaintiff Electronic Frontier Foundation ("EFF" or "plaintiff") brings this action

against the U.S. Department of Justice ("the Department", "DOJ" or "defendant") for

failure to disclose information pursuant to the Freedom of Information Act ("FOIA").

Plaintiff seeks material from DOJ's Office of Legal Counsel ("OLC") that interprets the

scope of certain areas of the Federal Bureau of Investigation's ("FBI") authority under

federal surveillance law.  Before the Court are the parties' cross-motions for summary

judgment.   Upon consideration of the parties' pleadings, relevant law, and the entire

record herein, the defendant's motion is GRANTED and the plaintiff's cross-motion is

DENIED.

### BACKGROUND

Plaintiff is a non-profit organization concerned with technology-related civil

1

liberty issues.  Compl. ¶ 3, ECF No. 1.  In February 2011, plaintiff submitted a FOIA

request for a January 8, 2010 memorandum prepared by OLC (hereinafter, "OLC

Opinion") for the FBI.  *Id.* ¶ 9.  The requested OLC Opinion was generated in the context

of an internal executive branch examination of some of the FBI's information-gathering

techniques.  *Id.* ¶¶ 5-6.  More specifically, pursuant to the reauthorization of the USA

PATRIOT Act, DOJ's Office of the Inspector General ("OIG") examined the FBI's

practice of requesting and receiving telephone records from major companies by using

secret administrative subpoenas known as National Security Letters ("NSLs").  *Id.*  The

OIG found that the FBI was sometimes requesting immediate disclosure of telephone

records using exigent letters, rather than or prior to providing NSL subpoenas, and

subsequently initiated a study of the FBI's use of these exigent letters to obtain

telecommunications records.  *Id.* ¶ 5.

      While the OIG study was still in progress, the FBI sought OLC's legal advice on

whether, in national security investigations, the FBI's obtainment of certain types of

telephone records without the use of NSLs or any other process complied with the law.

*Id.* ¶ 6.  On January 8, 2010, OLC provided the FBI with a memorandum of its legal

analysis and advice.  *Id.*  Pursuant to the FOIA, plaintiff requested a copy of the OLC

Opinion on February 15, 2011.  *Id.* ¶ 9.  Ten days later, on February 25, 2011, OLC

denied plaintiff's FOIA request, explaining that the OLC Opinion was being withheld

under FOIA Exemptions 1 and 5.  *Id.* ¶ 10.  Plaintiff formally appealed OLC's decision to

DOJ's Office of Information Policy ("OIP") on March 18, 2011, but received no

response.  *Id.* ¶¶ 11-13.

Two months later, on May 19, 2011, plaintiff filed a complaint in this Court, seeking an order to compel disclosure of the OLC Opinion. *See generally id.* On November 10, 2011, the Department moved for summary judgment, contending that the OLC Opinion was justifiably withheld under FOIA Exemptions 1 and 5. Def.'s Mot. for Summ. J. ("Def.'s Mot.") at 1, ECF No. 11. The Department supported its motion with two affidavits, one from the FBI Section Chief responsible for FOIA requests and the other from OLC Special Counsel. *See* Corrected Decl. of David M. Hardy ("Hardy Decl."), ECF No. 12-1; Decl. of Paul P. Colborn ("Colborn Decl."), ECF No. 11-4. On December 13, 2011, plaintiff also moved for summary judgment, asserting that the DOJ is not entitled to summary judgment because it failed to carry its burden to withhold the OLC Opinion under Exemptions 1 and 5. Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. and in Supp. of Pl.'s Cross-Mot. for Summ. J. ("Pl.'s Mem.") at 11-12, ECF No. 14. For the reasons set forth below, I disagree and GRANT summary judgment in favor of the defendant.

## ANALYSIS

Both parties have moved for summary judgment in this case. FOIA cases are "typically and appropriately" decided on motions for summary judgment. *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009). "When assessing a motion for summary judgment under FOIA, the Court shall determine the matter *de novo*." *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 598 F. Supp. 2d 93, 95 (D.D.C. 2009) (citing 5 U.S.C. § 552(a)(4)(B)).

Summary judgment is appropriate when the record demonstrates that there is no

genuine issue of material fact in dispute and that the moving party is entitled to judgment

as a matter of law.  Fed. R. Civ. P. 56(a).  With respect to an agency's non-disclosure

decisions in a FOIA action, the court may rely on affidavits or declarations if they

describe "the justifications for nondisclosure with reasonably specific detail, demonstrate

that the information withheld logically falls within the claimed exemption, and are not

controverted by either contrary evidence in the record nor by evidence of agency bad

faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *see also*

*SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (affidavits and

declarations are "accorded a presumption of good faith, which cannot be rebutted by

purely speculative claims about the existence and discoverability of other documents")

(internal citation and quotation marks omitted).

　　"Ultimately, an agency's justification for invoking a FOIA exemption is sufficient

if it appears 'logical' or 'plausible.'" *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C.

Cir. 2009) (quoting *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007)).  In assessing

the logic and plausibility of an agency assertion of an exemption, "reviewing courts

[should] respect the expertise of an agency" and avoid "overstep[ping] the proper limits

of the judicial role in FOIA review." *Hayden v. NSA*, 608 F.2d 1381, 1388 (D.C. Cir.

1979); *see also Military Audit Project*, 656 F.2d at 753; *Halperin v. CIA*, 629 F.2d 144,

148 & n.20 (D.C. Cir. 1980).  For the following reasons, the Court finds there are no

genuine issues of material fact as to the validity of each exemption invoked in this case.

## I.　　Exemption 1

　　Information can be withheld under Exemption 1 if it is "specifically authorized

4

under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and [is] in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). The Department asserts that the withheld information contained within the OLC Opinion was properly classified pursuant to Executive Order ("E.O.") 13526, 75 Fed. Reg. 707 (Dec. 29, 2009), which exempts from disclosure information pertaining to "intelligence activities" and "intelligence sources or methods" that, if disclosed, could be expected to cause damage to the national security. E.O. 13526, §§ 1.2, 1.4(c).

To show that it has properly withheld information under E.O. 13526, and that the classification is proper, DOJ must demonstrate that the withheld information falls within the substantive scope of E.O. 13526, and that the information was classified using the proper procedures.[1] Under section 1.1(a) of E.O. 13526, information can be properly classified if it (1) is classified by an original classification authority; (2) is owned, produced, or controlled by the U.S. government; (3) pertains to "intelligence activities

---

[1] *See King v. DOJ*, 830 F.2d 210, 214 (D.C. Cir. 1987); *Halperin v. Dep't of State*, 565 F.2d 699, 703 (D.C. Cir. 1977); Hardy Decl. ¶ 7. These proper procedures include: (1) the document was marked as required and stamped with the proper classification designation, E.O. 13526, §§ 1.6(a)(1)-(5); (2) the document was marked to indicate clearly which portions are classified, which portions are exempt from declassification as set forth in E.O. 13526, § 1.6(c), and which portions are unclassified, E.O. 13526, § 1.6(c); (3) the prohibition and limitations on classification specified in E.O. 13526, § 1.7(a) were adhered to; (4) the declassification policies set forth in E.O. 13526, §§ 3.1 ("Authority for Declassification") and 3.3 ("Automatic Declassification") were followed; and (5) any reasonably segregable portions of this classified document which did not meet the standards for classification under E.O. 13526 were declassified and marked for release, unless withholding was otherwise warranted under applicable law, 5 U.S.C. § 552(b). *See* Hardy Decl. ¶ 10. The Hardy declaration explains that all of the procedural requirements of E.O. 13526 were followed in this case. *Id.*

5

(including covert action), intelligence sources or methods, or cryptology", among other protected categories, and (4) "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in [a specified level of] damage to the national security, . . . and the original classification authority is able to identify or describe the damage." E.O. 13526, §§ 1.1(a), 1.4(c); *see also* Hardy Decl. ¶ 8.

Here, DOJ withheld from the plaintiff specific portions of the OLC Opinion that contained highly specific, classified information relating to FBI intelligence sources or methods. *See* Hardy Decl. ¶¶ 12, 16, 17. The eleven-page OLC Opinion was written in response to a specific request from the FBI for legal analysis and advice regarding the OIG's then ongoing evaluation of the FBI's information-gathering techniques in national security investigations. *Id.* ¶ 11. To support its actions in this case, the Department submitted two declarations, one from David M. Hardy, Section Chief of FBI's Records Management Division, and another from Paul P. Colborn, OLC Special Counsel. *See generally id.*; Colborn Decl. Based on these detailed declarations, I find that the specified portions of the OLC Opinion were appropriately withheld by DOJ under Exemption 1.

First, the Department's declarations demonstrate that the classification markings in the OLC Opinion, which were ultimately withheld, were properly made pursuant to the mandated procedures of E.O. 13526. More specifically, the Hardy and Colborn declarations explain that the FBI, in making its request for legal advice to OLC, sent two letters to the agency that included classified factual information regarding "certain

6

sensitive techniques used in the context of national security and law enforcement investigations."[2]  Colborn Decl. ¶¶ 9-11; Hardy Decl. ¶ 4.  Utilizing such classified factual information to render its guidance, OLC followed its standard practice and marked as classified "[t]hose portions of the [OLC] Opinion which reflect classified factual information provided to OLC by the FBI."  Colborn Decl. ¶ 11.  Accordingly, in determining whether each classification marking contained in the OLC Opinion is proper, Hardy, who holds original classification authority pursuant to E.O. 13526,[3] also carefully reviewed each of the classification markings contained in the two FBI letters.  Hardy Decl. ¶¶ 4, 18, 21.  The Hardy declaration makes clear that, in accordance with E.O. 13526, all withheld information in the OLC Opinion was appropriately classified at the "SECRET/NOFORN" ("S/NF") level by the FBI, was under the control of the U.S. government, and continues to warrant classification at the "S/NF" level in the interest of national security.[4]  *Id.* ¶¶ 5, 9, 12, 19, 21.

In addition, through the assertions in its declarations, the DOJ demonstrates that

---

[2] The first letter, a November 27, 2009 opinion request, was from FBI's General Counsel, Valerie Caproni, to OLC's Acting Assistant Attorney General, David Barron.  Hardy Decl. ¶ 4.  Supplementing the previous letter with additional facts and an expanded request for legal advice, the second letter, dated December 11, 2009, was again from Caproni to Barron.  *Id.*  The DOJ declarations confirm that a number of the individual paragraphs in these two letters were marked as classified by the FBI at the "SECRET/NOFORN" ("S/NF") level, which restricts access to persons who need to know with an appropriate security clearance.  *See id.*; Colborn Decl. ¶ 10.

[3] More specifically, Hardy has been designated by the Attorney General of the United States as an original classification authority pursuant to E.O. 13526, §§ 1.3 and 3.1.  Hardy Decl. ¶ 2.

[4] The only reclassification ordered by Hardy after his "careful classification review" of the OLC Opinion was the re-designation from "UNCLASSIFIED" ("U") to "S/NF" of *one footnote.*  Hardy Decl. ¶ 21.

the withheld portions of the OLC Opinion were properly classified under section 1.4(c) as intelligence activities, sources or methods and that disclosure of such information could reasonably be expected to cause damage to national security. More specifically, Hardy avers in his declaration that the classified information contained in the OLC Opinion concerns: (1) "actual intelligence activities, sources or methods used by the FBI against targets of foreign counterintelligence and counterterrorism investigations or operations"; and (2) "intelligence-gathering capabilities used by the FBI to gather specific information on targets of national security investigations." Hardy Decl. ¶¶ 14-15. Explaining that such information is "highly specific," "known to very few individuals," and "still used by the FBI today to gather intelligence information," *id.* ¶ 16, Hardy asserts that the disclosure of such information could reasonably be expected to cause "serious damage to national security" by, among other things, "allow[ing] hostile entities to discover the current methods and activities used" and "appraise the scope, focus, location, and capabilities of the FBI's intelligence-gathering methods and activities." *Id.* ¶¶ 12, 16-17. In addition to causing a major disruption to FBI's intelligence-gathering capabilities, this would also "severely damage the FBI's efforts to detect and apprehend violators of the United States' national security and criminal laws." *Id.* ¶ 16. Moreover, Hardy explains that disclosure also could "allow hostile agents to devise countermeasures to circumvent these intelligence activities or methods," such as the "alteration of behavior to evade detection" or the "utiliz[ation] [of] these same methods and activities to engage in disinformation," thus rendering the FBI's methods and activities "useless in providing intelligence information." *Id.* ¶¶ 16-17.

8

"[C]ourts must 'recognize that the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of public disclosure of a particular classified record.'" *Salisbury v. United States*, 690 F.2d 966, 970 (D.C. Cir. 1982) (quoting S. Rep. No. 93-1200, at 12 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6267, 6290).   Thus, while this Court's review is *de novo*, our Circuit has consistently emphasized its deferential posture to the executive in FOIA cases involving national security concerns, as judges "lack the expertise necessary to second-guess such agency opinions in the typical national security FOIA case." *Halperin*, 629 F.2d at 148; *see also Larson*, 565 F.3d at 865; *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 928 (D.C. Cir. 2003).   Accordingly, this Court should not "conduct a more detailed inquiry to test the [DOJ's] judgment and expertise or to evaluate whether the court agrees with the [DOJ's] opinions" if the agency's statements in support of exemption "contain reasonable specificity of detail as to demonstrate that the withheld information logically falls within the claimed exemption and evidence in the record does not suggest otherwise." *Larson*, 565 F.3d at 865; *see also Hodge v. FBI*, 764 F. Supp. 2d 134, 138 (D.D.C. 2011).   "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Larson*, 565 F.3d at 862 (internal citations and quotation marks omitted); *Wolf v. CIA*, 357 F. Supp. 2d 112, 116 (D.D.C. 2004), *rev'd on other grounds*, 473 F.3d 370 (D.C. Cir. 2007) ("In reviewing a classification decision . . . this Circuit has required little more than a showing that the agency's rationale is logical.").

Conferring substantial weight and deference to the DOJ's declarations, I find that

9

the Department has explained with sufficient detail why the withheld information in the OLC Opinion qualifies as "intelligence sources or methods" and adequately described the potential harm to national security that could result from the information's public disclosure. The Department has thus met its burden for invoking FOIA Exemption 1 by demonstrating that the information requested by plaintiff in the OLC Opinion is properly classified according to the criteria established by E.O. 13526.

Plaintiff's arguments to the contrary are unpersuasive. First, plaintiff argues that the DOJ failed to provide a detailed justification of its withholdings, tied to the particular part of the OLC Opinion to which it applied, and thus failed to sustain its burden regarding FOIA Exemption 1 on summary judgment.[5] *See* Pl.'s Mem. at 14-15. The law of our Circuit has made clear, however, that an agency satisfies its burden provided that the agency's submissions[6] set forth a "relatively detailed justification for invoking an exemption to disclosure; specifically identify the reasons why a particular exemption is relevant; and correlate those claims with those records (or portions thereof) to which they apply." *Schoenman v. FBI*, 763 F. Supp. 2d 173, 188 (D.D.C. 2011) (quoting *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 145 (D.C. Cir. 2006)) (internal quotation marks omitted).

---

[5] More specifically, plaintiff takes issue with DOJ's application of Exemption 1, in the aggregate, to pages 1 to 2 and 4 to 11 of the OLC Opinion, without specifying "that [certain] words, lines, or paragraphs in the document are classified." Pl.'s Mem. at 14.
[6] Although a *Vaughn* index is generally required in FOIA cases, our Circuit has made clear that supporting affidavits may be submitted in lieu of a *Vaughn* index, as "it is the function, not the form, of the index that is important." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006); *Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 349 (D.C. Cir. 1987).

Here, the Department has made clear, via its declarations, that it is asserting

Exemption 1 only as to certain paragraphs of the OLC Opinion which have been marked

as classified in accordance with the classification markings included in the FBI's two

letters to OLC requesting legal advice. *See* Hardy Decl. ¶¶ 4-5, 12, 20-21; Colborn Decl.

¶¶ 10-11. Having conveyed enough information for the plaintiff and the Court "to

identify the records referenced and understand the basic reasoning behind the claimed

exemptions," *Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007), the Department's

submitted declarations are sufficiently specific to satisfy its burden without going so far

as to disclose protected information. *See Judicial Watch*, 449 F.3d at 147 ("We have

never required repetitive, detailed explanations for each piece of withheld information.").

As such, this Court declines plaintiff's invitation to review the records at issue *in camera*.

*See* Pl.'s Reply Mem. in Supp. of Pl.'s Cross-Mot. for Summ. J. ("Pl.'s Reply") at 5, ECF

No. 20; *Hayden*, 608 F.2d at 1387 (in FOIA cases, *in camera* review is a "last resort to be

used only when the affidavits are insufficient for a responsible [d]e novo decision")

(internal citation and quotation marks omitted).

Second, plaintiff alleges that DOJ has failed to demonstrate a "logical connection"

between the withheld information, which it characterizes as "ten pages of legal analysis,"

and the claimed exemption, namely the disclosure of intelligence activities, sources, or

methods. Pl.'s Mem. at 15-16. The Department's submissions elucidate, however, that

information withheld from the OLC Opinion under Exemption 1 reflects classified

factual information provided to OLC by the FBI that, if disclosed, could cause damage to

national security, and any portion of the OLC Opinion that contains only legal analysis,

11

divorced from classified factual information, has been withheld under Exemption 5, not

Exemption 1.[7]   Plaintiff's argument is thus misplaced.

Last, plaintiff accuses the Department of improperly classifying some of the

material to avoid embarrassment or conceal law-breaking.  *See* Pl.'s Mem. at 16-17.  The

plaintiff however has no evidence to support its bald allegation of government

misconduct.  Without any evidence suggesting bad faith on behalf of the defendant, I

conclude that this information was properly withheld under Exemption 1.  *See Gov't*

*Accountability Project v. U.S. Dep't of State*, 699 F. Supp. 2d 97, 102 (D.D.C. 2010).

## II.    FOIA Exemption 5

FOIA Exemption 5 protects from disclosure inter-agency or intra-agency letters or

memoranda "which would not be available by law to a party . . . in litigation with the

agency." 5 U.S.C. § 552(b)(5).   To qualify for this exemption, a document "must fall

within the ambit of a privilege against discovery under judicial standards that would

govern litigation against the agency that holds it."  *Dep't of the Interior v. Klamath Water*

*Users Protective Ass'n*, 532 U.S. 1, 8 (2001).  Courts have incorporated civil discovery

privileges into this exemption, such as attorney work-product, attorney-client privilege,

and "deliberative process" privilege.  *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132,

148-49 (1975); *Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 862 (D.C. Cir. 1980).

Here, the defendant asserts both the deliberative process privilege and the attorney-client

---

[7] *See* Colborn Decl. ¶ 11 ("Those portions of the [OLC] Opinion which reflect classified factual information provided to OLC by the FBI are marked classified.  Those portions of the [OLC] Opinion that are marked unclassified reflect other confidential factual as well as confidential legal communications provided by the FBI to OLC for the purpose of obtaining legal advice.").

privilege to withhold the entirety of the OLC Opinion.  Def.'s Mem. in Supp. of Mot. for

Summ. J. ("Def.'s Mem.") at 1, ECF No. 11-2.  For the following reasons, I agree.

### A. Deliberative Process Privilege

The deliberative process privilege exempts from disclosure those documents that

contain deliberations comprising part of a process by which governmental decisions and

policies are made.  *Klamath Water Users*, 532 U.S. at 8.  Accordingly, government

materials that are both "predecisional" and "deliberative" are shielded by the privilege.

*Tax Analysts v. IRS*, 117 F.3d 607, 616 (D.C. Cir. 1997); *see also Vaughn v. Rosen*, 523

F.2d 1136, 1143-44 (D.C. Cir. 1975) (noting that a document is "deliberative" if it

"makes recommendations or expresses opinions on legal or policy matters"); *Petroleum

Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (citing

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975)) ("A

document is predecisional if it was prepared in order to assist an agency decision-maker

in arriving at his decision, rather than to support a decision already made.") (internal

quotation marks omitted).  "[T]he ultimate purpose of this long-recognized [deliberative

process] privilege is to prevent injury to the quality of agency decisions" as well as to

encourage "the frank discussion of legal and policy issues" by ensuring that agencies are

not "forced to operate in a fishbowl."  *Sears,* 421 U.S. at 151; *Mapother v. DOJ*, 3 F.3d

1533, 1537 (D.C. Cir. 1993); *Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768,

773 (D.C. Cir. 1988) (en banc).

In this case, the Department withholds the entirety of the eleven-page OLC

Opinion under the deliberative process privilege because "it constitutes advice used by

decision-makers at the FBI and by other Executive Branch agencies and Department components in the context of their efforts to ensure that any [FBI] information-gathering procedures comply fully with the law."  Colborn Decl. ¶ 13.  In his declaration, Colborn explains that the OLC Opinion was sought by the FBI in connection with the agency's "re-evaluation" of its use of sensitive techniques in national security and law enforcement investigations, in response to questions raised about such techniques by the OIG.  *Id.*  In evaluating how it should respond to OIG's draft report on the issue, the FBI thus sought OLC's guidance regarding "the proper interpretation of the law with respect to information-gathering procedures employed by the FBI and other Executive Branch agencies."[8]  *Id.* ¶ 14.  Disclosure of the OLC Opinion, Colborn asserts, "would undermine the deliberative processes of the government and chill the candid and frank communications necessary for effective governmental decision-making."  *Id.* ¶ 13.

It is apparent that the OLC Opinion is both predecisional and deliberative in nature, and thus subject to the deliberative process privilege.  The OLC Opinion as described in the Department's declarations contains inter-agency material that was generated as part of a continuous process of agency decision-making, namely how to respond to the OIG's critique of the FBI's information-gathering methods in certain investigations.  The declarations explain that the OLC prepared the memorandum at issue, which expresses legal opinions and makes recommendations based thereon, to

---

[8] FBI's request to OLC for legal guidance fits squarely within the OLC's principal function: to assist the Attorney General in his role as legal advisor to the President of the United States and to departments and agencies of the Executive branch.  Colborn Decl. ¶ 2.  In this role, the OLC *"provides advice and prepares opinions addressing a wide range of legal questions involving the operations of the Executive Branch."  Id.*

14

assist the FBI in arriving at its policy decision.[9]  The law of our Circuit is clear that under

such circumstances, the OLC Opinion is appropriately exempt from disclosure pursuant

to Exemption 5.[10]  Indeed, it is not hard to imagine how disclosure of the OLC Opinion

would likely interfere with the candor necessary for open discussions on the FBI's

preferred course of action regarding the OIG evaluation.  *See* Colborn Decl. ¶ 4.

Accordingly, I uphold the DOJ's classification of the OLC Opinion as subject to

the deliberative process privilege and therefore exempt from disclosure under Exemption

5.  Because all of the information withheld pursuant to the attorney-client privilege was

---

[9] Although plaintiff may dispute the DOJ's chronology of events, Pl.'s Mem. at 21-27, agency affidavits are accorded a presumption of good faith.  *See SafeCard Servs.*, 926 F.2d at 1200.

[10] *See, e.g., Grumman*, 421 U.S. at 188 ("By including inter-agency memoranda in Exemption 5, Congress plainly intended to permit one agency possessing decisional authority to obtain written recommendations and advice from a separate agency not possessing such decisional authority without requiring that the advice be any more disclosable than similar advice received from within the agency."); *Brinton v. Dep't of State*, 636 F.2d 600, 604 (D.C. Cir. 1980) ("There can be no doubt that . . . legal advice, given in the form of intra-agency memoranda prior to any agency decision on the issues involved, fits exactly within the deliberative process  rationale . . ."); *Coastal States*, 617 F.2d at 868 ("series of memoranda to the Assistant Secretary of the Army from the General Counsel . . . recommending legal strategy" is a "classic case of the deliberative process at work"); *Citizens for Responsibility & Ethics in Wash. v. Office of Admin.*, 249 F.R.D. 1, 5-7 (D.D.C. 2008) (OLC memorandum fits within the scope of deliberative process privilege because it "contains legal advice from the equivalent of [the Office of Administration's] outside counsel", "does not mandate a particular policy", and "can[not] rightly be described as itself a statement of the Executive Branch's legal position"); *Elec. Privacy Info. Ctr. v. DOJ*, 584 F. Supp. 2d 65, 75 (D.D.C. 2008) ("If OLC provides legal advice as part of a decision-making process, this legal advice is protected under the deliberative process privilege."); *Southam News v. INS*, 674 F. Supp. 881, 886 (D.D.C. 1987) (concluding that OLC opinion letters "generated in the course of formulating policies and positions that were being considered" falls within the deliberative process privilege); *Morrison v. DOJ*, No. 87-3394, 1988 WL 47662, at *1-2 (D.D.C. Apr. 29, 1988) (finding that an OLC legal opinion analyzing the constitutionality of a proposed *amendment was exempt from disclosure under the deliberative process privilege).

15

also withheld pursuant to the deliberative process privilege, I do not need to consider the propriety of the defendant's application of the attorney-client privilege.

### B. Segregability

Finally, with regard to segregability, it is well established that an agency claiming that a document is exempt under FOIA must, after excising the exempted information, release any reasonably segregable information unless the non-exempt information is inextricably intertwined with the exempt information. *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1026-27 (D.C. Cir. 1999).

Here, the Department has sufficiently established that no portion of the OLC Opinion is reasonably segregable and releasable. The DOJ's declarations explicate that, although only portions of the OLC Opinion were withheld under Exemption 1, the entirety of the OLC Opinion was withheld under Exemption 5, leaving nothing significant that could be disclosed in a redacted format. *See* Hardy Decl. ¶ 5; Colborn Decl. ¶ 11. As the Colborn declaration adequately states, the unclassified portions of the OLC Opinion could not be released without "harm[ing] the deliberative processes of the government" by "chill[ing] the candid and frank communications necessary for effective governmental decision-making." Colborn Decl. ¶¶ 13, 15. In the absence of contrary evidence or specific cites to potentially unsegregated portions, the declarations are afforded the presumption of good faith. *See SafeCard Servs.*, 926 F.2d at 1200. Therefore, I find that no portion of the OLC Opinion could be segregated and subsequently released.

**CONCLUSION**

For all of the foregoing reasons, the Court GRANTS the defendant's Motion for

Summary Judgment [Dkt. #11] and DENIES plaintiff's Cross-Motion for Summary

Judgment [Dkt. #14].  An Order consistent with this decision accompanies this

Memorandum Opinion.

RICHARD J. LEON
United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **ELECTRONIC FRONTIER FOUNDATION,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) ) | **Civil Case No. 11-939 (RJL)** |
| **DEPARTMENT OF JUSTICE.** | ) ) | |
| **Defendant.** | ) ) | |

## ORDER
(September 21, 2012)

For the reasons set forth in the Memorandum Opinion entered this date, it is this

21st day of September, 2012, hereby

**ORDERED** that defendant's Motion for Summary Judgment [Dkt. #11] is

**GRANTED**; it is further

**ORDERED** that plaintiff's Cross-Motion for Summary Judgment [Dkt. #14] is

**DENIED**.

**SO ORDERED**.

RICHARD J. LEON
United States District Judge